**Pages 1 – 131**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE**

| | |
|---|---|
| FORTINET, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | NO. C 13–5831 EMC |
| ) | |
| SOPHOS INC., ) | |
| ) | San Francisco, California |
| Defendant. ) | Monday |
| ) | December 15, 2014 |
| _____) | 9:49 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:          QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        50 California Street
                        22nd Floor
                        San Francisco, California  94111
                   BY:  JOHN M. NEUKOM, ESQ.
                        JORDAN JAFFE, ESQ.


Reported by:            BELLE BALL, CSR #8785, CRR, RDR
                        Official Reporter, U.S. District Court



(Appearances continued, next page)

APPEARANCES, CONTINUED:

For Defendant:          DLA PIPER LLP
                        2000 University Avenue
                        East Palo Alto, California  94303-2215
                   BY:  RYAN W. COBB, ESQ.
                        and
                        DLA PIPER LLP
                        401 B Street
                        Suite 1700
                        San Diego, California  92101-4297
                   BY:  SEAN CUNNINGHAM, ESQ.
                        KATHRYN RILEY GRASSO, ESQ.
                        and
                        DLA PIPER LLP
                        500 Eighth Street, N.W.
                        Washington, D.C.  20004
                   BY:  ANDREW N. STEIN, ESQ.
                        and
                        DLA PIPER LLP
                        401 Congress Avenue
                        Suite 2500
                        Austin, Texas  78701-3700
                   BY:  TODD PATTERSON, ESQ.


Also Present:           TODD NELSON, ESQ.

**MONDAY, DECEMBER 15, 2014**                              **9:49 A.M.**

### P R O C E E D I N G S

**THE CLERK:**  Calling Case C13-5381, Fortinet versus Sophos.

Counsel, please come to the podium and state your name for the Record.

**MR. NEWKOM:**  Good morning, Your Honor, may it please the Court.  John Newkom on behalf of Fortinet.

Also with me today is my colleague, Jordan Jaffe (Indicating), who at the pleasure of the Court will split argument with me today, and address some terms.

**THE COURT:**  All right.

**MR. NEWKOM:**  And also with us today is Todd Nelson, the Vice-president of Legal from Fortinet.

**THE COURT:**  Thank you.

**MR. NEWKOM:**  Thank you.

**MR. CUNNINGHAM:**  Good morning, Your Honor.  Sean Cunningham with DLA Piper for Defendant and Counterclaimant Sophos.

And I'm going to have a couple of other -- a few other people present argument to you.  And, I'll allow them to introduce themselves.

**THE COURT:**  All right.

**MS. GRASSO:**  Good morning, Your Honor.  Kathryn Riley Grasso.

**THE COURT:**  Thank you, Ms. Grasso.

**MR. STEIN:**  Good morning, Your Honor.  Andrew Stein.

**THE COURT:**  Good morning, Mr. Stein.

**MR. PATTERSON:**  Good morning, Your Honor; Todd Patterson.

**THE COURT:**  Thank you, Mr. Patterson.  All right.

Well, let's go through at least the order that I have them in; may or may not outline with yours.  I was going to start with the Fortinet patents, starting with the '430.

Is that all right?

**MR. CUNNINGHAM:**  Thank you, Your Honor.

**THE COURT:**  And "worker module" is the first term.

**MR. CUNNINGHAM:**  Your Honor, Mr. Stein will present our argument on that term.

**THE COURT:**  All right.  Let me ask -- I don't know if you need to start from square one.  There is an assertion by Fortinet that a single port could support both inbound and outbound net traffic.  And therefore, to try to impose a limitation of two data ports, among many other arguments, is off-point.

Is that a disputed scientific fact?  I mean, can a single data port support I/O traffic?

**MR. JAFFE:**  Well, I think that's a good place to start, Your Honor, in that the addition of the switch port and the data ports in the context of the '430 patent, those are

limitations that Sophos is seeking to add into the claim.  And one of the problems with adding those into the claim is that it's unclear exactly what those terms mean.

And so, Your Honor brings up the good point of:  What are the bounds of the data ports that Sophos was trying to import into the claim?

And I think it's a fair question to ask, which is to say: Do the data ports, are they able to be uni-directional or bi-directional in the idea of Sophos?  Whereas when you just look at the claim, none of those terms fall into the claim.

So, for Fortinet's position, to answer your question directly:  Data ports can be bi-directional or uni-directional.  It depends on the data port in question. But the ambiguity that bringing a term like "data port" in adds to the claim is one of the reasons why we think it's improper.

**THE COURT:**  What's the basis of trying to import these limitations, which I -- I don't see it in the language of the -- the plain language.

**MR. STEIN:**  I'll take you through it, Your Honor. And the simple answer to that question is that it's in the specification.  This is how the inventors, the applicants of this patent have defined the term "worker module."

Fortinet's proposal -- we should call it that -- starts from the, I think, flawed proposition that there's a plain and

ordinary meaning to the term "worker module."  And, there's just not.  "Worker module" can mean ten different things to ten different people in this art; it can mean different things in different arts.  There's just simply no plain and ordinary meaning of what a worker module is.

And in the absence of a plain and ordinary meaning for a term, we have to look at the specification to understand what the applicants intended that term to mean.

And when you look at the specification, you will see that they talk about the worker modules having data ports, and they talk about the worker module having a switch port.

So, the simple answer to your question, Your Honor, is that the specification is where we find the requirement that these worker modules have at least two data ports and a switch port.

And to your earlier question about whether it's a disputed issue of whether the ports can be uni-directional or bi-directional, I think I would respond to that by saying there's just no evidence for Fortinet's position that the ports that are being talked about in this patent can be either uni-directional,  bi-directional or both.

There is just no evidence for the proposition that Fortinet is talking about in that that --

THE COURT:  Well, is that disputed, though?

MR. STEIN:  I think I would dispute that there's

evidence of that.  But I don't think it necessarily matters.

And this issue of -- you know, using the word "port" creating an ambiguity I think is a little bit of a red herring, because the parties have agreed what a port means. They've agreed that it has a plain and ordinary meeting in this particular art.

And whether you call it a data port or a switch port, I think it just defines exactly what port you're talking about. A data port carries data, and a switch port carries data that goes to and from a switch.

So, Fortinet's point that it's now making that this introduces ambiguity I think is a little misguided.

THE COURT:  Well, I thought the argument is that this is an unfair limitation because if the worker module has inbound and outbound traffic and can be handled by a single port, at least as understood by one practiced in the arts or familiar with the arts at the time, what's the need -- why do we need to have to data ports and a switch port?

MR. STEIN:  Your Honor, I'd respond to that by saying that I just don't think that there is any evidence in the specification that these ports can be uni-directional.  And, I'll take you through the specification if -- direct your attention to column 3 --

THE COURT:  Well, but you haven't answered my question:  Would one practiced in the arts understand that

there was such thing as a bi-directional port?

**MR. STEIN:**  I think I will respond -- I'll respond to that question by saying that I don't think that there is any evidence of that.

**THE COURT:**  Yeah, I know; you said that.  You didn't answer my question.

**MR. STEIN:**  Um --

**THE COURT:**  Is there any dispute scientifically about that?  Was it known in this field that you could have a bi-directional data port?

You can admit that, yes or no.

**MR. STEIN:**  No, I -- well --

**THE COURT:**  Not the question of whether there was evidence.  I understand they haven't introduced evidence of that.  I'm just asking you a question.  Forget the evidence. I just want to know the answer.

**MR. STEIN:**  Sure.  At this time, when this patent was filed, I don't know whether there were bi-directional ports.

**THE COURT:**  When was this filed?

**MR. JAFFE:**  2005, Your Honor.

**THE COURT:**  Filed in 2005, issued in 2008.  So there was some prosecution that probably went on, I assume, during the interim.  But, 2005, was there such thing as a bi-directional data port?

**MR. STEIN:**  I don't know, Your Honor.

**THE COURT:** Do you think there's a dispute in the field, the knowledge of the field at the time?

**MR. JAFFE:** Fortinet would submit there was not -- there should not be a dispute that there were bi-directional ports at that time.

**THE COURT:** Show me where the specifications -- and not just specifications -- why the specifications would be deemed exclusive and should be imported into a limitation, which is generally not the case, of course.

**MR. STEIN:** That's correct, Your Honor. And --

**THE COURT:** Show me the passage in the specification and tell me why that this is an exception to the general rule.

**MR. STEIN:** Sure. Starting with the proposition that there is no plain and ordinary meaning for the term "worker module," we have to look at the specification to understand what that term means in this patent.

So, I direct your attention to column 3, lines 22 through 39. And here, in this column, we have the applicants talking about what a worker module is. And, we have the patent applicants talking about options for certain configurations, whether it's an optional configuration for an I/O module, or an optional configuration for a worker module.

The first example of this is at lines 36 through 39, where the applicants say although three worker modules are shown, in other embodiments the system -- and I'm paraphrasing a little

bit -- the system can have less than three worker modules, e.g. one or two, or more than three worker modules.

So, this is an example of how the applicants have disclosed other configurations for the number of worker modules.

Then if we go next to line 43 through 45 of column 3, the applicants say worker modules include first data ports and second data ports. So the applicants here are talking about the configuration where a worker module has two data ports.

The next thing, line 51 through 53, the applicants are talking about in other embodiments, I/O module can have more than one I/O port; an I/O -- the other I/O module can have more than one I/O port.

So, here, the applicants are talking about configurations for I/O module having more than one port. And they've also disclosed that the I/O module can have one port.

Then, at line 53 through 56, the applicants say --

**THE COURT:**  That's about I/O module.

**MR. STEIN:**  That's correct, Your Honor. And I'm building up to one particular point that I think will kind of put this to a close.

53 through 56, again, we're talking about the I/O module. And it says the I/O module can have more or less than three distribution ports.

So, the applicants have said:  Okay, we've got this I/O

module; it can have more or less than three distribution ports.

So, the point I'm trying to make is when we go through line 56 through 58, we go back now to worker modules.

And it says (As read):

"In further embodiments, worker modules 106 can each have more than two data ports."

So when you read all that in context, the applicants clearly knew that when they wanted to disclose a worker module or an I/O module with one, two, three, four, or more ports, they explicitly said that.

So, they said that an I/O module can have one, two, three or more ports. But they said for the worker module, they say right here (As read):

"In further embodiments, worker modules 106 can have more than two data ports."

But they never disclose a worker module with a single data port. And so, they knew how to do it, and they just showed you in that entire column that they knew how to claim a module in this patent with one, two, three or four or more ports, but yet, with respect to "worker module," they say:  Well, we never say anything about a worker module having one port.  All we say is that it can have two or more.

And that's on Line 56 through 58.

So that, Your Honor, is why I submit to you that a worker

module in the context of this patent has to have at least two data ports.

MR. JAFFE:  Your Honor, if I may respond briefly?

THE COURT:  Yeah.

MR. JAFFE:  So, a couple of points that Counsel raised that I want to respond to briefly.

Number one is:  You asked the question:  Why should this limitation be imported.  And, the question is:  Why should the plain and ordinary meaning be deviated from?  And the answer is:  It shouldn't be.

And, Counsel went through and he gave you a number of cites from the specification, but I submit to you that all of those are discussing an embodiment in a specification. Nowhere do you see that magic language:  In the present invention.  And specifically, he even read out language that said in one embodiment a worker module has more than two data ports.

So, what does that tell a person of ordinary skill in the art?  That doesn't tell a person of ordinary skill in the art that worker modules --

(Reporter interruption)

MR. JAFFE:  Sorry -- necessarily have more than two data ports.  Instead, that's describing a single embodiment.

And another thing I would submit on top of that, which is: When the specification is discussing the worker modules in the

citations that Counsel provided to you, what he left out is it says "worker modules 106A through C."

And, what does that indicate?  That's talking about the preferred embodiment described in the specification.  It is not describing all worker modules, ever.

The '430 patent describes a flexible architecture for using worker modules.

(Document displayed)

**MR. JAFFE:**  I'll fast-forward through some slides here.

(Document displayed)

**MR. JAFFE:**  It talks about having one worker module, two worker modules, three worker modules.

(Document displayed)

**MR. JAFFE:**  And it additionally talks about worker modules that do any number of things.  And there's two things to know here.  One that --

(Reporter interruption)

**MR. JAFFE:**  I apologize.

One, that it describes a flexible architecture.  And number two, these are all other features of the preferred embodiment that Sophos' proposed construction does not consider at all.

So, are worker modules something that merely have a couple of data ports and a switch port?  Is that what this patent

talks about as worker modules?  No.  It uses the term in a flexible manner to do many things.

There's no need to cherry-pick these two specific limitations that Sophos proposes, and add those into the claim.

**MR. STEINBERG:**  Your Honor, I'll just respond to that very briefly by saying Fortinet's proposal is simply: I'll just tell you later.  I'll just tell you what the term means later.

That's what plain and ordinary meaning is, in the context of Fortinet's argument here.  There is no plain and ordinary meaning of the term "worker module."

You know, preparing for this argument, I went in and I looked at patents that were filed before the '430 patent, to see if I could find any patent that used the word -- the term "worker module." I didn't find any patent in this -- in the classification that the '430 is filed in, I didn't find one patent that uses the term "worker module."

Just to verify that my search was correct, I expanded that search to include the date that the Fortinet patent was filed. And I got one result.  And it was the '430 patent.

So, they don't cite -- Fortinet doesn't cite any expert testimony, doesn't cite any treatise, doesn't cite any technical dictionary, doesn't cite any evidence for the proposition that this term "worker module" has a plain and

ordinary meaning.

THE COURT:  Let's say I accept your proposition that it's not plain on its face.  How does this enlighten what a worker module does?  You describe some characteristics that you want to import in limitations.  But, you provided nothing in terms of telling me what it does.  Does it process network traffic?  Does it do other functions?  Is it limited?

So, your proposal is not very helpful.  If you're complaining about the vagueness of this term, you haven't done anything other than adding some limitations.  It still doesn't tell me what a worker module is.

MR. STEIN:  Your Honor, what we've attempted to do is to give structure to the term "worker module" to allow the jury to say:  What is -- am I going to find a worker module here?

Because I will grant -- this patent, while, granted, it's very open-ended in terms of what the worker module does, the claims talk about all that the worker module has to do is process data.  It's very open-ended from a claim perspective.  And the specification, again, uses very open-ended things to talk about the function of what a worker module does.

But what we're trying to do here is define what a worker module is in terms of structure, rather than in terms of function.  And, that -- that's why we've looked at the specification, and we've looked at how the specification

describes what the structure of a worker module is.

And, and, looking at the specification, we come to the conclusion that it's a module that has the two data ports, at least the two data ports, and the switch port.

**MR. JAFFE:**  Your Honor, if I may respond briefly?

**THE COURT:**  Yeah.

**MR. JAFFE:**  Counsel mentioned a few times that the term doesn't have a plain and ordinary meaning.  We would submit that the plain and ordinary meaning of the term is clear, by looking at the claim language.

Here on the easel, you can see that it says that the worker module is for processing the network data traffic -- excuse me -- the network traffic data.  That's what the worker module does.  And this is clear from the language, itself.

Now, what you're not going to find here is any discussion of ports, whether they be data ports or switch ports.

**THE COURT:**  Do worker modules do anything other than processing network traffic data?

**MR. JAFFE:**  They can.  As I mentioned before, it's -- the patent describes them in broad fashion.  It even says they can do any sort of -- going back to some of the discussions that Dr. Nielson had at the technology tutorial, they can do any sort of policy enforcement which can include virus checking, firewall.  And then the patent describes that they can do other functionalities.

Now, what's important to note here is that the claim language, itself, is actually not focused on the internals of the worker modules.  What it's focused on is how you assign packets -- data -- to the individual worker modules.  That's what this claim is talking about, at a very high level.

So the idea within the claim is you parse the network traffic, and you figure out how you're going to assign the different network traffic to the different worker modules.

Now, calling back to what we were talking about before in the technology tutorial, what the '430 patent was, the problem it was trying to solve was the overhead in assigning network traffic within a gateway.  That's what this patent is about.

And, Sophos's proposed construction in importing these two, you know, we would submit random limitations out of the specification is unsupported.

THE COURT:  All right.  Well, let me just ask you: Other than the specifications that you've cited, is there anything that suggests that this -- these specs, these specifications don't fall into the normal rule that using the preferred embodiment in the specification or illustrated embodiment does not import the limitation into the claim?

MR. STEIN:  Your Honor, the reason that we're not importing limitations is because that's how the inventors have defined this term "worker module" in the specification.

The law, *Phillips*, et cetera, talk about:  In the absence

of a plain and ordinary meaning, you have to look and see how the inventors have used the term in the specification. And, and *Phillips* has a cite where, you know, if the inventors use the term consistently, it can be defined by implication. That's what we have here. We have --

THE COURT: Why wouldn't that be true in every case? Where you have some ambiguity that's not clearly defined by the language of the claims, you look to the specification, you see a typical embodiment; you might see two or three embodiments.

Suddenly that becomes -- I thought the rule is unless it is claimed to be the exclusive means, or something -- I don't see that here. It says "in an embodiment." "In an illustrated embodiment." "In a preferred embodiment." "In some embodiment."

MR. STEIN: I think --

THE COURT: It also says worker modules can have more than two data ports. I guess the implication is that, well, that assumes you have two or more. But it doesn't say that.

MR. STEIN: Your Honor --

THE COURT: That's pretty tough language. You have a pretty aggressive position, to say that suddenly now, without -- simply by citing to an embodiment, an illustrated embodiment, quote-unquote, from column 3, and where it -- wherein it says "worker modules can have more than two," which

does not literally preclude can't have only one, you want to import that.

You do want to import that, because it's not in the plain language.  You want me to construe the language of the claim to include this limitation.  You are importing, at least in the way I use that term.

**MR. STEIN:**  I think, in the absence of a plain meaning, we have to look at the specification to see --

**THE COURT:**  Yes.

**MR. STEIN:**  -- what the inventors have defined the term to be.  And in that case -- there are plenty of cases that say that the patentee can be his own lexicographer.  And in those situations, there's no dispute that we're looking to the specification to see how the inventors define the term.

So in those situations, the cases aren't worried about importing limitations from the specification or not.  They look to the specification; they say:  How has the inventor defined the term?  They say:  Here's how the inventor's defined the term, and here's what the term means.

I submit to you, Your Honor, that's what's going on here.  The term "worker module" has no meaning outside the context of this patent.  We have to look at the specification to understand what it is.  And, and, that's exactly how the inventors have described it here in the patent.

So, I -- I -- defining -- the inventors are the ones that

have defined this term to include these requirements, include the requirements of at least two data ports and a switch port. And I submit to you that we're not importing limitation beyond what the inventors have already imported, themselves.

THE COURT:  All right.  Let's go the next one.  Let's go to the '125, "flow-based packet classification."

MR. JAFFE:  I have some slides to walk us through this one.

THE COURT:  Obviously I want you to focus on the amendment which has this language that describes two forms of packet classification.  One, flow-based, quote-unquote, using various fields of the LQ header along with fields in the L3-L4 layers.  And then two, an unnamed type that uses the upper bits of the IP address or MPLS label to index a table of flow indices.

MR. JAFFE:  Absolutely.  And I think that's -- if you'll permit me, I'll get there in about a minute or two.

THE COURT:  Okay.

MR. JAFFE:  But what I want to do is kind of frame the dispute for Your Honor, which is actually fairly narrow. And what you do when you look at the parties' competing proposed constructions, which I have here on Slide 13.

(Document displayed)

MR. JAFFE:  You can see our construction, Fortinet's construction is plain and ordinary meaning.  And what you see

when you start comparing the two constructions is that Sophos's proposed construction includes a lot of the words in the claim already.  So, you can see that it includes packet classification.  It says "classifying a packet."  And in fact, it also says "based."

So, what is the dispute really, here, actually?  It's really over the word "flow."  They're taking the word "flow" and saying that it means fields of an LQ header and of the L3/L4 headers.

THE COURT:  Well, it's flow-based because in the patent prosecution, the applicant used the term -- and I think it's significant -- quote, "flow-based," unquote.

MR. JAFFE:  So I'll jump to there.

THE COURT:  Not just "flow."  Let's be --

MR. NEWKOM:  I agree.

THE COURT:  -- straight up on this.

MR. JAFFE:  Although -- I agree, except just to note that their construction includes the word "based" as well.  So, they're not -- the word "based" doesn't have a special meaning.

THE COURT:  But the key there is that they want to import or read into it this limitation of the headers.  Which fields are used.

MR. JAFFE:  That's right.  And, there's two problems with trying to do that.  And I'll jump through the explanation

of what a flow is.

(Document displayed)

**THE COURT:** Okay.

**MR. JAFFE:** Number one is (As read):

"To act as its own lexicographer..."

And this is *Thorner versus Sony*, a 2012 Federal Circuit case.

"...a patentee 'must clearly set forth a definition
of disputed claim term' other than its..."

(Reporter interruption)

**MR. JAFFE:** (As read)

"...other than its plain and ordinary meaning.  It's
not enough for a patentee to simply disclose a single
embodiment or use a word in the same manner in all
embodiments, the patentee must 'clearly express an
intent' to redefine the term."

So that's what we need to look at when we look at the specification amendment.  And turning to the specification amendment, which is column 15, lines 15 through 27 --

(Document displayed)

**MR. JAFFE:** -- what we see here is not a clear intent, a clear expressed intent to narrow the term.  We don't see a clear intent to define the term.

What we see here is that same language that we talked about in the context of the '430 patent, which was "According

to one embodiment..."

Now, it does say "One is flow-based," as Your Honor pointed out.  And then it does use some of the language that is in Sophos' construction.

(Document displayed)

**THE COURT:**  So the key is the predicate phrase "According to one embodiment..."  In one embodiment, the quote, "flow-based" uses the LQ header along with L3/L4.  Then you have the other form.  But that's just one embodiment.

(Document displayed)

**MR. JAFFE:**  That's right.  But there's also one other more procedural point, which was if you'll recall from the parties' briefing, the examiner in prosecuting the '125 patent rejected the term "flow-based packet classification," based on a 112 rejection.

**THE COURT:**  Yeah.

**MR. JAFFE:**  And in response, they added figure 12 and its description, which includes the text that we found here.

Now, there's two points I want to make about this.  Number one is -- and I've depicted this here on Slide 29 -- in responding to this 112 rejection, the applicant stated that the limitation is supported by the original application.  And they cited over five different places in the specification.  Not just what we talked about in figure 12, and the part -- and associated description that Sophos focused on.  And

there's actually a page that goes beyond what's on this page. Just didn't fit on one slide.

But, this shows that the patentees were not trying to narrow flow-based or packet -- or flow-based packet classification to the one embodiment disclosed in figure 12. It was their contention before the patent office that there was a wide broad disclosure of flow-based packet classification. And they cited many of these things.

**THE COURT:** These pages come from the application?

**MR. JAFFE:** That's right.

**THE COURT:** From the original application.

**MR. JAFFE:** That's right.

**THE COURT:** Which the examiner found was not sufficient.

**MR. JAFFE:** Under 112. But what we would submit is that in responding, there was no new matter added. There was never a rejection for new matter. And that this, this idea, the concept of flow-based packet classification was disclosed in the original application.

**THE COURT:** Well, but sequentially. And then the examiner said no, and then the applicant said: Okay, how's this?

**MR. JAFFE:** That's true.

**THE COURT:** That's a typical narrowing scenario that implicates estoppel, prosecutorial estoppel. I --

**MR. JAFFE:**  So that brings me to the second point, which is the -- in adding figure 12, the entire -- and I'll bring up, just so we have it up here, the portion.

(Document displayed)

**MR. JAFFE:**  This is Slide 27.  So, this entire -- and beyond this entire paragraph was actually added to the specification.

Now, if the applicants were trying to remedy a deficit in 112 description for flow-based patent (sic) classification, why would they add things that were not flow-based?

The logical conclusion is that everything in figure 12 and its description is describing things as flow-based, and trying to claim that.  Because otherwise, why would they include other types of packet classification using flow?

**THE COURT:**  So you're saying that in figure 12, what's been designated as the box 1230, where it says (As read) "perform flow-based packet classification on the packet and evaluate forwarding state information associated with the previously-stored flow learning results based on previously received packet of the packet flow," that when the term there is "perform flow-based packet classification," it's not necessarily tied or constricted by column 15, lines 18 through 23, which talks about flow-based -- calling flow base, using the LQ and the L3/L4?

**MR. JAFFE:**  That's right, Your Honor.  If you look at

that paragraph that starts at column 15, line 15, it says, it says (As read):

> "At block 1230, flow-based packet classification is performed..."

And then the remainder of the paragraph is describing flow-based packet classification.

**THE COURT:** And then it goes on, but it says the critical package that's been discussed is predicated on according to one embodiment.

**MR. JAFFE:** That's right.

**THE COURT:** So that means that that paragraph, which is tied to block 1230, is not necessarily wedded to that one embodiment.

**MR. JAFFE:** That's correct, Your Honor. Again, we're in an instance where we don't have the patentee expressing a clear intent to limit the scope of his or her claim. What we have is a description of an embodiment that does not describe -- use those magic words "the present invention" or, you know, distinguishes over the prior art. Again, we have a description of the prior embodiment.

**THE COURT:** And figure 12, itself, is not very -- it's not specific, it's not very indicative of what flow-based packet classification must be.

**MR. JAFFE:** That's right. And to go back on an earlier point, the rest of the claim language describes using

flow and classifying packets at a broad level throughout the claim. So while this one term just does say "flow-based packet classification," you can see that the claim language here on the board talks about establishing a flow cache, you're going to be receiving a packet and having virtual router flows (Indicating).

The claim as a whole is talking about how to classify packets, and how to deal with packets, in terms of their flow. This wasn't a narrow limitation that was added to the claim. This was a flexible limitation that was added according to its plain and ordinary meaning.

THE COURT: And, what about this argument that there's an embodiment that uses layer 2?

MR. JAFFE: That's another example. That's from earlier in the specification. And it describes -- I think I have it right --

(Document displayed)

THE COURT: Column 11?

MR. JAFFE: Column 11, lines 25 through 28. This is another embodiment that describes a different way of looking at flow other than the very narrow way described in the one embodiment in figure 12.

So, again, consistent with what Your Honor was just saying, we have description of different embodiments, describing looking at different layers in order to do packet

classification.  There's no clear intent expressed by the applicants or the patentees in this instance to limit the term in the way suggested by Sophos.

THE COURT:  What is described in this column 11, a flow-based packet classification?  Or, what is it describing?

MR. JAFFE:  At a broad level, it is flow-based packet classification.  You are looking at the flow, which is, as we talked -- as Dr. Nielsen talked about, header characteristics. And you're determining how to then route or classify the packets, based on that.

And in this instance, it's talking about using what's called a "flow index" in order to do that.

THE COURT:  And, your position is that the LQ header is different, is layer 1, not layers 2 through 4?

MR. JAFFE:  That's right.  And it's expressly defined in a patent that's incorporated by reference into the '125 patent.  It's the '311 patent.  It's incorporated by reference in the specification at column 1, lines 24 through 30.

And in the '311 patent, it describes LQ as L1, which is where our --

THE COURT:  Which column, again?

MR. JAFFE:  Of the '125 patent?  It's column 1, lines 24 through 30.  There's a large list of related applications that are incorporated by reference.

THE COURT:  I'm seeing reference to the '079.

**MR. JAFFE:**  That's right.  It issued as the '311 patent.  Excuse me.

**THE COURT:**  Oh.  And within that, there's -- LQ is described?

**MR. JAFFE:**  That's right.  If you look at -- it's -- that patent is Exhibit C to our opening claim construction brief.

**THE COURT:**  Okay.

**MR. JAFFE:**  And at column 5, Line 67 that's where it describes LQ as referring to layer 1 or L1 of the OSI model that Dr. Nielson described before.

**THE COURT:**  Let me hear your response.

**MR. PATTERSON:**  Thank you, Your Honor.  Todd Patterson, for Sophos.  And, I don't mean any disrespect by unbuttoning my coat, but this -- put on a few pounds since I got this done, so --

**THE COURT:**  It's the holiday season.

**MR. PATTERSON:**  Thank you.

Your Honor, the case really boils -- this determination boils down to one thing:  Are we excluding a preferred embodiment?  Or, did they not claim a preferred embodiment?

And as hopefully I'll highlight here, what they have actually claimed is less than maybe what they disclosed.  And that's the point of "flow-based packet classification," as opposed to if they would have claimed "packet classification."

And if you give me just a minute, I'll highlight the point, using some of the same language that was just described by Counsel.

If I can have my slides, and have control?

(Document displayed)

**MR. PATTERSON:**  There we go.

(Document displayed)

**MR. PATTERSON:**  Your Honor, what's actually claimed in the patent -- and let me jump actually --

(Document displayed)

**MR. PATTERSON:**  -- ahead to the timeline.  Because this puts it a little bit in perspective.  So when I go back to discuss the claim language, it'll make more sense.  And Your Honor, there's two copies of that timeline in your -- in your briefing packet.

**THE COURT:**  Am I looking at the PowerPoint?  Or the binder?  What am I looking at here?

**MR. PATTERSON:**  I'm sorry, sir; the binder that has the -- and it's Slide 69.

**THE COURT:**  Okay.

**MR. PATTERSON:**  And at Slide 69, Your Honor, if you're interested you can just tear that right out of the packet because I'll be referring to it.  And there's another copy of it already in the packet.

**THE COURT:**  Okay.

**MR. PATTERSON:** This timeline, Your Honor, highlights really what happened in this case. They filed the patent in 2002, of course. The patent office rejected their first set of claims in May of 2006. In the interim, the patent was acquired by Fortinet -- or the patent application was acquired by Fortinet from Cosine Communications.

Later on, the patent -- they put a reply into that office action that had rejected those claims. As I'll show you in a minute, it's at that point in September of 2006 that they add the "flow-based packet classification" claim limitation.

In December of 2006, three months later, the patent office issued a final office action, and rejected it for -- one of the reasons they rejected it for was the lack of support for flow-based packet classifications. As the Court has already highlighted a moment ago in its questioning.

The amendment that was made in March of 2007, three months later, then added figure 12, and all the discussion specific to flow-based packet classification that we'll be discussing in greater detail in just a moment.

But the important point I would like to bring out is, as Counsel pointed out, they did say there was other examples of packet classification in their response. But if you look at the entirety of the patent specification, those other five cites that he referenced, none of them say "flow-based packet classification," as they then went and added in their

March 2007 amendment.

Now, had patentee believed that there was sufficient support for "flow-based packet classification" as opposed to just "packet classification," they would have, in their -- in typical patentee practice, they would have responded to the reject- -- to the office action, and simply stated:  Here's the support in these five places.  And they would not have amended the specification to add 31 lines to the specification to explain what flow-based packet classification is, as opposed to just packet classification.

So what we are really talking about is what the patentees were claiming in their amended claim is not packet classification in general, as may have been discussed or described in other sections of the specification.  They were only claiming flow-based packet classification.  And that is what we will look at in a moment with respect to the claims.

Now, I do want to highlight two other points before I go further, that were not probably brought out very well in our briefing.  The case law cited in -- in Fortinet's reply brief specifically talks about the fact that if the patentee refers to -- starts defining terms in terms of prior art, that is usually a good indication of definitional.

Now, an examination of the file history shows that the patentees came up with their definition of flow-based packet specification -- or classification, flow-based packet

classification specifically from a document authored by the inventors about six or seven months before they filed their patent application.  And they lifted it verbatim from there.  And that's -- that's called out in the file history in our attachment -- I believe it's attachments 5 and 6 to our brief, Your Honor.

THE COURT:  Attachments 5 and 6?

MR. PATTERSON:  I believe so, Your Honor.  And if not, I'll get the exact page in the file history for you momentarily.

But in the file history, they actually reference that document, and they put that document as part of what they're talking about.  So now, we have an example of the patentee, himself, referred to "flow-based packet classification" in a prior published document.

Secondly, Your Honor --

THE COURT:  What does that prior published document say?

MR. PATTERSON:  It actually uses these words verbatim, Your Honor, that they've added into the specification.

THE COURT:  Oh, that flow-based packet classification is -- uses various fields of the LQ header along with fields in the L3/L4?

MR. PATTERSON:  Yes, Your Honor.  And I will endeavor

to find that in the file history for you.

THE COURT:  Yeah, I'd like to see that.

MR. PATTERSON:  Yes, Your Honor.  The second point I'd like to bring out, Your Honor, is that as the patentees later prosecuted this patent, later on in August of 2007 -- referring back to the timeline -- they added two new claims.

Now, they did not at that point go back and amend and take out "flow-based packet classification" from the claims.  They just added two new claims, and continued to build on it.  But what they said in that amendment was that they would continue to add more claims later on.  Or, continuation patents.  And indeed, they have.

And I would submit, Your Honor, that in their continuing patent -- continuation patents that they have generated, one of them in particular, U.S. Patent No. 8,542,595, right in claim 1, actually claims packet classification.  Not "flow-based packet classification," but actually just claims "packet classification."

So clearly, patentee understood how to claim more broadly, versus -- the language that they've added actually narrows the -- narrows to what they claim, to flow-based packet classification, not packet classification.

MR. JAFFE:  One brief point in response, Your Honor.

Counsel noted that he didn't think that he brought these points out well in his briefing.  I would submit that I

haven't heard these arguments before.  And they weren't in their briefing, and we weren't given an opportunity to respond to them.

THE COURT:  Why weren't they in the briefing? Because I read the briefing, and it's not in there.

MR. PATTERSON:  Your Honor, it did not make the cut in the briefing, and it should have.  And I --

THE COURT:  Well --

MR. PATTERSON:  -- figured I would bring it out now.

THE COURT:  Well, there's a waiver potential here because, you know, we have a briefing schedule, and I've got to go with the briefing.

MR. PATTERSON:  I understand, Your Honor.

MR. JAFFE:  And we haven't had an opportunity to consider these arguments.  I just submit there's -- to the extent Your Honor wants to consider any of these new arguments, we want the opportunity to take a look at them, and respond.

THE COURT:  All right.  Well, continue.

MR. PATTERSON:  Thank Your Honor.

(Document displayed)

MR. PATTERSON:  Going back to the specification, Your Honor, the part of the specification that they added that described all of -- the figure 12 that described the one embodiment specifically makes a distinction between -- it says

there are two types of packet classification.  There's flow-based, and another unnamed type.

And the reason, I submit, that they did not explain or claim a second form is they only intended to claim flow-based packet classification in the claims as they amended them, because that's what the words say.

And, an examination of the actual fourth claim limitation as shown on the '125 patent over here on the board shows that it deals with, in the fourth limitation, flow-based packet classification.

(Document displayed)

**MR. PATTERSON:**  And the description in the specification says one of those two types is flow-based.  And it then explains that flow-based packet classification are examining the various fields of the LQ header along with fields in the L3 and L4 header to identify a particular micro-flow.

It does not go on to explain -- it makes a distinction between the other form of packet classification.  And again, I submit:  Had the fourth claim limitation simply said "packet classification," we would not be in this discussion.  They have acted as their own lexicographer, and then only claimed "flow-based packet classification."

So there's -- essentially, they've limited what they were trying to claim, as opposed to trying to claim every possible

embodiment.  Which they could have done, but they did not do.

(Document displayed)

**THE COURT:**  Let me ask just from a --

(Document displayed)

**THE COURT:**  Just from a layperson's point of view, why wouldn't it be flow-based packet classification, if you also employed fields in L2?

**MR. PATTERSON:**  Your Honor, it could, in the sense of if they had not defined -- actually provided a definition for flow-based packet classification, then I would submit that maybe there's a plain and ordinary meaning that you could conclude includes the layer 2.  But, they have provided their own definition.

And as the case law they cite -- they cite repeated says, when the inventor acts as his own lexicographer, he takes away his plain-and-ordinary-meaning argument and acts -- and actually defines what he's talking about.

And, it fits right in line with what the examiner said.  The examiner said there's no support.

They could have said -- if they believed that they had sufficient support for flow-based packet classification, they could have said back to the patent office:  We think there's support in the specification; look at these five locations, including the layer 2 site in column 11.  And not amended their specification.

But they didn't even bother to try that.  They just simply amended the specification, and provided a specific definition for "flow-based packet classification," that they now want to tell you was really describing all packet classification.

But to show that it's really not describing what they had earlier said in the patent relating to layer 2, layer 3 and layer 4 in column 11 of the patent, they now introduce an embodiment that's specific to layer 1, 3 and 4, not layer 2, 3, and 4.

So, had they intended to have flow-based packet classification include layer 2, they could have added that in their definition.  But they didn't.  They took a specific definition that their inventor had already stated, and put it directly into the -- amended the specification, and put it in there.

**MR. JAFFE:**  May I respond, Your Honor?

**THE COURT:**  Yeah.

**MR. JAFFE:**  So, a couple of points I want to drill down on.  Number one is -- and counsel can correct me if I'm wrong.  It sounded like he agreed at one point that there could be a plain and ordinary meaning of "flow-based packet classification."  So I think the parties are in agreement on that point.

And, which brings me to my next point which is what's -- the issue here, as Sophos has posed it, is:  Have the

patentees acted as their own lexicographer?

And the legal standard that we're faced with here is:  Do we have a clear intent to define the term different or apart from its plain and ordinary meaning?

And if you look at the language that we've been focusing on the entire time, Fortinet submits you do not see that clear intent to define the term differently.  What you see is the same sort of description that we've seen in other parts of the patent, you see in one embodiment.  You see using these headers.

It doesn't say that flow-based is.  It doesn't say that in the present invention, flow-based is.  It says, in one embodiment, there's this; it uses the following headers.

(Document displayed)

**MR. JAFFE:**  Now, does that rise to a level of a clear intent to redefine the term?  In light of the entire intrinsic record, we would submit:  No.

The word "flow" is used in its plain and ordinary meaning.  Sophos doesn't contest that the word "flow" appears at least nine other times in the claim.  And in those nine other times, it's not limited to those specific headers.  It's only in this one specific instance that Sophos is arguing that "flow" has some different meaning.

**MR. PATTERSON:**  Your Honor, if I may respond?

**THE COURT:**  Yeah.  I guess maybe what I should

understand:  Is your argument the lexicographer argument?  Or is it an estoppel argument?

MR. PATTERSON:  I'm sorry; you're talking to me, Your Honor?

THE COURT:  Yeah.

MR. PATTERSON:  I'm sorry.  Yes, Your Honor; it's essentially both.  One, they've acted as lexicographer by defining that there's -- they say that there's two forms of packet classification.  One is flow-based, and the other -- and they provide a specific definition for what they mean by "flow-based."  And then, there's another form that in this case relates to other parts of that IP address.  Other parts of the OSI --

THE COURT:  All right, but do you take issue with the standard that there has to be a clearly-expressed intent to define or to redefine an otherwise term that maybe, doesn't necessarily need definition?

MR. PATTERSON:  Your Honor, I would say -- I'm not sure if I'm understanding your question correctly.  Because, they have defined it expressly by saying there's two kinds.

THE COURT:  They clearly expressed intent.

MR. PATTERSON:  Yes, Your Honor.

THE COURT:  It's not just more likely than not.  I mean, it's got to be clear.

MR. PATTERSON:  Yes, Your Honor.  And I would say

they have met the clearly expressed intent.  And if you look at the case law that they cite, for example, *TexEx* (Phonetic) and *Home Diagnostics* and *Lynix Technology* (Phonetic), all those cases stand for the proposition that there was actually some disavowal of claim scope by the inventor because they did provide some specific declaration that is akin to this in the sense that they have defined what the term meant.

And in those, they did not -- in those cases as discussed by those courts, they didn't say -- the patentee was not saying expressly:  This is the present invention.  They explained what the definition is that they were providing.

And in this case, we have the same type of thing, where it says a flow-based uses various fields of the LQ and L3 and L4 header.

Now, with regard to the idea that there may be a plain and ordinary meaning to flow-based, to classifying a flow, I don't dispute that.  There clearly could be.  Because we're talking about a flow of packets as it moves through the network.  But, we are not talking about grammatically; we're talking about flow-based where it's hyphenated, and they explain what it is they were trying to do.

**THE COURT:**  Let me ask:  The critical passage in the specification where it talks about the other form, non-flow-based uses the upper bits of the IP address or the MPLS label, what is "MPLS"?

MR. PATTERSON:  Trying to draw back to my networking days, Your Honor.  Just a second.

THE COURT:  Well, "MPLS label to index a table of flow indices," would that also be a form of flow-based -- putting aside the argument here, would one normally think that's also a form of flow-based packet classification?

How's it fundamentally different than using the LQ header and L3/L4?

MR. PATTERSON:  Your Honor, it relates to -- this other form relates to the other -- thank you -- multiprotocol label switching.  Multiprotocol label switching is what MPLS stands for.  And it relates to a different layer of the OSI model.  It does not relate to layer 1 of the OSI model where the LQ header is.

THE COURT:  But it is a layer.

MR. PATTERSON:  It is a layer; yes, Your Honor.

THE COURT:  That's also kind of flow-based.

MR. PATTERSON:  Yes, Your Honor.  I can't dispute that it's related to the flow, as it comes through.  You're examining that flow as it comes through.

THE COURT:  Well, that helps you.  Because what I'm observing is that although they both are kind of a form of flow-based packet classification, the specification says labels 1 -- I think that's your argument -- flow-based -- called it flow-based.  He didn't have to call it that, but he

called it flow-based using LQ and L3/L4.

The other form, kind of nameless, or one could say non-flow-based, uses this other method.

**MR. PATTERSON:**  Yes, Your Honor.

**THE COURT:**  So, I think that supports your argument that yeah, it's sort of distinctly defined here.  They didn't have to use one is flow-based.  They could have just said one form is blah, another form is blah.  Or you could have said one flow-based classification uses LQ/L3, the other flow-based classification uses the IP address at MPLS, et cetera, et cetera.

**MR. PATTERSON:**  Yes, Your Honor.

**THE COURT:**  And you're arguing they didn't do that.

**MR. PATTERSON:**  Yes, Your Honor.

**THE COURT:**  They only labeled the first one.

**MR. PATTERSON:**  Yes, Your Honor.

**THE COURT:**  Of course, your argument is: well, it says according to one embodiment.

**MR. JAFFE:**  That's right.  And --

**THE COURT:**  But, but within that, you've -- the patentee has kind of arguably come up with its definition of "flow-based."

**MR. JAFFE:**  Well, looking at the -- the specification here, the slide that Sophos has up only gives us part of the paragraph that we were looking at before.

If you remember when we were looking at the entire paragraph, it says:  At block 1230, we perform flow-based packet classification.  The entire paragraph is describing that step.

Now, two points.  Number one is you asked about the case-law issue.  And we would submit that Sophos has not provided a case to you where the Court has language that says according to one embodiment, and they then find that it's a clear intent to disavow.  So, what we -- we have a lack of case law on that point.  Instead, what you find is when you have according to one embodiment, what you don't have is a clear intent to disavow.

And Your Honor, us going back and forth on this, I think at best what it reinforces is the ambiguity of the passage.  And when you have the ambiguity, does that rise to a clear intent to disavow claim scope?  And we would submit no.  At best, you have an ambiguous part of the specification, which does not show a clear intent to disavow claim scope or redefine the term.

**THE COURT:**  Let me ask you:  In terms of if you're making a an estoppel argument, how's that -- is that distinct from the own-lexicographer argument?

**MR. PATTERSON:**  Your Honor, I wouldn't -- I don't think I can characterize it as a distinct argument because they are intertwined in this case, because of the order of

events that they practice things in.  And I don't think I can honestly say that it's a straight-up pure estoppel argument.

And Your Honor, I would like to point out, my final point with regard to the passage of the specification, the section 1230 that he refers to or refers to block 1230 of figure 12 --

THE COURT:  Yeah.

MR. PATTERSON:  If you actually look at the words of the actual -- the entirety of that section -- and I have it here.

(Document displayed)

MR. PATTERSON:  It does say it's describing block 1230, but it does say flow-based packet -- at the beginning it says (As read):

"At block 1230 flow-based packet classification is performed on the packet..."

That's what it says block 1230 does.

THE COURT:  Yeah.

MR. PATTERSON:  And then it goes on to say "flow-based," and it explains what flow-based is.  And then it draws the distinction between flow-based, what it's defining as flow-based and this other unnamed form.

So the embodiment is not saying that you do both of them. The embodiment says clearly, all you're doing is flow-based. And that's all they claimed.

Again, had they claimed just in their -- in their claims

just "packet classification," we would not be having this discussion. But, they explain at block 1230 what flow-based packet classification is, and that's what they're limited to.

It's not a question of excluding a preferred embodiment. They disclosed maybe more, but they only claimed part of what they disclosed. And that's not an issue that needs to be fixed by anybody. Again, they've later claimed differently, in later patents.

THE COURT: All right. That is helpful. Thank you.

Let me go on now to the next one, which is Sophos' '587. The "stored for access by" or "storing for access by."

(Document displayed)

THE COURT: I don't see why this thing is just plain meaning. I mean, "access by" is not the same as stored in or stored on, or -- you know. It's just -- it's access. Stored for access by.

MR. CUNNINGHAM: Your Honor, may I go sit down?

THE COURT: Pardon?

MR. CUNNINGHAM: May I go sit down now?

THE COURT: Maybe you might have something to add after I hear the counter-argument, but I -- seems to me, this one is -- if there's ever a rule of plain English and grammatical construct ought to inform, this is it.

MR. NEWKOM: Well, thank you, Your Honor. And that's what I've struggled with. Because I actually think it's not

-- it's not very clear.  Or at least, it hasn't been to me.

So, if I said that pancakes are chewed for pleasure by my six-year-old daughter, in that instance, "by my daughter" is modifying the verb "chewed."

We submit that here, when you said "stored for access by the first processor," the action of storing is done by the first processor.  So it's -- I agree with Your Honor.  I think this dispute is more about grammar than it is about the state of the art.

As we read this sentence -- and I admit, Your Honor, it could be read one of two ways.  And that is why we're asking for a construction.

**THE COURT:**  Well, if you do it your way, it's like saying:  Well, it's stored by the first data processor for access...what?  By whom?

I mean, so, "by" must relate to not only proximate-wise in terms of grammar; it's next to the word "access."  But if you moved it up and say, well, it really means stored by the first data processor for access -- what?  By whom?  By --

**MR. NEWKOM:**  So, the same way that if I say my six-year-old daughter chews for pleasure her pancakes in the morning, the "stored for access by the first processor" is explaining why it's being stored at the first data processor, which -- and I can -- I think I see the look on Your Honor's face.

THE COURT:  I'm not sure that you've answered my question.  Let's buy your construct, and move the word "by" in front like it should have been, as you put it, "stored by the first data processor," but you're ignoring the words "for access," if "by the first data processor" doesn't -- doesn't modify "access" and it only modifies "store," then access for whom, by whom, what?  What does it mean?

MR. NEWKOM:  If I may, I'm going to try to answer Your Honor's question by reference to the claim language.

THE COURT:  All right.

MR. NEWKOM:  So, and, Your Honor, if I may leave the podium to approach the -- the poster board?

THE COURT:  Yeah.

MR. NEWKOM:  Thank you.

So, the question here is:  There are two uses of this phrase in claim 1 (Indicating).  The first which I'll focus on is right here in the limiting preamble: "stored for access by a first data processor."

Now, if the debate between the parties is:  Where does that storage take place?  Does it have to be at the first processor?  Or can it be elsewhere?

And in a hierarchy of authorities for claim interpretation, the highest authority is always the claim language, itself.  And in this claim, we've got numerous instances in which it's explained why you're storing for

access at the first processor.

For example -- and I'm sorry, I'm just not used to this format.

THE COURT:  Old-school.

MR. NEWKOM:  Here we go.  "... causing the first data processor to provide the second data processor with a copy of the item of data..."

Now, Mr. Jaffe and I had our own fun grammar debate this morning.  What this does not say is:  The first data processor causing a provision of the item of data to the second data processor.

It uses the active voice, that it is the first data processor which -- you know, anybody -- I guess anybody can cause it, but however it gets caused, it is, in fact, the first data processor that provides the second data processor with a copy of the item of data.

THE COURT:  Can it do that -- can't it accomplish it by then having the first data processor direct some storage bin or locker, or whatever it is, to say give it to the second processor?

MR. NEWKOM:  And that, Your Honor, is exactly what Mr. Jaffe and I were debating at about 6:30 this morning.  I don't think so, given the grammar of this limitation.  Because that would not be an instance of the first data processor providing the item of data.  That would be an instance of the

first data processor causing any processor --

THE COURT:  It could have two causes.  The initiating force causes the first data processor to then cause the provision -- I mean what --

MR. NEWKOM:  So, imagine there's the first data processor, which I think is sometimes referred to as a "work station" in this patent.  We're talking about sending the file to the file server, to check it against the -- the virus indicative or the bad indicia.

So, the question is:  Does the -- the Word file that you've just received, does it have to be stored at the work station?  Or -- and sent from the work station to the file server to be checked?  Or, is it possible that that Word file never hits the work station or the first data processor, and instead, the work station or the first data processor somehow causes some other device in some other location to provide a copy of the Word document to the file server?

The problem with that -- if that were claimed in claim 1, I think we would be -- Fortinet would be wrong.  But, this limitation is a serious problem for Sophos, because that's not what's described.  What is described, in fact, is that -- right -- that causing the work station to provide to the file server a copy of the item of data.

-- more as a matter of logic and grammar to the state of the art, Your Honor, that cannot happen without the first data

processor having -- storing -- the item of data.

And, there's another example later in the claim language. So we are debating the phrase "store for access" both as it relates to the first data processor, and also as it relates to the second data processor, which stores a plurality of definitions or forms of data.

And if you focus on that second -- that second phrase -- no, pardon me, Your Honor. I wanted to draw your attention to something else.

Here at the end (Indicating), "...causing the first data processor to prevent access to the item of data if the item of data is declared as invalid."

Now, this second limitation -- and to be clear for the record, it's not the second limitation of the claim; it's the final limitation.

But this second limitation that I would like to bring to the Court's attention is not as open-and-shut as the first limitation I brought to Your Honor's attention, but it does also support the read that the item of data is stored. And it happens to be stored for access, but it is stored by the first data processor. Otherwise, it makes less sense, that the first data processor is preventing access to the item of data.

**THE COURT:** Can it prevent access without storing? I mean, if it -- once it's told by the second data processor that "No, no, no," it then executes that. Why does it have to

be stored?

**MR. NEWKOM:**  So, and this is -- I think that's a fair question, Your Honor, which is -- I think of these two limitations, the first limitation, I think, with the proper grammatical read, precludes the data being stored -- any reading of the claim in which the item of data is not stored at least on the first data processor.

For this second limitation (Indicating), even if it were possible for the first data processor to remotely block access, to issue an instruction that an item of data stored separately should be blocked from access, even if that were possible, it is a more attenuated read of the claim language than the more immediate read, which is that the processor which has -- which is storing the data is the most sensible and the most effective place to block access to it.

Now, and before I test Your Honor's patience whether I'm relying too much on these particular limitations, if I could direct your attention to Page 67 of our booklet.

Mr. Jaffe, if it's possible to bring that up, please?

**MR. NEWKOM:**  Well, I can read it for the record.

(Document displayed)

**MR. NEWKOM:**  These two concepts, these limitations that I've just discussed with Your Honor --

**THE COURT:**  It's up.

**MR. NEWKOM:**  Thank you -- were highlighted by the

patentee during the prosecution.  And I'm reading from the March 20, 1995 amendment, at pages 8 to 10.

Quote (As read):

"The key to the present invention is that by providing for the first data processor to provide the second data processor with a copy of an item of data for validity checking, and by allowing..."

Now I'm going to the second limitation:

"...and by allowing the first data processor to prevent access to the item of data depending on the signal it receives from the second data processor, the first data processor does not need to perform validity checking, itself."

This same read, Your Honor, that the '587 -- which was originally filed for in 1993, eons ago in the state of the art -- that when the named inventors filed this patent, it was crystal clear to their minds that the item of data, which is to say the Word document or the Excel spreadsheet which is questionable, that that item of data was stored on the first data processor.

**THE COURT:**  Well, it doesn't say that.  It's basically the same argument as the claim language, itself.  Provide, causing the first data processor to provide, which begs the question:  Well, can it provide it without storing it?

**MR. NEWKOM:** And I think -- and that's a different question to my mind, Your Honor. I don't think Fortinet is arguing that it would be impossible in 1993 for one work station to access an item of data stored at a separate work station. We're certainly not arguing that.

What we mean to be arguing is this -- pardon the expression -- somewhat funky grammatical phrase "stored for access by," that -- I concede that it can be read either way. Whether it's stored somewhere for access by a first data processor as Sophos contends, or whether it's stored at the first data processor for that processor's subsequent access and use of it.

But, to the extent there's ambiguity there, what does "stored for access by" mean? I think that Mister -- or Dr. Hruska was quite clear when I asked him about this in his deposition, that he had the same understanding that I did. But, even -- and of course, inventor testimony is a little more useful now, under *Gemalto,* than it was six months or a year ago.

But, even putting Dr. Hruska aside, these subsequent limitations clarify any ambiguity about the grammar being used by the patentee.

**THE COURT:** Well, how about my first question? That is: To read the ambiguity the way you would like to read it, so "stored by," that "by the first data processor" modifies

"stored" and not "access," that leaves access as kind of a dangling phrase.

MR. NEWKOM:  I think -- I would wholeheartedly agree with Your Honor that it's not great -- it's not great grammar. But to my mind, that, that doesn't make the phrase "for access" superfluous.

What it means is that you've got slightly awkward chunky language which is trying to describe that the first data processor stores an item of data (Indicating).  It stores it, right, the -- as this claim unfolds in the order, it stores it initially so that it can be accessed and provided to a second data processor.  Namely, the more powerful file server that has the ability to keep a long list of virus or malware indicia.

THE COURT:  What do I do with the specification that says --I know it's describing claim 2 and not claim 1, but it actually becomes explicit when it says "first data processor stores or has access to a set of records."  So number one, it illustrates an understanding that that configuration is possible.

And although it deals with a different set of records, it does -- claim 2 does use the same words: "is stored for access by."  It's the same phrase -- ambiguous -- what you say is ambiguous phraseology.

And to the extent the specification enlightens that same

phrase, although it appears in claim 2, why doesn't that further illustrate this sort of off-site-storage kind of notion?

**MR. NEWKOM:**  I think -- I can answer Your Honor's question, and I think I -- if I may, I can make it an even tougher question before I answer it.

In column 2, lines 15 through 21, there's this -- this phrase that I think Your Honor was referring to.  Now, this is not necessarily claim 2, but it's referring to a different portion of claim 1, which is the storage of the characteristic forms of data.

**THE COURT:**  Yeah.

**MR. NEWKOM:**  But we do have there on column 2, lines 15 onward (As read):

> "Information defining a plurality of characteristic
> forms of data to be tested for is stored by, or for
> access by the second data processor."

I think Your Honor's question could be applied to that bit of the specification.  Your Honor's question, I think, quite clearly goes to later in column 2, lines 55 through 57 or 58. And to my mind, there's an even trickier portion in column 3, lines 51 through 54, in which we have the sentence (As read):

> "The storage means of each work station may be
> located remotely of the rest of the work station.
> For example, at the file server."

So -- and I will answer Your Honor's question, but I wanted to give it its full weight --

**THE COURT:**  Appreciate that.

**MR. NEWKOM:**  -- before beginning the dance.

**THE COURT:**  Yes.

**MR. NEWKOM:**  So, a couple of thoughts, Your Honor. First, because I think this boils down to a question of:  How would a skilled artisan read this awkward grammar?

As an initial matter, I don't -- the use of commas and the disjunctive in the specification in the two instances in column 22 distinguishes this use of language to my mind.  It is not the same phrase, and it's not an explanation of what that specific phrase means.  In fact, however much fun we may poke in this courtroom today about the patent prosecutor who inserted this phrase (Indicating) into the claim language, he or she was careful to present different language, structured differently in column 2.

So as an initial matter, I'm not -- it is not clear to me that what's happening in column 2 is an attempt to use a synonymous phrase.

My second thought, Your Honor, was -- and Mr. Patterson previewed this argument for me -- on one hand, patent lawyers are taught never to reduce claim language to a preferred embodiment.  On the other hand, it is also possible for -- or rather, patent lawyers are taught never to exclude a preferred

embodiment or a disclosed embodiment.

On the other hand, it is possible for a patentee to describe in a specification an idea or subject matter which is not subsequently claimed in the claim language.  But I guess -- and I've got two more answers of my four, and then I'll stop, Your Honor.

The third thought is:  To whatever extent column 2 gave me some confusion in recent days or weeks -- and it has, I admit that -- I believe that the patent law or the Federal Circuit teaches us that when you reach a state of confusion such as this, you don't just pick the most persuasive argument; you go through the hierarchy of claim-construction authorities. Which, I believe, leads us back always to the claim language, itself, as the number one authority.

So, to whatever extent column 2 is problematic, it can only be read to define this phrase "stored for access by..." which again, due to the commas and the disjunctive, is not actually used in the claim language.

But it could -- even then, if we forgave the difference in vocabulary, it could be used to give meaning to this phrase (Indicating), only if it could do so consistent with the remainder of the claim language (Indicating).

And in light of these two additional limitations, but most importantly the, quote, "causing the first data processor to provide" limitation, I think that's problematic.

THE COURT:  All right.

MR. CUNNINGHAM:  Thank you, Your Honor.  Could we switch over to --

THE COURT:  What about Mr. Hruska's comments?

MR. CUNNINGHAM:  Your Honor, the law says that an inventor's testimony is legally irrelevant.  The *Gemalto* case referred to a specific situation where an inventor's testimony was used to disprove an assertion of plain and ordinary meaning.

(Document displayed)

MR. CUNNINGHAM:  I don't think *Gemalto* was intended to or did change years of black-letter law that says an inventor's testimony is irrelevant to claim construction.

But even if it were relevant, Mr. Hruska had a claim put in front of him; he was asked:  What do these particular claim limitations refer to?  He answered, to the best of his memory.

He was not asked:  Now, look at this piece of the specification, and tell me if that's consistent with the claim language or not; or look at this piece of the specification and tell me if you're now disclaiming the coverage of that portion of the specification in your answers.

And so, it's precisely why we don't rely on an inventor's testimony to try and come to some clear and unmistakable -- and that term has been used a lot in the arguments to date -- a clear and unmistakable disavowal of claim scope.

There are portions of the specification that very clearly explain and illuminate the claim language that you see on that board (Indicating).  And I can go into that in a little more detail if you care to hear it.

**THE COURT:**  No, I think I understand the issue well enough.

**MR. CUNNINGHAM:**  Okay.  Then I will be quiet.

**THE COURT:**  All right.  Well, let's move on to the next one, perhaps subtle, or maybe not, but:  Forms of data. And whether it's limited to constructions that are characteristic of a computer virus, as opposed to other forms of data.

And, here, it seems like a lot turns on the BPAI's opinion in this matter, which I have seen.  And I will say, not sure I fully understand the logic, and maybe you can help me with this.

But, it does state at Page 6 that the -- recites the appellant's specification defining the limitations as follows, and it's a pretty broad limitation because it says "These characteristics" -- this is the appellant's specification -- "These characteristics" (As read):

> "These characteristic forms may indicate whether the
> file contains unwanted data such as a virus, or
> whether it has been authorized or barred from use.
> Or a virus, for example..."

Et cetera, et cetera.  Jump instructions.  And then, the opinion then goes on to state:

"Reading the claims in light of the specification, we interpret the limitation..."

It says --

"...testing for computer virus."

Seems like a little bit of a non-sequitur there.  They've just read the specification, which seemed broader than that.  And then they did that.

And then I understand that they go on to say why there's a prior-art problem in distinguishing the Franc- -- Francisco's electronic indicia on various grounds.

And, the various grounds do not necessarily -- I guess that's the question:  Do they include -- do they necessarily -- would that distinction have fallen, had the claim been interpreted to include other unwanted data?  Such as unauthorized use, I suppose.  Just "virus," it's not clear to me that that's the case.

So, I don't know.  Maybe you can help me interpret what happened here.

**MR. NEWKOM:**  I will try, Your Honor.

As an initial matter on this term, I think between the parties and the Court, however this phrase is construed, it needs to be construed in some way which is useful to the jury.  Which is to say:  Some sort of construction.

The phrase "forms of data" which is used repeatedly and with some awfully specific meanings in the '587 patent, if divorced from that intrinsic evidence and just presented to the jury as any form of data, I -- I'm probably the least technical lawyer in this room least amongst outside counsel, but I think that is about as broad of a description of data as we could possibly give to the jury.

And whatever debate Mr. Cunningham and I may have about what the right substitute language is, I don't think there's any good-faith debate that "forms of data" means more or something much more specific than simply "any and all forms of data."  It's particular forms of data.

So the question is:  What are they?  And how do we -- at least this is how I've approached this phrase, Your Honor. How do we give some faithful meaning to "forms of data" which is narrower than --

**THE COURT:**  Let me stop you right there.

First of all, I don't know if it is good-faith or not, but there is a debate what it means.  But, you know, sometimes you look at the words to -- you know, you test it for indefiniteness or some other problem.

And here, in claim 1, it says you're storing a plurality of definitions of forms of data indicative of invalidity of items of data.  So, it is a form of data that is indicative of invalidity.  So, it's just not free-flowing.  It has -- it is

modified.

MR. NEWKOM:  So the question then -- understood, Your Honor.  The question then being:  What was claimed as the kind of form of data?  What kind of form of data would be indicative of invalidity?

To avoid, quite frankly, the situation that Fortinet respectfully contends happens here, which is something which was conceived of and described in 1993 is, 21 years later, mapped onto a wildly different -- wildly different firewall market.

So in terms of the prosecution-history argument, we read the decision to include the following:  First, the board's understanding that the -- the board's understanding that the appellant or the patentee was asking for "forms of data" to mean virus, something indicative of a virus, such as jump instructions.  And it's for that reason, Your Honor, that we've imported that phrase verbatim into our proposed construction: "such as jump instruction."

So I don't think what the patentee suggested to the board, I don't think what the board relied on, and I don't think what the jury should hear is that a form of data is a jump instruction indicative of -- of a virus.  It should be:  "Data indicative of a virus, such as a jump instruction."

After, after the board understood the appellant's argument to be asking for the presence of instructions that are

characteristic of a computer virus such as jump instructions, it specifically -- it granted, allowed the claims, with that specific understanding in mind.  And including the explanation -- and I'm reading, Your Honor, from -- my goodness, that's an awfully long Bates number.

Well, I'm reading from page 77 of our slide deck provided to Your Honor.  That the board was specifically looking at whether the prior art -- which is to say, the issue that the patentee had to surmount in this proceeding was whether the prior art included a limitation of testing a computer program or file not for any data indicative of invalidity, but rather, specifically for the presence of instructions that are characteristic of a computer virus such as jump instructions, as claimed.

I'll just take a step back.  I think I understood Your Honor's question to be:  Was the board's reading of appellant's arguments perfectly fair in light of the materials that they submitted in that proceeding?

And, I do think it's fair.  But more importantly, it was no coincidence that the appellants in that procedure or process focused on instructions characteristic of a virus, such as a jump.  Because that was the prior art they were trying to get around.  And in fact, they succeeded on that basis.

So, now, 15, 20 years later, to allow Sophos as the

patentee to unwind that process and to broaden "forms of data" to something else would undo the board's decision to grant these claims with that very specific meaning in mind.

THE COURT:  Based on your reading of the board's distinguishing of the Francisco prior art, would it have also said -- if it construed the limitation to include not just testing for viruses, but also for unauthorized use, which was in the specification, but had they -- could the same thing have been said about the Fran- -- distinguishing the prior art?

Would that have created a -- in other words, read more broadly, would the Francisco prior art have created a problem, under its analysis?

MR. NEWKOM:  I don't believe so, Your Honor.  But, that is based primarily on the board's almost unusually explicit adoption of this verbatim -- this understanding of the phrase, which is where we ran to for our proposed construction.

THE COURT:  The reason why I ask, and I don't know where the law is on this, but I understand that the board's construction is entitled to weight.  It seems to me, it would be entitled to even more weight if the construction were the necessary and indispensable part of distinguishing prior art, and therefore holding that it's valid.  Because at that point, you can almost imply that there was no response from the

applicant, an acceptance, an implied disavowal or, you know, whatever you want to call it, because, you know, this was essential. I mean, without it, you couldn't have gotten the patent. I think it's fair to almost deem some kind of -- I don't know if there's any case law that says that, but I mean, viscerally, that's my gut.

On the other hand, if it wasn't absolutely necessary to distinguish prior art, but it was part of it, then you just go to the: Well, we'll give it the kind of deference that --

MR. NEWKOM: Sure. And I think, Your Honor, I refrained from reading it into the record in deference to the court reporter, but I should do so now, just in an attempt to be helpful.

At Exhibit K to Fortinet's responsive brief on this patent, Exhibit K is numbered with an unwieldy page-numbering system, thanks to the Bates stamps. But the page number I believe that we're focusing in on is 5831SOPHOS_194.

And I'm focusing Your Honor on a conclusory paragraph -- or not conclusory, but a conclusion paragraph from the board, in which the board writes -- I think the board describes its reasoning to be exactly what Your Honor just described.

Quote (As read):

"For the foregoing reasons, we are not persuaded that the prior art would have suggested the limitation of testing a computer program or file for the..."

And I'll stop right here.  Right?  What comes next?  Is it something indicative of invalidity?  Is it unauthorized use?  What follows is:

"...testing a computer program or file for the presence of instructions that are characteristic of a computer virus such as jump instructions as claimed.  The examiner has not established a prima facie case of obviousness.  Therefore, we reverse the rejection of claims 1, 4, 9, et cetera."

This reads to me, Your Honor, to be as clear an indication as possible from the board that these claims were allowed, specifically based on the board's understanding of the claim language to be -- to be verbatim, the proposal we have provided to the Court in this matter.

**THE COURT:**  Yeah, no; I understand that was a predicate to its finding of no prima facie case of obviousness, and rejecting any claim that it was rendered obvious by Francisco's invention.  And therefore, it is entitled to some weight.

But, is it entitled to dispositive weight?  I'm a little more dubious about that.  Especially given the way that they distinguish the Francisco art by saying:  Well, first of all, the electronic indicia was not even instructions.  Each electronic index is a numeral that is uniquely characteristic of the total number of binary 1s and binary 0s of a software

program.

Moreover, the indicia did not indicate the invalidity  of the data.  (Reading) Didn't store form the data that are indicative of invalidity.  Simply electronic indicia uniquely and selectively identified for the submitted program.

So, those bases for distinguishing Francisco's electronic indicia as prior art would, seems to me, would have applied with the same force if the limitation had been construed to include not only checking for viruses, but checking for unauthorized use.  Because it's-- it's validity or invalidity for various reasons.

So, that's why this doesn't seem to be a case where the board's reasoning made its -- was -- that the construction it gave in this case was indispensable to its ultimate outcome. It could have reached it either way.  And if that's the case, then it's just entitled to normal deference, not super deference, it seems to me.

MR. NEWKOM:  So I think, Your Honor, if the -- I hate to do this, but I'm going to present a problem, rather than a solution.

But, if -- if Sophos is given no construction, or plain and ordinary, then what we run the risk of is that the jury is presented an infringement case which relies on such a broad reading of "forms of data" that it would include, for example, electronic indices or unique characteristics, right, based on

the binary composition of the code.  But, of course, that -- that is one of the areas of concern for the board with Francisco.

Likewise, with Sophos' lack of construction, or plain and ordinary, a program's index, the contents of the computer file or program other than instructions or instructions indicative of a computer virus could be put before the jury.

I mean -- and I say at the outset, Your Honor, that I'm presenting a problem rather than a solution, because I'm -- we have tried to give Your Honor our best proposal for a way which is faithful to the board and the history of this patent to exclude the prior art that the board was concerned with, and the examiner was, before that, concerned with, without letting Sophos get it back into this case.

And our proposed solution to that is simply to adopt the verbatim definition or understanding of the claim language that the board used when overruling the examiner and allowing the claim.

        THE COURT:  Let me ask, was there any response -- I don't know if there's an opportunity to respond.  Once the board issued its decision as it did, is there any response right, or period?  What happens after this?

        MR. NEWKOM:  I do not know the answer to that question.

        MR. CUNNINGHAM:  Not that I'm aware of, Your Honor.

I think that's the final word.

**THE COURT:**  Okay.  Well, I'd like you now to answer: Doesn't this phrase need some interpretation for the jury?

And number two, why shouldn't I give deference to the BPAI's construction?

**MR. CUNNINGHAM:**  On the first question, Your Honor, I don't think the claim language is self-limiting other than -- as Your Honor pointed out, other than by the modifiers that are in the claim language, itself.

So in other words, it's not any form of data; it's forms of data indicative of invalidity.  So that's -- and maybe that's the claim phrase that ought to be focused upon.

But the fact of the matter is the words "forms of data" aren't self-limited by the claims.  They aren't.  They're any form of digital data that's indicative of invalidity.

The issue with the Francisco reference was not what types -- what forms of data Francisco looked at.  The distinguishing characteristic between the Francisco prior art and our patent was the fact that Francisco stored a list of data that was indicative of valid data.  Not invalid data.  And so, that was the primary basis upon which the PTAB decided to allow the Sophos patent over the prior art.

And, Francisco was different for a different reason.  And that is:  Francisco was looking at these separate things called IEDs, which my colleague was kind enough to tell me is

electronic identifying data.  So, "IED."  And those IEDs were separate from the data, itself.

So in other words, the Sophos patents looks at these forms of data and looks at the information within these forms of data to decide whether the data is invalid.  And so for those I guess 1A and 1B reasons, Francisco was determined to be different from the Sophos patent.

The other point, I think the patent office didn't directly construe the term "forms of data."  There's no statement in the decision saying "'Forms of data' means X."  There's this, as you called it, a non-sequitur in here which is a little difficult to explain.

But, the fundamental legal point, Your Honor, is: the PTO can't create a disavowal of claim language.  Only the applicant can do that.  And, that's a reference to the *3M Innovative Properties* case that we cite at Page 6 of our reply brief, 350 F.3d, 1365 (As read):

"Prosecution history cannot be used to limit the scope of a claim unless the applicant took a position before the PTO."

That's a quote from that case.

So, let's look at what the applicant -- what position the applicant took in the proceedings before the PTO.  And, I have Slide 17 from our presentation up in front of Your Honor.

(Document displayed)

MR. CUNNINGHAM:  This is a -- this is a quote -- whoa.

(Document displayed)

MR. CUNNINGHAM:  This is a quote from the decision, where they're quoting our reply brief.  And we say (As read):

"Virus instructions, such as 'Jump' instructions..."

And then there's a citation.

"...are exemplary forms of data indicative of invalidity that can appear within multiple unrelated programs..."

And then they go on to make the distinction between the '587 patent and the Francisco prior art.

But the point is:  Sophos, the applicants, never said "forms of data" means X or doesn't mean Y.  It's always phrased in terms of what is exemplary.

THE COURT:  What about -- and it's your position that no definition beyond plain and ordinary meaning need be given because there are already qualifiers around it in the claim language, therefore a jury won't be totally at sea?

MR. CUNNINGHAM:  Your Honor, I do -- and I struggled with how to -- you know, forms of data, "types of digital information."  That's one possibility.  But I don't know that those words mean anything more or less than "forms of data." It is a pretty simple phrase.

THE COURT:  All right.  Let's go on to the next one.

(Reporter interruption)

THE COURT:  Oh, time for a break.  Well, if we're going to take a break, why don't we -- let's see; how many do we have left here?  We've got three terms left, it appears?  Is that right?

MR. CUNNINGHAM:  We're doing pretty good.

THE COURT:  Secondary URLs, sub-deliverables, and genes.  Right?

MR. CUNNINGHAM:  Yes.

THE COURT:  Why don't we go ahead, we'll just take an early lunch, like an hour or something like that.

MR. CUNNINGHAM:  Sounds great.

THE COURT:  And give everybody a chance to break, and then we will hopefully finish up about an hour or so after that.

MR. CUNNINGHAM:  Thank you, Your Honor.

THE COURT:  All right?

(Recess taken from 11:33 a.m. to 12:40 p.m.)

THE COURT:  Okay.  I do have a request.  I want to go back to "flow-based packet classification" -- and maybe I missed something here -- back on the '125.

This embodiment that is claimed to conflict with the proposed narrowing construction that's at column 11 that talks about the "packet flow index" is -- in one embodiment the packet's flow index is identified by extracting various L --

layer -- I'm sorry -- various layer 2 through 4 fields.

Does that conflict with -- with the proposed -- Sophos' proposed construction, which would limit it to LQ and L3/L4 fields?

**MR. JAFFE:**  Yes, it does, Your Honor.  Because, just to put it simply, this embodiment is talking about using layer 2, and Sophos' proposed construction would exclude that and only include 1, 3, 4 and 5.

**THE COURT:**  Now, but this part of the specification existed prior to the amendment.  Is that right?

**MR. JAFFE:**  That's correct.

**THE COURT:**  And yet, it was rejected in the final office action in December of '06?

**MR. JAFFE:**  There was a 112 rejection, that's correct, Your Honor.  Although, as I mentioned before, the patentee did not acquiesce that the 112 rejection was proper, and cited to five different places in the specification where the limitation was disclosed already.

**THE COURT:**  After the rejection.  Subsequent --

**MR. JAFFE:**  That's right.

**THE COURT:**  -- to the filing in -- I think it was March or something?

**MR. JAFFE:**  That's correct, Your Honor.

**THE COURT:**  That's when -- these additional cites. But, so, I guess that's one question.  What am I supposed to

do with this?  Or, do you disagree that this conflicts?

MR. PATTERSON:  Your Honor, it doesn't preclude the layer 2, 3, and 4 being an example of packet classification.  But it's not flow-based packet classification, as they defined in their amendment in March of 2007, after the patent office rejected their construction in December 2006.

THE COURT:  So, this language, this specification preceded the addition of the "flow-based" language in September of 2006?

MR. PATTERSON:  Your Honor, the -- the way the -- if I could have Slide 69?

The way that it worked on that timeline is that the patent office --

(Document displayed)

MR. PATTERSON:  There we are.

The patent office rejected their claim term that they originally filed that did not have "flow-based."  They added "flow-based" in September of 2006, not to the specification, but just to the claims.

THE COURT:  Yeah.

MR. PATTERSON:  The patent office then, in December, 2006, rejected that, and said there's no support for it.  They then amended in 2007, and added that support.

They did not first go back to the patent office in March of 2007, and say:  Hey, just look at these spots, and then be

quiet.

They said:  Look at these spots, but oh, by the way, here's a specific definition for "flow-based packet classification" in column 15, when they added the 31 new lines of material.

THE COURT:  But did the reference to the embodiment which identified the flow index by extracting various layer 2 through 4 fields, did that exist prior to the September 18th rejection?

MR. PATTERSON:  Yes, Your Honor, it did.  That was in their original file.

THE COURT:  So it was there, but it wasn't called a "flow-based packet classification."

MR. PATTERSON:  That's correct, Your Honor.  It was never called "flow-based."  And I would add and point out the obvious, that when they amended the specification in March of 2007, they didn't go back and amend that other portion around column 11 and call that a flow-based as well.  They only explicitly defined "flow-based" relating to layer 1, 3 and 4 in column 15.

THE COURT:  So, what is one supposed to do now with this specification that remained -- part of the specification that remained in here?  It wasn't labeled "flow-based."  And you're saying that now that the claim requires flow-based packet classification which has subsequently been defined

otherwise, that this kind of becomes superfluous; it's no longer really operative?

MR. PATTERSON:  It's not superfluous in that it's an embodiment, but it's an unclaimed embodiment.  So, the only embodiment that they have claimed is flow-based packet classification, not just packet classification in general.

THE COURT:  So it's virtually useless, because if they haven't claimed it in any of the claims of the '125, this embodiment just sits there as background information?

MR. PATTERSON:  Well, two answers to that, Your Honor.  First, it is dedicated to the public. Technically, this other embodiment, layer 2, 3 and 4, would be dedicated public.

However, they did in subsequent continuation patents, as I mentioned on the record before, claim only packet classification in general.  They did not -- they had a claim that did not -- that they removed "flow-based" from, and later just claimed "packet classification."

And that claim -- that patent is not at issue in this case.  But that patent is Patent No. 8,542,595.  And that was a continuation patent of this patent.

Now, interestingly enough, they removed in that patent, they have removed all of the column 15 new material that they added that was not included in the later continuation patent.

MR. JAFFE:  The material regarding the continuation

patent falls into the category of things that weren't briefed.

**THE COURT:** Well, okay. But what do I do -- because one of your arguments is that: Well, you can't construe it narrowly because this would essentially read out the -- one of the embodiments.

But that embodiment, if you look at it historically, was something that was presented pre-September-'06, was not called "flow-based classification," and then it was rejected, notwithstanding that. Apparently that wasn't good enough to enable a practitioner in the arts to practice the patent. And then, came back. So it's like maybe it's not claimed, but that's the way it goes.

**MR. JAFFE:** If I can make one brief point on this, which is that I think the patent, the '125 patent discloses the use of flows to classify patents. Now, the question that we have been talking about is the latter instance, when they use the exact phrase "flow-based packet classification."

But if we're looking at -- and I think Counsel, himself, has touched on this, there are many other instances throughout the '125 patent that describe classifying packets using their flow. Based on their flow. That concept is disclosed throughout the '125 patent.

And I think the instance that you identified in column 11 is a great example of this, and shows why that term should not be given such a narrow meaning, based on the, at best,

ambiguous phrasing describing figure 12.

            **MR. PATTERSON:**  Your Honor, if I might respond just briefly to that?

            **THE COURT:**  Yeah.

            **MR. PATTERSON:**  I didn't -- I don't agree -- and if I did, I didn't mean to -- I don't agree that the earlier disclosures around column 11 and other places in the earlier part of the specification are flow-based as in -- as how they've defined it.  It's dealing with a flow, because we're dealing with packets flowing through the system.  That's just by the very nature of what we're talking about.

    But, flow-based packet classification is something they explicitly defined in their amendment, and after they were told there was no support for what they were trying to do. And they never made an attempt to simply say:  Look at all these other spots, and then not amend their specification. They went straight to the amendment on the specification. And, that's -- it's a clear acquiescence that:  Look, we have a problem here.  And they addressed it.

    And again, they understand how to claim it more broadly later in the later claimed patent.  And --

            **THE COURT:**  Well, but you've admitted that in the March, 2007, submission to the office, they pointed out things that were in the prior specification, in addition to the additional language in column 15.

MR. PATTERSON:  Yes, Your Honor.  But, the -- the point is that they didn't go back into that earlier part of that specification where they were pointing at, and they didn't bother to amend that and call that flow-based packet classification.  They were just describing packet classification.  Classifying packets in general.

There's no dispute that we're talking about a flow, because packets flow through the system.  That's what the network is all about.  The network traffic flows.  But, they define specifically flow-based packet classification in column 15.

And so, if they had believed that their disclosure was adequate for flow-based packet classification in their earlier -- in their original submission, they would not have needed to add the column 15 reference to the new figure 12 that they added to the patent.  Because figure 12 was also added when they added the 31 lines from column 15, line 8 through line 38.

THE COURT:  Doesn't that indicate a lack of clear intent to disavow anything but this new language, when they cited supplemental language of other parts of the prior specification that -- in trying to defend their position about there being sufficient information about flow-based packet classification?

MR. PATTERSON:  I don't think it does, Your Honor,

for two reasons.  First, they could have not submitted the new column 15 and merely made an -- or --

THE COURT:  Yeah.  Could have.  They also could have just submitted column 13 (sic) and said:  Forget all the other stuff; we're going to just rely on this new piece of information; that ought to do it.

MR. PATTERSON:  Understand, Your Honor, there would be nothing for you to decide if they had simply said only column 15 is what you refer to.  I understand that.  But the only thing we have that we can look at that is -- we understand the patentee is trying to use various words to maybe have something down the road to say about something.

But the clear fact here is that you have to look at their actions, not just their words.  And their actions indicate that they made a disavowal, and they understood that "packet" -- or excuse me, they understood that "flow-based" was a particular kind when they wrote that.

And Your Honor, if I could bring up one more point, now is probably the appropriate time.  You mentioned the concern about waiver, they had brought up.

The *O2 Micro* case -- took the -- took time at break.  And the *O2 Micro* case specifically dealt with this issue of the patentee -- or the -- on appeal, of bringing up new claim-construction arguments, and new support for your claim-construction arguments on appeal.  As long as you are

maintaining the same position, the Court in *O2 Micro* held that that was perfectly appropriate.

And that particular cite is at 521 F.3d, I believe it's -- 1321?  Unless I have miswritten it down.  But, it's *O2 Micro v. Beyond Innovation Technology.*

And I do happen to have, then, a paper copy of the functional -- or of the file history with me as well, Your Honor, that shows where they incorporated from the inventor's earlier-created document that they included in the -- that they included in their original filing, and -- back in 2002.

And that's at -- it starts at -- specifically that cite is on Page 49 of the file history, in Section 2.2.1, dealing with packet classification.

And I can show it to Your Honor, if Your Honor would be willing to accept that.

THE COURT:  Well, if I'm going to do that, at the very least I'd have to give the other side a chance to respond, because you've come up with something post-briefing.

Whether that's a waiver or not, that's one question.  But if it's not a waiver, certainly, you know, it's not fair to bring up something that could have been brought up; no reason not to bring it up --

MR. PATTERSON:  (Nods head)

THE COURT:  -- and deprive the other side of a chance

to respond.

MR. PATTERSON:  I understand, Your Honor.  And I would not mean to preclude that.

THE COURT:  Okay.

MR. JAFFE:  As you suggested, there's a lot in there that we haven't had the opportunity to hear before.  If that's the *O2 Micro* case that I'm familiar with, I'm not aware that it stands for the principle that you don't necessarily waive things if you don't bring them up.

I know there's lots of Federal Circuit case law -- specifically the *E-Plus* case -- that notes that if you waive a claim construction, just because there's a dispute down the line does not mean that you get to undo that waiver.

And to the extent that Counsel's bringing up that point, which I'm not sure, having not reviewed the cases he's mentioned, then we would disagree with that.

THE COURT:  Well, let's do this.  I'm going to look at what you've got a second time, and see whether I need any additional -- I mean, you've made essentially a proffer of what that might be, and I'll decide whether that's going to be useful or not.  And if it is, and I find that there's not a waiver, I'll allow you to do a supplemental filing.

And then you (Indicating) can respond like a week thereafter.  But right now, I don't want anything.

MR. JAFFE:  Okay.  Just one last point, Your Honor.

On the figure 12 part that we've been arguing about so much on this patent, we would submit that -- as I mentioned before, that the entire paragraph is talking about flow-based packet classification.  It says one is flow-based, and then the next one is also flow-based.  And those are both flow-based packet classification within the scope of the claim.

And you can see that by the words used right there in the specification.  It talks about adding things to a flow index.  It is classifying packets, based on their flow.

THE COURT:  I'm sure whoever had a chance, if you could turn back the clock and redo this, it could be -- because it could be construed the other way, as Counsel has argued, that yeah, block 1230 talks about there's a block for flow-based packet classification.

And one could read the specification, that column 13 is saying:  And here's what flow-based classification is, LQ/L3/L4.  Now, there are other forms which we don't call flow-based; that's not what we meant when we make that block in 1230.

Or, you could construe it to say:  Well, block 1230 means everything in here, but we're going to -- you know, again, I don't know why one -- why the phrase "one is flow-based" -- it's interesting.  I mean, they're both flow-based, really. Right?

**MR. JAFFE:** Yes.

**THE COURT:** Why do they say one is flow-based? The other form does X, but flow-based is Y. It would have been simpler if it had just said "one is," instead of a "flow-based."

**MR. JAFFE:** I agree that would be simpler. One thing I want to make sure is clear before I sit down on this point, in terms of the timeline, we've noted about them adding figure 12 to the specification in response to a 112 objection. They also, at the same time, pointed to the other parts of the specification and said it was disclosed.

So, it wasn't a case that they added figure 12 by itself, and then said yes, that's sufficient.

**THE COURT:** Right. And that's the point that --

**MR. JAFFE:** So I don't think there's any --

**THE COURT:** -- show a clear disavowal because they didn't just add figure 12 in column 15; they pointed to earlier stuff.

**MR. JAFFE:** So to that point, to the extent that Counsel was arguing that there was an acquiescence by the applicants, I would argue that there wasn't any acquiescence, let alone a kind of clear disavowal that the other disclosure of flow-based packet classification is within the amendment to the specification in figure 12.

**THE COURT:** Okay. All right. Thank you.

(Off-the-Record discussion between the Court and Clerk)

**THE COURT:**  So, I want to talk about the '852 and the secondary URL, which I don't think we need to spend a lot of time on.

**MR. STEIN:**  Good afternoon, Your Honor.

**THE COURT:**  Good afternoon.

I think we all know what it is.  We're just trying to describe it in a way that's accurate, and helpful, and not confusing to the jury.  And I think both of your descriptions, I think, are problematic in my view.

To say it's something other than the primary URL is not exactly enlightening.  But to say it is a sub-string of, maybe that's kind of okay.  And "distinct from," I'm not sure what that means.  It could be misleading.

Can we cut to the chase?  Why we can't say something like "a distinct URL embedded within a primary URL"?  I mean, isn't that sort of what it is?

**MR. NEWKOM:**  Fortinet's fine with that, Your Honor.

**MR. STEIN:**  I think that's accurate, Your Honor.  I think the only flag that that raises in my mind is that I know that there is a dependent claim that uses the terminology "embedded."

**THE COURT:**  Oh, there is?

**MR. STEIN:**  And so, the patentees have defined that to be something different than what's claimed in the

independent claim.

THE COURT:  Oh.

MR. STEIN:  And I think, Your Honor, that's claim 13 that claims an embedded -- the secondary URL is embedded in the URL.  I've got a --

(Document displayed)

MR. STEIN:  It's on this slide here, Your Honor.

THE COURT:  Yeah, I see it.  Then you have that redundancy kind of issue.

MR. STEIN:  I think the Court's intention is -- is right with that.  "Embedded" might not be -- it is a little bit of a loaded word, in the context of this patent.

MR. NEWKOM:  If I may, Your Honor?

THE COURT:  Yeah.

MR. NEWKOM:  This may not be the first time that a patentee elucidates in a dependent claim a concept which is fairly obviously present in the claim from which it depends.

I'm also having Mr. Jordan checking to see whether -- is claim 13 still in the case?

MR. JAFFE:  No.

MR. NEWKOM:  Claim 13 is not in the case, from Sophos.  So to the extent the jury is presented with the awkwardness of an "embedded," "embedded," that's not going to arise because they're not going to see that claim language.

I understand that's a different question --

THE COURT:  Right.

MR. NEWKOM:  -- from whether we've faithfully done claim construction while avoiding redundancy.  But, insofar as it's a confusing issue for the jury, they won't see that.

MR. STEIN:  Your Honor, would you repeat your construction?

THE COURT:  I was going to suggest something like "a URL embedded within a primary URL."

MR. CUNNINGHAM:  Your Honor, what if we said "included within" rather than "embedded within"?  Then we don't have the redundancy.

THE COURT:  Okay.  How's that?

MR. STEIN:  I think we can be fine with that.

MR. NEWKOM:  Fortinet's fine with that, Your Honor.

THE COURT:  Excellent.  Now if we can only settle the case this way.

MR. STEIN:  Thank you, Your Honor.

THE COURT:  Thank you.  All right.

Sub-deliverables.  So, is it agreed that deliverable -- I think it was -- I forget who -- I'm trying to remember who said this in their brief, but they said "deliverable" is content of data to be delivered or provided.

Is there a dispute that that's a fair definition of what a deliverable is?

MS. GRASSO:  That's what Sophos put in its brief.

THE COURT:  Yeah.  That's what I thought.  I mean, is that a generally-accepted concept?

MR. NEWKOM:  I'm sorry, Your Honor.  Can I hear that again?

THE COURT:  Yeah.  "Deliverable" is "content of data to be delivered or provided."

MR. NEWKOM:  I don't have any basis to disagree with that.

THE COURT:  Okay.  So then we get to "sub-deliverable."

(Document displayed)

THE COURT:  Does that really need -- you know, "sub" means something, a smaller piece, or within, or something.  I don't know if it -- if it's -- if we need anything.

MR. NEWKOM:  I think, Your Honor, the point that Fortinet is trying to get at with the "separately-delivered" portion is if we take or if the jury just takes sort of a language-based approach, and they say:  I understand what a deliverable is or how a skilled artisan would understand that term, and a sub-deliverable could be some portion of that.

Well, the intrinsic evidence suggests that we're not just talking about some portion of a deliverable.  We are instead talking about, in the context of packets moving around a network, a sub-deliverable -- which Dr. Nielson says is not a term of art, and I don't think we've heard any contrary

evidence to that -- that a sub-deliverable, as this patent describes it, each sub-deliverable always has its own source address.

And, and that means to any skilled artisan that in a packet routing network, if you will, that each sub-deliverable is a distinct communication unit, if you will.  Because it must have its own source address.

In particular, Your Honor, if I may walk away from the podium for just a moment to look at some claim language?

THE COURT:  Yep.

MR. NEWKOM:  And I'm sorry, Your Honor, I don't have a thicker marker today.  But --

THE COURT:  Maybe, here, you can borrow -- Betty, do you want to give him the blue one or --

(Request complied with by Madam Clerk)

MR. NEWKOM:  That's fine, thank you.

In Claim 1, a source address -- "wherein the contextural information includes a source address for each one of the plurality of the sub-deliverables..."

So even for me, let alone a skilled artisan, if each one of these units of data, a sub-deliverable as they're described by the patentee, if each one of them must have a source address, it's separately delivered.

Otherwise -- it's not the case that each one has a source address.  They may be sharing a source address.

**MS. GRASSO:** May I respond?

**THE COURT:** Yeah. What about that? I mean, if -- it's clear that the patent claim anticipates a source address for each sub-deliverable.

**MS. GRASSO:** Absolutely. We agree with that. But there's nothing in the intrinsic record that suggests that it has to be a unique source address.

For example, you can have sub-deliverable 1 at source address 1. Sub-deliverable 2 at source address 2. Sub-deliverable 3 at source address 1. Because if you look at the claim 1, you're talking about a pattern of source addresses. And that's what we're focusing on.

So, yes, each sub-deliverable has a source address. It doesn't have to be unique. It's a pattern of changing source addresses. So you don't need to put separately-delivered content into the definition. It just has -- it doesn't belong there.

**THE COURT:** So if it has the same -- if sub-deliverable 1 and 2 have A as their source address, they don't have to be separately delivered?

**MS. GRASSO:** I believe that's correct.

**MR. NEWKOM:** Can I try -- let me supplement, Your Honor, if I may.

**THE COURT:** Okay.

**MR. NEWKOM:** In the same claim limitation, there's a

concept that not only does each sub-deliverable have its own source address, right, for each one (Indicating), not only that, the -- quote (As read):

"...the contextual information includes a pattern of changing source addresses for each one of the plurality of sub-deliverables..."

So, a skilled artisan reading this claim, trying to understand, right: What is a sub-deliverable, if it's not a term of art?  According to the patent, not only must each -- each sub-deliverable have its own source address.  Part of the point of this patent is, you look at patterns or changes in the source addresses for each sub-deliverable.

If this doesn't mean --

THE COURT:  What does that mean?  Maybe you can go back to the basics for me, and give an example of how that plays out in the real world.

MR. NEWKOM:  As I understand it, Your Honor -- and I'm probably the worst lawyer in the room to ask.  But as I understand it, it means -- part of the value of this patent, as the patentee described it to the PTO, is that sometime -- you -- you can discern a security risk to network-communicated content.

By looking not just at the packet-related information or the control information, for example, on a particular packet, but rather, by collecting contextual information across

numerous -- numerous sub-deliverables or numerous packets that when you look at those together, you might be able to discern security risk, indicative --

THE COURT:  So, what's an example of a sub-deliverable that is looked at?  Sender's address?  Or -- what's an example of --

MS. GRASSO:  If I may, Your Honor?

MR. NEWKOM:  Please do.

MS. GRASSO:  It could be -- let's think about a website.  So, it could be a picture on the website is one sub-deliverable, and the, you know, header on the website could be another.  One could be coming from server 1 in Russia; one could be coming from France.  Or, pick your country.

THE COURT:  Is the idea that by looking at those patterns, just like where it came -- if you saw a combination of France plus Russia plus Bulgaria or something, the flags go up?

MS. GRASSO:  Correct.  And it's not just looking at where the sub-deliverable comes from.  It could also be -- you know, we're talking about contextual information.  So, we're trying to provide more context.  Who sent -- you know, where is it from?  How big is the data?  You know, other things like that.  The author of the data -- of the sub-deliverable; excuse me.

**THE COURT:** Okay. So, back to your point.

**MR. NEWKOM:** So my point, Your Honor, is if you're -- this is -- in claim 1, if you're making this determination based on a pattern -- this is not optional, this is mandatory -- a pattern of changing source addresses for each one of the plurality of sub-deliverables (Indicating), I -- I have not been able to fathom yet a reading of this patent in which each sub-deliverable was not a separate -- a separately-delivered or a separate bit of communication traffic. It has to be.

Otherwise, as was just suggested I think by Sophos, if this could just mean that, you could have all sorts of packets, and they all have the exact same source address. But you -- and I don't mean to be -- I can see Ms. Grasso responding. I don't mean to be misrepresenting the argument. There's no pattern to discern.

The point of looking for a pattern is that you are looking for a pattern between the source addresses for every single one of those sub-deliverables. If those sub-deliverables are grouped, if they're not independent communications, there's no meaning to the pattern you can discern.

**THE COURT:** This pattern of changing source addresses for each one, is that saying a pattern of different source addresses, or various source addresses for each one? Or does that mean dynamically, any one deliverable source address

changes over time?

I -- I didn't -- I've looked at that.  I'm not sure I understand what it means.  What does it mean to be changing source addresses for each one?

MR. NEWKOM:  I'm not sure I do either, Your Honor.

MS. GRASSO:  May I?

THE COURT:  Yes.

MS. GRASSO:  Thank you.  It's -- each sub-deliverable source addresses is changing -- keep in mind, you know, the reason behind this patent is that people were trying to get around the block lists.  And to do that, they were breaking up their data into different sub-deliverables to fool it, the block list, if you will.

So what we're talking about, the pattern of changing source addresses is just where -- where each source address is coming from, because they're trying to get around, you know, the block list.  So, a pattern does not mean that every sub-deliverable has a separate originating source address.

As I gave the example before, sub-deliverable 1 can come from source address A, sub-deliverable 2 can come from source address 2.  And sub-deliverable 3 can also come from source address 1.  It's still a pattern of changing source addresses.

THE COURT:  What's changing?  What does "changing" describe?

MS. GRASSO:  Where they're coming from.  The source

address.  So every -- every sub-deliverable does not have the same source address.  They're not all coming from server 1 in Russia.

THE COURT:  So "changing" -- I mean, normal English, you would say "differentiating" or "different" or something, right?  But "changing" implies a dynamic process.  Changing, over the dynamic of time.  This is at any one point in time, they're coming from different places.

Is that what it is?

MS. GRASSO:  They're coming from different places.

THE COURT:  So I guess that's the argument, they come from different places, then how can you have one -- is it possible to do this when you only have one source address, and it's not being delivered separately?

How do you -- how does this thing work, if it all comes from -- if it's not delivered separately from different source addresses?

MS. GRASSO:  It isn't that they are all being delivered from the same source address, but there's nothing in the intrinsic record that suggests that you can't have more than one of the sub-deliverables coming from the same place.  Because there's other contextual information that could flag the problem.

So, it's not -- I would agree, certainly, that all of the sub-deliverables would not have the same source address.  But

it's certainly possible that two of them could come from --

THE COURT:  Well, some, but not all.

MS. GRASSO:  Exactly.

THE COURT:  And that's the problem with this, it says separately delivered content.  That precludes the "some" part.

MS. GRASSO:  Correct.  And certainly, the inventors never made a clear and express limiting of this.

THE COURT:  Okay.

MR. NEWKOM:  I -- I think, Your Honor -- and I'm just going to return to the claim language again.  I suppose it might be the case that you could have multiple independently- or separately-delivered content that happened to have the same source address.  But that doesn't conflict with Fortinet's construction.

When Ms. Grasso just said a moment ago that there's no intrinsic evidence to support this, we're going for the gold standard.  We're going for the claim language, itself.  Two instances in the claim language.  All right?  Each of which say that each sub-deliverable must have a source address.

THE COURT:  Doesn't say "unique."

MR. NEWKOM:  It doesn't say "unique," and I don't think it should, because that would mean this would apply only to some sort of communication in which every single sub-deliverable happened to have a different source address.

But for a skilled artisan to say that network data has a

source address, they're talking about -- when each one of this unit has a source address, I -- I think it takes quite a bit of acrobatics to read that to mean anything other than each one of these units, sub-deliverables, is something which is separately delivered.  That's why each one has its own source address.

And yes, of course, some of those source addresses may be the same.  But the point being if you ask a skilled artisan what has a source address, it's going to be an independently- or separately-delivered bit of content.

**THE COURT:**  But if two of the sub-deliverables are from the same source address and the other ten are not, two of them would not be separately.  Those two would be delivered together.  And your construction would seem to preclude that. It seems like you're requiring every single sub-deliverable to be separately delivered.

**MR. NEWKOM:**  We absolutely are.  And I think, Your Honor, in that instance, it can certainly be the case that two sub-deliverables -- or the two packets could originate from the same source, and subsequently get to the same destination.  But that doesn't mean that they were delivered together, as they -- they may even get there through a different path.

But if you've got -- if -- I mean, I am -- I don't want to over-sell the point, but I'm focusing on a couple of bits of

language in the claim.  The repeat use of "each one" (Indicating) with respect to sub-deliverables, "each one," and the source address.

So, if you have multiple bits of data moving across a network, right, you may discern a pattern by seeing some -- to use the language we were using before, some from Russia, some from France.  But if you were also picking up 40 bits of data from the same address in Mexico or South Dakota, that, in itself, may be part of the pattern of changing, or -- as Your Honor was having the exchange with opposing counsel, I was thinking of changing the word "changing" to "various."

That, too, is part of the pattern.  And just because, as Fortinet readily admits, you can have multiple bits of data with the same source address, that doesn't change a fair reading of the claim language, itself, which is that each one of these -- each one of the sub-deliverables has its own source address.

What does it mean for a bit of data to have a source address, its own, or each one to have a source address?  It means separately delivered.

THE COURT:  Let me ask about the stored or processed as a unit.  What's the problem with that?  How else could it be processed?

MS. GRASSO:  Well, there's a couple of instances in the specification where it talks about just that.  And it

doesn't require all of the sub-deliverables to be stored or processed as a unit.

They give the example that in some instances you might only need one sub-deliverable to raise the red flag and say this is a problem.  In other instances, there might only be -- you know, you need two sub-deliverables.

And, that's at column 19, if you want the cite.  19:66 to column 20:10.  Just discusses that you don't necessarily need every sub-deliverable to realize there's a problem.

THE COURT:  19:66?

MS. GRASSO:  Excuse me, 67, column 20, I believe it's Line 11.  Also again at column 25, I believe line 26 to 30.

MR. NEWKOM:  I'm sorry, Counsel; I lost track of where you are.  Which column?

THE COURT:  Go back to column 20.

MS. GRASSO:  Column 20, through line 10.

THE COURT:  Yeah, and then the next one was --

MS. GRASSO:  Column 25.

THE COURT:  Oh.  Hold on.  Yeah.

MS. GRASSO:  Line 26.

THE COURT:  Yes.

MS. GRASSO:  Through 30.  The end of that paragraph.

THE COURT:  And was there a third?

MS. GRASSO:  No, those were the only two.

THE COURT:  So, what these talk about are looking at

the first address in the series, that's looking at one sub-deliverable?

**MS. GRASSO:**  Correct.

**THE COURT:**  And you can do stuff with just one.

**MS. GRASSO:**  Yes.  You may know, just based on that one sub-deliverable, that you have a problem and stop the presses there.  In other instances, you might need two.  It doesn't -- it clearly contemplates you don't necessarily have to have all of them.

**THE COURT:**  Well, once you get more than one, they do have to be processed as a unit, do they not?

**MS. GRASSO:**  Yes.  And the claim addresses a plurality of sub-deliverables, which is two or more.  So, you don't need to include the additional language of "as a unit."

I don't know what "as a unit" means.  Does that mean all of them?  Does that mean some of them?  I don't know what that means.  And I don't think it's necessary, because the claim is saying "a plurality of sub-deliverables."

**THE COURT:**  Well, if the claim requires a plurality, and if there's more -- and "plurality" means two or more, and you have that, you would agree that they would have to be processed, or stored as a unit?

**MS. GRASSO:**  Depending on what a "unit" means.  I don't agree that they all have to be processed and stored as a unit.  But I would agree that in some instances two do; in

other instances, more.

I just don't know what "unit" means, and I don't think it's necessary to include that in the definition.

THE COURT: So then, you are raising a question of: What is a unit.

MS. GRASSO: Correct.

THE COURT: Okay. What's your response to that?

MR. NEWKOM: One or two of them, Your Honor. The first is: Let me just make clear why we came to this construction. And, I'm looking again at the claim language.

So, this discussion of contextual information, sub-deliverables, et cetera -- this discussion of contextual information including sub-deliverables, there is a phrase -- sorry, I just sped up -- "the data" (Indicating).

And what is the data? Well, the data must be, at a minimum, a plurality of sub-deliverables. And I won't try to reignite the sub-deliverables debate. But, the data.

And later in the exact same claim, there is this phrase (Indicating): "...authorizing delivery of the data and the contextual information..." and then "...scanning the data... and the contextual information on the client device that receives the data and the contextual data to determine whether a target data is present..."

So as we -- and I'm sorry, Your Honor; I've marked up this poster so much I'm not sure it's useful any more. But this

phrase "the data" must include "a plurality of sub-deliverables," that's clear.  And later in the claim, in limitations, "the data," the data which must include a plurality of sub-deliverables is digested, if you will, as "the data" by the claim system.

So in order for that to be the case, what's being described is not, for example, a system which dribs and drabs one sub-deliverable at a time, and creates a repository of information to discern patterns in that way.  What's described here is a system which collects the data, "the data" being a plurality of data points, if you will, about the sub-deliverables.  And then that plurality is reviewed.

I keep saying "digested," but scanned, in order to make a determination about the presence of target data.

Now, that -- I'm not sure that answered Your Honor's question about what a unit is.  So, I don't want to disregard that question.

**THE COURT:**  What's your answer to that?

**MR. NEWKOM:**  Saying it is a unit was simply our attempt to get language which would make sense to a jury to make the point which I just tried to illustrate a moment ago, which is:  Even if you have a plurality of sub-deliverables, that -- that the -- the scanning and determination is made -- it's not done on a rolling or seriatim basis.  That's not what claim 1 describes.  It describes the data as being a

plurality, and then it describes the data being scanned -- provided to and scanned in one step.

THE COURT:  Okay.  Your response?

MS. GRASSO:  Again, it's not all of the data.  It's not every sub-deliverable and, you know, waiting for that all to be stored and processed together.  It's exactly the examples that I gave you in column 19 and 25.

Think about loading the website again.  You don't go to weather.com to see if it's raining and you stare at a blank screen, waiting, waiting, waiting and then poof, it all comes up.  It comes, at a time.  And yes, it can be, you know, two of the plurality, two or more, but it's not all.

And that's really my issue with Fortinet's proposed definition.

THE COURT:  So if it said "some of which is processed together," that would be less objectionable to you?  I'm not suggesting it, but --

MS. GRASSO:  It would be less objectionable to me, yes.

THE COURT:  So your concern is that it means all processed together --

MS. GRASSO:  Correct

THE COURT:  -- as a, quote, unit, which I assume means together or something.  And you're saying not all of it has to be processed together.

**MS. GRASSO:** Exactly.

**THE COURT:** Well, I'm wondering whether, you know, in attempting to define all these subtleties and these permutations and these possibilities, this thing just gets more confusing, when in fact some of the limitations that you want to read into this claim is already covered by a lot of the claim language, itself.

So I'm not sure what -- what we advance, because there would have to be some limitations, based on what I just heard, on yours. And by the time we add some, could be less than all, and could be processed -- you know, those could be processed first and before you process the others; some situations you might even -- don't even have to process more than one.

You know, I -- there would be so many footnotes to this thing, I think -- I'm not sure we get anywhere.

**MR. NEWKOM:** I think our concern, Your Honor, is that because Dr. Nielsen has testified that "sub-deliverables" is not a term of art, our concern is that without some sort of construction, without some sort of guidance for the parties, it's going to be the Wild West on this term, in front of the jury.

So we are looking to Your Honor for some guidelines on what the parties can present to the jury as what constitutes a sub-deliverable.

THE COURT:  Is there anything in -- now, you base this all on kind of discerning from the claim language, itself.  Is there anything in the specifications or anything else that supports your asserted limitations here?

MR. NEWKOM:  I believe there is, Your Honor.  But, you know, I -- I'll give Your Honor a couple of examples.

THE COURT:  Okay.

MR. NEWKOM:  And I tried to pare down so much for today that I don't have the complete book in front of me.

But, looking at column 25, lines 7 through 24 --

THE COURT:  Uh-huh.

MR. NEWKOM:  I'm looking in particular at the following language (As read):

"Further, the pattern may be realized across a sequence of addresses, such as breaking the delivery of content into a series of sub-deliverables, each with their own address.  For instance, malware may be configured for delivery to a client machine with a unique sequence of addresses such as www.bad-alpha, bad-beta, bad-charlie, and the like."

I believe, Your Honor -- I can pull more if you would want.  But I do -- it is not the case that we're playing a heuristic game just on the claim language, itself.

The concept that each sub-deliverable has its own source address and therefore is separately delivered and the concept

that they are looked at -- I think the basic -- the basic gist here is they are delivered separately; they are considered collectively.  Collectively being two or more.

THE COURT:  How does this address the requirement that each sub-deliverable be delivered separately?  This is about -- as I glean from this, about how you identify this changing address used to avoid blacklisting, it doesn't say much to me about pluralities of sub-deliverables and how they have to be delivered, and whether they have to be processed as a unit.  It's really giving an example of this changing business, and this disguise kind of thing.

MR. NEWKOM:  So, Your Honor, I was focusing first on the phrase "breaking the delivery of content into a series of sub-deliverables, each with their own address," which Fortinet submits is consistent with not just the claim language (Indicating), specifying that each sub-deliverable must always have its own source address, but furthermore, that it is actually delivered separately.

And the second point -- so if that's the first half, how are they delivered in?  And each sub-deliverable is delivered in on its own.

And then the question being:  How are they digested by the system?  And, that, Your Honor, is more to the point of the claim language brought to Your Honor's attention.

THE COURT:  Let me ask:  What about this?  It talks

about breaking -- for instance (As read):

"The pattern may be realized across a sequence of

addresses, such as breaking the delivery of content

into series of sub-deliverables, each from an

address..."

And then you look for patterns."

**MS. GRASSO:**  Absolutely, Your Honor.  That is one way it's done.

And I would direct you just a few lines below that to -- I believe it's Line 26, where it also talks about that you don't need to do that.  Sometimes you'll find out with just one sub-deliverable.  Sometimes, two.  So, there's a range of ways to do this that are contemplated.

**THE COURT:**  Plus that paragraph starts off: "In embodiments..."

**MS. GRASSO:**  Yes.  Right.

**THE COURT:**  -- import specification limitation into limitation of claims.

Okay.  All right.  Well, I guess -- I think that's what I need to hear on that.

Let me go to the last one, "genes."

It seems to me that everyone is agreeing with the inventor's first sentence, and that is (As read):

"A gene is a piece of functionality or property of a

program."

But then, goes on to state:

"Each piece of functionality is described using sequences of APIs and strings when it can be matched against functioning blocks."

And so, there's no dispute that that's accurate.  Is that correct?  I mean, do you dispute that that's an accurate --

**MS. GRASSO:**  Yes.

**MR. NEWKOM:**  I think actually, Your Honor, this is the heart of the dispute.  Whether -- whether a gene is the piece of functionality or property, or whether it is a description, and a specific way of describing that functionality or property.

(Document displayed)

**MR. NEWKOM:**  I had the same first-blush response, Your Honor.  And I think even our -- our pitch-book materials before Your Honor say at one point that the parties are in agreement about functionality or property of a program.

But upon reflection, I think that misses the point.  I think the parties have a pretty fundamental disagreement about genes.  So it's not just a matter of adding the additional language.

**THE COURT:**  Maybe you can explain this distinction.  I'm not sure I --

**MR. NEWKOM:**  Sure.

**THE COURT:**  -- fully understand it.

MR. NEWKOM:  Mr. Jaffe, can you please bring up page 112?

(Document displayed)

MR. NEWKOM:  So on one side, each side has the phrase "piece of functionality or property of a program."  And there are some differences between the parties, but they are minimal.

But the difference is Sophos is asking Your Honor to construe the piece of functionality or the property to be the gene.  And I think that's actually dead wrong, when you read the patent.

What a gene is, is instead, something that describes that piece of functionality or property.  And we've used the phrase "sequence of APIs and strings" that describe that piece of functionality.

But let me just try to illustrate the point with -- as an initial matter, Your Honor, for looking at the materials from Sophos.  I'm looking at Page 43 of Sophos' binder for today.

Now, on Page 43, there are some highlighted portions from the abstract for the '344.  In particular, the following phrase (As read):

"The method includes identifying one or more functional blocks and/or properties of software.  The method further includes identifying genes in the functional blocks and/or properties."

Looking again at Page 47 of Sophos' materials, so from the same book, where there's the phrase taken from the intrinsic evidence, column 2:

"The method further includes identifying one or more genes in the at least one of the functional block and a property of the software."

So, let me try to further illustrate the point, if I may, Your Honor, by reference to the claim language.

Looking at claim 1, in this method, one step is identifying a functional block and a property (Indicating). The next step is identifying one or more genes -- the genes, namely, that describe one or more of the at least one functional block and the at least one property of the software -- as a sequence of APIs and strings.

So, to construe a gene to mean a functional block, you know, I have yet to understand how that is logically consistent with a claim which separately discusses a gene as something which can describe or identify a functional block. If a gene is simply a functional block or a property, claim 1 devolves into a nonsensical disclosure or claim.

**THE COURT:** If it's something that describes a functional block and at least one property, then the second limitation is identifying one or more genes which describes at least one functional block, each describing one or more at least -- then you have the redundancy issue.

**MR. NEWKOM:**  Well, so I think -- so the -- what I intended to be responding to first was Your Honor's comment that:  Is it the case that the parties are in agreement as to the piece of functionality of a property or program?

And, in looking just at the language, we are.  But in terms of the fundamental -- what our thought objects are, we're going after very different ideas here.  A gene -- there's a separate question which we can get to in a minute, which is:  If a gene is not a piece of functionality or a property, but it is rather, a specific way of describing functionality, what does that description look like?  What kind of a description is being claimed?

And that's where we've got the sequence of APIs and strings.  And we've briefed our intrinsic evidence to support that, and I'm happy to talk more about it today.

But before we get to the question of what kind of a description is claimed, first I think we have to separate out the issue of:  Is a gene a way of referring to the functional block?  Or is it something different?  Is it a specific way of describing or identifying that functional block or property?

And I want to stop just for a moment, because I want to make sure I'm not sounding like a freshman in philosophy class.

**THE COURT:**  I hear what you're saying.  And of course, I'm -- not seeing your summary-judgment motions, I

have no idea what the significance of all this is.  I'm sure it's significant in some way.

But before we get there, the problem there is you've got two limitations.  One suggests that the description approach is better.  The other suggests if you use the description approach, it becomes kind of redundant in the second one.  And if you used the functional -- the actual functioning, it kind of doesn't jibe with the first one.

I mean the problem is, frankly, you've got two limitations there that kind of go in different directions as to:  What is a gene?  Is it a descriptor?  Or is it an actual thing?  Is it this functioning block?

And the way this claim 1 is written, any one of those runs into some grammatical problem, it seems to me.

MR. NEWKOM:  (Nods head)  It's not my patent.  I agree, Your Honor.

THE COURT:  Okay.  Well, all right.  Well, I understand what you're saying.  I don't -- like I say, I don't know what the significance of it is, but I suppose I'm not supposed to know, to a certain extent.  But -- so, go on to your next point, I guess.

MR. NEWKOM:  Okay.  So, beyond that, after that issue, it does become a simpler debate.

The intrinsic evidence supports a construction that a gene is a piece of functionality or property of the program.

However, it also couples that with the statement that each piece of functionality is described using sequences of APIs and strings which can then be matched against functional blocks.

(Document displayed)

**MR. NEWKOM:**  So, I don't think the debate between the parties is about whether this patent repeatedly describes a gene in the context of sequences of APIs and strings.  I think the question is whether that should be recited as a limitation.

And, we're seeing and I think we've cited for Your Honor consistently in the intrinsic evidence that a gene is referred to, used that way, by the patentee.

For example, also in the prosecution history, if we could go, Mr. Jaffe, please, to page 117.

(Document displayed)

**MR. NEWKOM:**  And whether waiver, or whether persuasive for how a skilled artisan would use it, the patentee, themselves, were referring to genes as "sequences of APIs and strings, referred to as 'genes,'" which genes are used to describe software.

Now, before I turn over the microphone, I will say part of what --

**THE COURT:**  This comes from -- what is the source of this?  What are you quoting here?

MR. NEWKOM:  This, Your Honor, is from Exhibit 3 to our responsive claim construction brief which was an April 3, 2012, amendment.

THE COURT:  Okay, Exhibit P, it says, is that right?

MR. NEWKOM:  Pardon me?

THE COURT:  Exhibit P to your responsive construction.

MR. NEWKOM:  Oh, Exhibit P, yes, as in "potato."

THE COURT:  Okay.

MR. NEWKOM:  And my understanding, Your Honor, is that within the art, the use of the word "genes," whatever else we may have to say about this patent in weeks or months come, to the use of the word "genes" was certainly novel. That there is, outside the intrinsic evidence, a dearth of guidance to the experts, to a skilled artisan, about what this means.

So we are -- we have been hunting for what "genes" means. And to simply call it the functional -- piece of functionality or program without also -- as the patentee did consistently -- including the phrase that there's a sequence of APIs and strings to describe that piece of functionality or property is inconsistent with the patent.

THE COURT:  What about -- I mean, you have this qualifying language that is "a sequence of APIs and strings that describe..." et cetera, et cetera, but the third

limitation of claim 1 says "identifying one or more genes, each describing one or more of at least one functional block and at least one property of the software as a sequence of APIs and strings."  So, isn't that already there?

MR. NEWKOM:  Well, I guess in response to Your Honor's argument, it looks like both -- both sides' constructions would be entirely there within that limitation.

THE COURT:  Yeah.  That's what I mean.

All right.  What's your response?

MS. GRASSO:  So, this is a situation where the patentees were their own lexicographer, and they define "gene" to be two possible things.  On the one hand it's a piece of functionality.  Then there's an "or," it's a property of a program.

And, that makes perfect sense when you think about what is this patent trying to do.  It's trying to identify malware and unwanted software by looking at the characteristics of the software.

So, that could be a piece of functionality, like collecting passwords.  Or it could be a property of a program: Bank site from Russia.  You know, those are two different things.  Both are bad.  You want to be able to catch both of them.  Or either of them.

The specification always refers to them as an "or."  It's either a piece of functionality, or it's the property of a

program.

Same with the prosecution history.  If you a turn to -- can we get our slide up?  On January 24, 2011, a gene is a piece of functionality or a property of a program.

I'm sorry, could we switch the --

**THE CLERK:**  (Nods head)

(Document displayed)

**THE COURT:**  What page is this?

**MS. GRASSO:**  It's 45.  Yes.

So, the patentee's being consistent in the definition in January of 2011, in June of 2011.  And then -- and we're not even being inconsistent with the passage that Fortinet's Counsel showed you, the April, 2012, part of the file history.

And that's because in that instance, they were only talking about the functional part, you know, the piece of functionality.  The functional code.

And we're not disagreeing that when you're talking about a piece of functionality, when you're talking about the functional code, that is being described by a sequence of APIs and strings.  But that's not everything.  And they never gave up property of a program.  And they wouldn't, because then you would be missing a ton of, you know, malware, and unwanted software.  This invention goes to both.

So yes, when you talk about the functionality, you're talking about, you know, it being described by sequence of

APIs and strings, which is what the inventors said in the --

THE COURT:  Property, property of a program is different from that.

MS. GRASSO:  Exactly.  And that's the problem -- one of my problems with Fortinet's construction is that it basically reads out the "or" and makes the sequence of APIs and strings apply to both.  And you have to -- you know, a property of a program is something different.

THE COURT:  So, do you have any objection to adopting the whole of what the inventors said, that a gene is a piece of functionality or property of a program; each piece of functionality, which is the part you're -- the first half, is described by using the string of APIs, et cetera, et cetera?

MS. GRASSO:  I would be fine with that.

THE COURT:  It leaves "property" in play.

MS. GRASSO:  Yes.

THE COURT:  Whereas the way that Fortinet has it, the string of APIs -- and "strings" arguably describes both functionality and property, and that's the problem.

MS. GRASSO:  Correct.  I don't think the second sentence is necessary, but I -- I would be fine having both sentences.

THE COURT:  What about your point about -- his bullet point about describing versus being the actual functionality, itself?  Or description versus the description of the

functionality?

MS. GRASSO:  If I understood it -- and that was the first time I heard it.  I didn't know we had that disagreement until we got here.

So, the boundaries are very clear about what a gene is. It is a piece of functionality, or it's a property  of a program.  It's not describing it.  It is.

We need to pay careful attention to what the inventors -- how the inventors defined it.

THE COURT:  So, your definition is okay, because when you look at like the limitations in claim 1, whether we add the second sentence or not, you say piece of functionality or property of program, you would say:  Identifying one or more genes which is a piece of functionality or property of a program, each describing one or more of at least one functioning block and at least one property of the software as a sequence of APIs and strings.

MS. GRASSO:  Well, that's why I don't think we need the second sentence, because the "sequence of APIs and strings" is already in the claim.

THE COURT:  Well, it's interesting.  This describes, this says:  The gene, each describing one or more of at least one functioning block and one property as a sequence of APIs and strings.  That does suggest that even describing the property is a sequence of APIs and strings, does it not?

How do you get around --

MS. GRASSO:  Well, I think the definition of "gene" is broader than the specific limitation.  And it's talking about one or more of the at least one.  So, I agree.

I probably would have written the claim differently, myself, but --

THE COURT:  So "genes" is broader, but you may be hemmed in by the limitations --

MS. GRASSO:  Yes.

THE COURT:  -- that's contained in the actual claim language; that does not necessarily dictate that the word "genes" itself be as narrow as the limitation.

MS. GRASSO:  Correct.

THE COURT:  Okay.  What about, what about the point about disregarding the "or property"?

MR. NEWKOM:  Well, I was a little disappointed that Your Honor went to the claim language before I got a chance to do so, because you stole my thunder.

This (Indicating), this claim language in its relation to the rest of the limitation, I think with any -- destroys the possibility that there could be "sequence of APIs and strings" referring to a functional block, and yet being totally different from the property.

THE COURT:  Well, that may be, under this third limitation.  That doesn't tell what you "genes" means.  You

can have a term that's broader, and then it gets limited by the claim language.

MR. NEWKOM:  And I think the problem with that, Your Honor, is -- and so this will be the last time I use the word "hierarchy," but in the hierarchy of interpretive guides of evidence that we're supposed to use for claim interpretation, number one is the claim language, itself, before any part of the patent.

And I think the argument that Counsel is making or inviting here is the idea that although the claim language is perfectly clear about what this term means, it could nonetheless be something broader.

And I think that runs afoul of --

THE COURT:  Well, I'm not sure it's clear what it means; it's clear how it operates and how it's limited in this context, under the third limitation.  Doesn't necessarily tell me that the word, itself, starts with something larger and that once you work through to the third limitation you're within a subset of that larger universe.  Doesn't tell me what that universe is.

In fact, one could argue because it is -- if it was already built in, you wouldn't need that language.  Then you have a redundancy problem.  The counterargument is that:  Well, if I believe you or buy your argument, that becomes superfluous.

So, why would we have superfluous -- you know, something like claim differentiation, kind of an analog to that.  I mean, we've got language now that's built in there.  Why would you put it in there if "genes" didn't already mean that?

MR. NEWKOM:  Well, I think what Fortinet's interested in, Your Honor, is making sure that we avoid arguments about Fortinet systems looking at "genes" to mean anything other than looking at the sequence of APIs and strings as way to describe a piece of functionality or a property.

And I -- well, I'll stop there for now.

THE COURT:  Okay.  Well, you know, there's that argument, and then there's the argument about the inventor having opined, although, and that's -- that is in column 5, is that right?

MS. GRASSO:  Correct, Your Honor.

THE COURT:  Column 5, line 32.

MS. GRASSO:  And 33.

THE COURT:  And that's where you contend that that's -- the inventor became the lexicographer.

MS. GRASSO:  Yes.  And that's confirmed later in the prosecution history.

MR. NEWKOM:  If I may, Your Honor, in that exact same paragraph?

THE COURT:  Yep.

MR. NEWKOM:  I'm looking at column 5, line 37.

**THE COURT:**  Uh-huh.

**MR. NEWKOM:**  The same paragraph includes the phrase, quote (As read):

"The gene and the functional block do not need to match exactly."

Now, I take that sentence from the paragraph that Ms. Grasso has brought to your attention, and then take a proposed construction that a "gene" means a piece of functionality.

And at this point, we've got a proposed construction which is an identity statement.  That "gene" equals "piece of functionality."  And we've got intrinsic evidence being offered to this Court which, in the exact same paragraph, says that in fact, the gene and the piece of functionality may not be identical.

**THE COURT:**  And in fact, a functional block -- next sentence -- may contain more than one gene, because a gene is only a piece of functionality.

**MR. NEWKOM:**  Yes.  A way of describing it through a sequence of APIs and strings.  Again, this is -- you know, going back to the initial point, I -- there is a -- there is similarity of language between the parties for half of, at least, our construction.

But, a pretty different fundamental approach about whether a gene is, in fact -- is it a description, as claimed?  Or is

it identical to, synonymous to the piece of functionality?

And I don't think column 5 changes other parts of the intrinsic -- you know, that any portion of column 5 changes a fair read of the entirety of column 5, plus claim 1, that a gene is -- it's a description.  It's part of what's interesting about this claimed invention, is it's a very particular way to splice what data you're going to look at, in order to keep a network safe.

THE COURT:  All right.  All right.  Well, this is all very helpful.  And I think that's the last term, right, that we have?

MS. GRASSO:  Yes, Your Honor.

THE COURT:  Okay.  So obviously the ball is in my court at this point to render a decision on this, which I will, as quickly as I can.

So let's talk about the case-management situation now.  It's little hard to plan exactly, until you know how quickly I can move on this.  But I intend to act, as I say, as quickly as I can.

I guess the question I have is with respect to the adoption of the Federal Circuit Advisory Committee model order limiting patent claims, what are your thought -- how far are we in this process?

MR. NEWKOM:  I think -- I think, Your Honor, the parties jointly proposed and the Court ordered either that --

either that exact Federal Circuit narrowing, or something very close to it, at last. I believe that as of today, each side has narrowed their asserted claims.

MS. GRASSO: (Nods head)

MR. NEWKOM: And I think the first -- the first round of narrowing. And we have also, I believe, engaged the first round of prior-art narrowing.

MR. STEIN: (Nods head)

THE COURT: Okay.

MS. GRASSO: Correct.

MR. NEWKOM: There's a subsequent round of narrowing that --

THE COURT: Twenty-eight days after I issue my claim construction?

MS. GRASSO: Correct.

THE COURT: So you're waiting for me to get to round two.

MS. GRASSO: Yes.

THE COURT: And, and then, after that, while that's going on, you've indicated that there's some initial discovery that -- there's been discovery already.

MS. GRASSO: There has been very limited discovery so far.

THE COURT: All right. So, well, I guess the question is: What can I reasonably set now, if anything?

What are your thoughts about what we can accomplish?

Let's say it takes me, you know, some weeks, given the holiday, to get this order out. But I'm glad we're down to seven, not ten. But in any event, so, in terms of the -- the stage two of federal advisory model, that's going to wait a bit, so I know that one.

Do we need to do anything; do I need to say anything about discovery at this point?

**MS. GRASSO:** Well, what Sophos has suggested is still in tracking with the model rule, which is we've pegged everything off of when we get that claim-construction order, which I think makes the most sense, and will solve the problem of not bothering Your Honor again to set new dates, once we get that claim-construction order.

**THE COURT:** All right.

**MS. GRASSO:** As said, there's still a lot of discovery to be done. And I think Sophos's schedule is still aggressive, but accounts for that.

**THE COURT:** Your schedule of proposing a January 2016 trial?

**MS. GRASSO:** Yes, 25 months to trial. For 13 patents.

**THE COURT:** All right. There is one practical issue, and that is the ability to actually get you a trial date. I -- even if I were to agree to the somewhat-accelerated

schedule that Fortinet proposes of September, right now I have a -- three-month gang case that ultimately will not be resolved since there are some 17 defendants, and I'm sure some are going to go, promises to go.  Since it's a quintuple-homicide case, it's probably going to take the last three months of this year.

So even if I wanted to give you in September, you would have to trail, and I don't know if you want to trail with, you know, expenses incurred and all that, --

MR. NEWKOM:  Yeah.

THE COURT:  -- not knowing until days before whether they're going to plead out or not.  So, it seems to me to make more sense to give you a certain date.  And I can give you a certain date, according to my trusty courtroom deputy here, of January 19.

Right, Betty?

THE CLERK:  Yes.

THE COURT:  That's clear of any --

THE CLERK:  Yes.  We have another civil case but it's -- we're trialing some cases.

THE COURT:  Okay.  All right.  Everything's double-and triple set around here, but the criminal ones are more problematic, because those have to go when they go.

So, I can give you January 19th.  You ought to pencil that in.  And I will -- I mean, that also tells me how quickly I've

got to move to get this thing out in order to get everything else in sequence.

MS. GRASSO:  Just so you know, Your Honor, our schedule did assume a January trial date, so I think --

THE COURT:  Right.

MS. GRASSO:  -- it sticks pretty close.

THE COURT:  Right.  Right.  So I'm going to give you that date now, and you think -- how long of a trial?  Twelve court days?  That's three weeks, four court days a week, around here.

MS. GRASSO:  I believe so, Your Honor.

THE COURT:  Okay.  You think you need all three weeks, because of the number of patents.

MS. GRASSO:  As it stands now.

MR. JAFFE:  I hope to beat that, Your Honor.  I think the parties can work together to get to something shorter than 12 days.

THE COURT:  Good.  Well, we'll reserve it for now, but that's always subject to revisiting as we go along.

So, between now and claim construction, I think I'll have you come back immediately after I do the claim construction to make sure we are on track with respect to the model order and any developments in discovery.  And I guess there's probably a summary-judgment motion in the offing there.

And if I choose January, the normal-summary judgment

deadline is to have that heard in October, or September-October.  That means you have to start briefing in August.

MS. GRASSO:  Uh-huh.

THE COURT:  So, you know, that should give you -- provided we can move reasonably quickly on this, should give you plenty of time.

What about ADR?  I know you tried without success, and I didn't see a whole lot of optimism, based on your short statement in here.  But, after claim construction, can I assume that we can raise that issue again and see where you're at?  And by then you've also -- be on the brink of narrowing the claims.

What are your thoughts about ADR?

MR. NEWKOM:  Fortinet is always open-minded about participating in further ADR, Your Honor.

MR. CUNNINGHAM:  And Your Honor, from our perspective, I think after the claim-construction ruling comes out, we would probably be interested more along the lines of a private mediation.

THE COURT:  Okay.  All right.  Do you concur in that?

MR. NEWKOM:  I think I do.  Yes.

THE COURT:  Okay.

MR. NEWKOM:  I'm sorry, Mr. Cunningham; what was the timing?

**MR. CUNNINGHAM:**  After the claim-construction ruling.

**THE COURT:**  All right.  Well, why don't we discuss that.

I'll schedule a -- we what we should do is, just so I have a control date, set a case-management-conference date to come back, which hopefully I can advance, if I can get the claim-construction order out.

And I mean, the clock will start running, I'm going to -- you know, you've got the 28 days, et cetera, et cetera.  Maybe we should set something out for 60 days from now.  And hopefully it'll be sooner than that, but for now.

**THE CLERK:**  January 19 -- I'm sorry; February 19, at 10:30.

**THE COURT:**  In the meantime, I will get out at least a partial schedule that will have trial dates and pretrial conference dates, and, you know, various other deadlines, knowing that we're going to fill in some more stuff that's peculiar to this case.

I'll give you at least the general outlines of the last dates for summary judgment, et cetera, et cetera.

**MS. GRASSO:**  Perfect.

**THE COURT:**  All right.  We'll talk about ADR.  Hopefully, maybe, when we get back together you will have met and conferred, and talked about if you're going do private, where you're going to go and how long, and that kind of thing.

All right?  All right.  Good.  It's been helpful.  Thank you.

        **MR. NEWKOM:**  Thank you, Your Honor.

        **MS. GRASSO:**  Thank you, Your Honor.

        **MR. CUNNINGHAM:**  Thank you for your time.

        **THE COURT:**  Thank you.

    (Conclusion of Proceedings)

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Monday, January 19, 2015

Belle Ball, CSR 8785, CRR, RDR