Pages 1 - 76

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | | |
|---|---|---|
| FORTINET, INC., a corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | NO. 3:13-cv-05831-EMC-DMR |
| SOPHOS, INC., a corporation, MICHAEL VALENTINE, an individual, and JASON CLARK, an individual, | ) ) ) ) ) | |
| Defendants. | ) ) | San Francisco, California Monday, November 24, 2014 |

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING OF PROCEEDINGS - TECHNOLOGY TUTORIAL**

FTR 2:39 p.m. - 4:42 p.m. = 123 minutes

**APPEARANCES**:

For Plaintiff:          Quinn, Emanuel, Urquhart
                          & Sullivan, LLP
                        50 California Street, 22nd floor
                        San Francisco, California  94111
                     BY: **JOHN M. NEUKOM, ESQ.**

                        Quinn, Emanuel, Urquhart
                          & Sullivan, LLP
                        555 Twin Dolphin Drive, 5th floor
                        Redwood Shores, California  94065
                     BY: **JORDAN ROSS JAFEE, ESQ.**

          (Appearances continued on following page.)

Transcribed by:          Leo T. Mankiewicz, Transcriber
                        leomank@gmail.com
                        (415) 722-7045

APPEARANCES:  (cont.)


For Defendants:          DLA Piper LLP (US)
                         2000 University Avenue
                         East Palo Alto, California  94303-2215
                     BY: **RYAN WILLIAM COBB, ESQ.**

                         DLA Piper LLP US
                         401 B Street, Suite 1700
                         San Diego, California  92101
                     BY: **SEAN C. CUNNINGHAM, ESQ.**
                         **KATHRYN RILEY GRASSO**, **ESQ.**

                         DLA Piper LLP US
                         500 Eighth Street, N.W.
                         Washington, D.C. 20004
                     BY: **ANDREW NEAL STEIN, ESQ.**


ALSO PRESENT:  **Dr. Seth Nielson.**

Monday, November 24, 2014

(Transcriber's Note:  Wherever speakers failed to identify themselves when speaking, speaker attribution was based on best guess.)

---o0o---

2:39 p.m.

P R O C E E D I N G S

THE CLERK:  Calling case C13-5831, Fortinet versus Sophos.

Counsel, please come to the podium and state your name for the record, and also please state your name before you speak.

MR. NEUKOM:  Good afternoon, your Honor.  May it please the Court, John Neukom for plaintiff Fortinet.  With me today is Jordan Jaffe.  Jordan is an associate at the Quinn Emanuel law firm, and shortly after introductions, I plan to take my seat and he will captain our ship today.

And also with us today is Dr. Seth Nielson, a computer scientist and a lecturer at the Johns Hopkins University.

THE COURT:  Great, thank you.

MR. CUNNINGHAM:  Good afternoon, your Honor.  Sean Cunningham with DLA Piper for Sophos, and with me today is Katie Grasso, Andrew Stein and Ryan Cobb, all from my law firm, and I wanted to introduce them in particular, because they will all be handling portions of the *Markman* hearing in a couple of

weeks.

THE COURT:  All right.  Great, and now that you've mentioned the *Markman* hearing, I want to -- before I forget, I want to reschedule that to either the following week or the week after.

I've got a trial that starts on the 8th that did not resolve, and I'd rather, since you're estimating five or six hours, I'd rather devote a whole day to it, and the calendar is such that I do have a whole day on the week after, on the 15th, as well as on the 22nd.

So what's your preference?

MR. NEUKOM:  Fortinet's at the pleasure of the Court, your Honor.  Either of those dates would work.

MR. CUNNINGHAM:  My memory is either of those days works for us, as well.

THE COURT:  Well, why don't we set it for the 15th, so we don't get too close to the holidays, and we just move it back a week, seven days.  And we could start at 10:00 that morning and take a break, and then we'll -- that should give us enough time to go through...

Do we have anything else that day?

THE CLERK:  (Inaudible.)

THE COURT:  Yeah, okay.  All right, good.  So, we're going to start off with Fortinet, or who -- I mean --

MR. NEUKOM:  Happy to.

THE COURT:  I'm ready to follow whatever you want to do, in terms of who goes first and...

MR. NEUKOM:  I will turn the podium over to my colleague, Mr. Jaffe.

THE COURT:  All right.

MR. JAFFE:  Thank you, your Honor.

THE COURT:  Okay.

MR. JAFFE:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. JAFFE:  So before we get started, I was just going to talk a little bit about Fortinet the company and development of some, but not all, of the patents-in-suit.

It's a company that was founded in 2000, went public in 2009.  It's headquartered in Sunnyvale, California.  As of now, it has over 2700 employees worldwide, and this past year 29 percent of its revenue went towards research and development -- excuse me -- 29 percent of its employees worked on research and development, and over $100 million fiscal year last year was on research and development.

Now, I'm only going to talk about one aspect of what Fortinet does today, and that's what I've selected here on the slide, which is called FortiOS, which is a specialized operating system created by Fortinet, and what FortiOS offers is the ability of a specialized operating system to perform malware and anti-virus, these are concepts we'll get into more

detail on, but this is one of the products that Fortinet has been developing over its lifetime.

Now, with that, I have the pleasure of handing it over to Dr. Nielson, who's going to explain some of the underlying technology for the patents-in-suit and the underlying technology in general.

**DR. NIELSON:** Good afternoon. Because a lot of the patents involved deal with networking technology, I'm going to start with just a very brief tutorial of some of the basic concepts that are foundational to networking technology.

And so to start off with the -- maybe the simplest possible example, the most simple network started with just what we would today call a local area network, or LAN, and the computers are almost all connected to each other, almost directly, and it's really a much more simple system than, say, the internet that we use today, but even with that relative simplicity, it was a lot of processing that goes into getting a message from one computer to another.

So in this example here, and computer scientists get tired of saying Party A and Party B, so we make up things like "Alice" and "Bob" to keep ourselves amused, I guess.

So Alice wants to send Bob a document, and that document, when it's going to go over the network connection, it gets broken up into a bunch of little pieces, and the reason why it's broken up into pieces is because -- oh, there's a lot

of reasons, but one reason is if there's an error, right, on the networks, something got messed up, data got flipped, then you sent the whole document, now you've got to re-send the whole large document.  If you've broken it up into pieces and a small piece gets an error, then you can just re-send that small piece, and it's much more efficient.

Another reason is that if there's a lot of people using this network, then you can kind of interweave these little pieces together and make the system more efficient, and we call these little pieces "packets," and packets are really -- really just show up all over the place.  So we're going to talk about them just a little bit more.

And so here on the next slide, kind of a basic description of what you get in a packet.  There's usually two major divisions in the packet, and the data, which is the part you really care about, and then the header.

A header can be thought of like an envelope, when you're mailing a letter.  The letter inside is your data, but you put it in an envelope, so that you can put who it's coming from, where it's going to, put the stamp on it, and the header is kind of the same thing; usually has a source address that says what computer it came from, a destination address where it's going to.  A lot of times it will include some kind of reassembly information so the data can be put back together properly.  It may contain other information like transmission

information, error detection, and some other things like that.

So as I said at the beginning, the LAN, the local area network, is kind of the simpler version, and then of course, today we have this worldwide internet, and comes out of this concept of taking these smaller networks and connecting them together, inter-networking them.

So now if Alice wants to send Bob a message, it's a lot more complicated.  You can think of it like, a LAN would be like one of those department -- inter-department mailboxes where everybody just has a box and you can run, just drop a message in somebody's box, everybody knows everybody; it's very simplistic.

But if you want to send a message around the world, then you have to have a worldwide addressing scheme.  You have to have the infrastructure to get it over oceans or through the air, and it just takes a lot more infrastructure.

With computers, it's kind of the same way.  Once you get past the LAN, once you get past the local network, not all the computers know about each other.  There has to be what's called "routing" to move them back and forth until they reach the correct destination.

And actually, there's quite a fair bit of processing that goes into it, and so computer scientists kind of have this -- on this next slide, here, it's called the OSI network model.

OSI is the Open Systems Interconnection.  That's part of the ISO standards body, the international standards body, and they laid out these layers that kind of describe the different types of processing that happens to a packet in order to make it work in the kind of advanced networks that we have.

So in the image that you see here, you see a transmitter on the left, and what happens is the transmitter wants to send some data.  The data, as it goes down, starts to go through different processing layers, each layer having a different responsibility for making that packet prepared to go out on the network, and because it was visualized as one layer on top of another, it got called a "stack."

And importantly, as the data goes through each one of these layers, it actually gets put into kind of a new packet.

Let me show you -- I'm going to maybe flip back and forth between these two slides just for a bit.  This kind of visualizes what I'm describing here with having one packet inside of another.

So you have maybe this document that you're sending around the world, right?  And it gets broken up into a small piece of the document, and then as it goes down through those layers, it gets into the first layer and it gets put into a new packet.  So there's a new header, and the data of the new packet is what was the old packet.  So now you've got a packet inside a packet.

And the reason why this is done is because each individual layer needs to do some of the processing, and so each layer needs to have its own kind of record of what it's trying to do and what information needs to be checked. And so as it goes down through that stack of layers, you put on additional headers and wrap it up until it's ready to go.

So returning to this OSI model, the data goes down and that's why you can see on the left it's getting larger, it's getting wrapped up in these extra layers, and then when it goes out over the wire, it eventually reaches its destination, where that whole process is reversed.

You take off the outer layer, the outer envelope. That lowest layer checks the information on the envelope, makes sure that it was transmitted correctly according to its processing requirements, and if everything was working correctly, then it takes the inner packet and passes it up to the next level. And so you get kind of this parallel processing of these different layers until the data is received at the top.

One of the reasons why I'm emphasizing this is there are a number of times today we'll be talking about reading packet headers, and it's plural because you have packets inside of packets, so you can end up with that multiple headers on the same piece of data.

That kind of -- that's the information I wanted to go

over that's some of the basics of the networking, and with that, I'm going to switch over into talking about Fortinet's patents and the technology that kind of underlies some of those patents.

So the Fortinet '125 patent, entitled "Service Processing Switch," was filed June 4th, 2002.  The basic concept behind this patent is simplifying the deployment of additional services in a network.

So in the background of the patent, it identifies that it's problematic if you are deploying equipment to a number of different networks to interconnect them, if you want to provide additional services besides just interconnecting them, like a virus scanning at the network level or VPNs or some of these other technologies, that you have to go and deploy a physical piece of equipment to all of these interconnecting points, and the problem with that is that there's, of course, up-front costs associated with it, complicated to configure.  If anything goes wrong, you have to go out and physically fix the piece of hardware.

So here's kind of an image of what that looks like, where you go put out these physical boxes out at all of these interconnecting points.  And the '125 solution is to centralize that into a central location where all of the functions of those boxes are provided by a central powerful box that can do all of that work itself, and it uses a process that's called

"virtualization."

So the idea here is that you can have a powerful computer that can simulate or replicate what a smaller box would do, but you can then have it -- you know, if you have all of those located centrally in a system, or in a group of systems, then it's easier to manage and to deploy new features or to correct if things go wrong.

THE COURT:  What's an example, these boxes, CP --

DR. NIELSON:  Sure.

THE COURT:  -- 518, what's an example of what those boxes do?

DR. NIELSON:  Right.  So when you are connecting networks to the internet, you will have a box that is, as the very least, a router, and the point of the router is to route packets from one network over to another, but you often want to insert additional services at those connecting points.  It's often a -- there's often a kind of a natural -- a natural correlation of concerns where it makes sense to insert some scanning or some other processes there.

So to do that, though, you have to have a box that is capable of adding those services in, and so then what you have to do is you have to go physically put a box out there with those extra services.

On the other hand, the idea here is that once you have it connected and it can route, you can have the data reach the

central processing place where you can handle all of those extra services in a central location, reducing the need to go put the functionality into boxes at the connecting points of the network.

So in the architecture that is proposed in the '125 patent, they call it an IPSG, or an IP Service Generator. They describe having three basic pieces that provide this additional functionality: Basically a virtual router, which makes sure that the packets for whichever network are going to the right place, and also doing packet classification, which we'll talk about; a virtual service engine, which is used for doing some of those more advanced processes, like the anti-virus scanning or it's called deep-packet inspection when, instead of just looking at headers, you actually look at the data in the packets, and that's described as being done by a virtual service engine; and an advanced security engine, which it describes as using hardware support for speeding up encryption, if you have an encrypted communication connection.

And so these three pieces are used to provide those value-added services at this central location.

The figures in the patent also describe the type of hardware you might use to implement some of these features. And then, even though the '125 patent describes a number of different technologies, and there are apparently some related patents, the '125 claim language focuses on handling certain

aspects of packet processing.

And so the Figure 12 here shows a packet coming in from the outside to this IPSG, and when it's received, it's forwarded into that virtual routing engine -- that's the yellow box -- and from there, the system, the language says, performs a flow-based packet classification on the packet, and evaluate forwarding state information associated with the previously stored flow.

A couple of words that are important.  "State information," this is information that gets collected over time.  So when you receive one packet, you learn something from it, so that when you see another similar packet, you have information to go on and you're not starting from scratch, and that's what is referred to as "state."

So it's my understanding that "flow-based packet classification" is a disputed term, so I won't go into that, but there's some underlying technology about it that I'm going to cover next.

The first thing is, what is a flow?  So "flow" is a term that I use in the field and is used commonly in networking technology.  There's a definition I found in a paper that is reasonably characteristic.  It says, a flow is defined to be all the packets sharing common header characteristics.  For example, a flow may be defined as all the packets between two specific IP addresses.

So basically, you're saying, as I look at all the packets that come through, I'm going to start to see if I can categorize groups of them together.

**THE COURT:** What does that mean, to categorize them into groups? Based on what?

**DR. NIELSON:** Right. So depending on the circumstance, depending on the exact application, you would pick header characteristics that allow you to make some kind of intelligent grouping.

For example, if you are -- like the example here, where it's packets between two specific addresses, then you can group all of the packets between A and B together and all of the packets between C and D together and identify them as separate flows.

So the -- also in the Internet Protocol Version 6 specifics, which is kind of an update that's supposed to be rolling out, it's been developed for 20 years, but it's only barely starting to go out now, it's such an integral part of the header that they actually created a special spot in the header just for putting information that could be used to signal flows.

So the idea was -- the idea was that up until now, a lot of times a router had to decide how to come up with its own flows, right? Well, I'm going to categorize based on addresses or I'm going to categorize based on ports, and IPv6, Internet

Protocol Version 6, actually creates a place in the header where a sender can say, I'm going to give you some information about which packet should be grouped together.

So that's just to illustrate that flows are a common concern in computer networking.

To kind of visualize this, you could picture packet one, packet two and packet three coming in, and you analyze the headers for these characteristics that you chose.  And so when you see packet one, you might say, I've never seen these characteristics before, I'm going call this a new flow.  Maybe it's to a new address.

And so you categorize it, and you do some processing on it the first time you see it, so that you're saying, well, this shouldn't be allowed, or do I think it needs extra processing, or whatever reason you want to handle packets a certain way.

And then later on, you see packet three with those same header characteristics and you can group them together, and so you can say that, okay, packet one and packet three are a flow.

So kind of to answer another question you were asking just a minute ago is, what is packet classification, how would you even decide what to do to decide something is a flow?  So you have to come up with a classifier that makes sense for your configuration.

If you're working primarily with the IP header, then it probably makes sense to use something from that header, again, addresses.  If you're working with TCP headers, those have information that's called ports, and that could be useful in categorizing a flow; or you might pull pieces of information from both, and pull an IP address and a TPC port, and use that as a classifier.

And so the reason why you would do this is because it will allow you to speed up how you process subsequent packets in the flow.

So there might be a thousand packets in a flow, and so -- and in fact, maybe what I should emphasize is, at the beginning I mentioned we break something up into pieces, right, to send it on the network.  So sending a document could be broken up into thousands of pieces, but they're all part of the same flow, if we -- you know, under an appropriate classification.

So if a router or an IPSG sees the first packet in a flow and spends some processing time to make a decision about how that type of packet should be handled, then when the subsequent packets from the flow come in, it doesn't have to spend that time to re-analyze.  It can say, oh, I see, you're part of that same flow, I'll handle you the same way, and it has a significant speed-up.

So in the Fortinet '125 patent, they provide some

examples of how you might classify flow or choose which packets fit together in a flow, in this particular context.

So they say one example is to take the LQ header, which is Layer 1 header information, along with fields in L3, L4, and when we were talking about that OSI model earlier, it's become common to just refer to them by the layer number, and so 3 and 4 are layers that deal with routing, and they get mentioned all the time.  So L3, L4 headers would be in a lot of circumstances your IP header and your TCP header.  Those are -- those deal with making sure that the packets get where they need to go without errors, right, worldwide.

And so in this example, in the patent specification, it says you could pull some fields from the LQ header along with field from the L3, L4 header, to identify a flow.

And the VR there is the Virtual Router, so this is a micro-flow within the virtual router.

It gives another example of how you might identify a flow where it says, let's pull apart the IP address, or you could use an MPLS label.  It's another type of header that has routing information in it.

They extend this example and give just a few more details about which elements might be used.  In this example, where they say in one embodiment the packet's flow index is identified by extracting various Layer 2 through 4 fields such as IPTLS, that's a field in an IP packet, protocol is a field

in the IP packet, source address and destination address are fields in the IP packet.  TCP or UDP source and destination ports are fields in the TCP packet.

So these would be examples of what you could use from Layer 3, Layer 4, to classify a flow.

One of the things I've seen in my own experience is sometimes routers will identify with reasonable certainty to end points on either side, a sender and a receiver, by taking the source address, the destination address and the port, the destination port, and those three pieces of information are often used to say, oh, these packets all were part of the same sender going to the same receiver.  So that's an example that I've seen in my own work.

The other thing that's important here is it talks about a flow index, and this is just referring to being able to look up in a table and say, oh, I've seen this packet before; using these fields, I generate an index, and in a table I can see whether I was going to block this patent or -- packet, or allow the packet, or it needs to do additional processing.

For example, the '125 also shows in Figure 12 that you can use this flow information to decide whether or not the packet needs to go to the Virtual Services Engine where it does that additional processing like virus scanning, or if it can be sent out without doing any of that additional processing.

If there are no other questions about the '125, I'm

going to move on to the '430, the Fortinet '430 patent.

**MR. CUNNINGHAM:** Excuse me.  Your Honor, before we move on to another patent, I wanted to ask your Honor's preference in terms of the sequencing, whether you'd have Dr. Nielson continue with Fortinet's patents or have Sophos present on the '125.

**THE COURT:** Actually, because we have so many, it may make sense to hear any additional comments, and take them one patent at a time.

**MR. CUNNINGHAM:**  Thank you, your Honor.

**THE COURT:**  So thank you.

**DR. NIELSON:**  Sure.

**MR. CUNNINGHAM:**  Your Honor, I think Dr. Nielson's explanation of some of the technology behind the '125 patent is not something we disagree with, so I will be relatively brief and try not to duplicate too much effort.

I want to focus a little more on sort of the hardware aspects related to the technology herein, in particular on the concept of a service switch.

This is obviously a piece of hardware, it's similar to a router, and I actually had to learn the difference between a switch and a router.  A switch creates a network, whereas a router connects to networks.  So that's how you distinguish between those two pieces of hardware, and the switch in particular serves as a controller that enables network devices

to talk to each other more efficiently.

These two types of hardware devices are really the modern building blocks of a business network environment. Without switches and routers, computers, printers, et cetera, don't talk to each other.

Next slide.

And so as Dr. Nielson explained, the switch allows these data packets to be distributed more efficiently to the various devices in a network, and here we have a simple mockup of a network that has a couple of client devices, a printer and obviously a server, and the packet is how the data is bundled, so that it can be delivered most efficiently to the destination it's supposed to reach.

Next slide.

So I agree completely with Dr. Nielson's description of what a packet is.  The one other piece of information that I found interesting in terms of what a packet is or does is, a packet allows, say, a Word document, an image file, what have you, that's being sent over a network, to be distributed across the network.  So different packets can go different routes to reach their destination, and that's why these switches and routers are so important, because they allow those packets to be reassembled at the back end, at the client destination computer, into what it is you're supposed to be looking at, hearing, seeing, video, et cetera.

So it's important that these packets contain a fulsome set of header data to allow them to be reassembled once they reach their destination by traveling on as many different roads as you can imagine across the country, even more so than the highway system.

Next slide.

Here we just have the simple activity of data packets going into the switch, data packets coming out of the switch, and the switch is designed to process the packet so that it knows where to send them on to their destination, and we'll see that on the next slide.

The switch contains engines that look at this header data, which might be address information, might be file type, might be other types of information, and decide, based on that processing, where the packets are destined to go. And so you end up with these classifications of similarly-headered packets that are all sent to the same destination for preassembly into the document, the file, the audio, the video that you're intending to see.

And then again, we see the packets go into and out of the service switch, headed to their correct destination, depending on -- and in this simple example, it may be packets that are destined for a printing device are all classified with the same type of header information, so they end up with the printer, it's reassembled into the document that actually gets

spit out of your printer.

That's really all I have to add to what I've just heard.

**THE COURT:**  All right.

**MR. CUNNINGHAM:**  Thank you.

**THE COURT:**  Great, thank you.

**DR. NIELSON:**  Can we switch --

**THE COURT:**  Go into the '430?

**DR. NIELSON:**  -- phrase.  So the '430 patent, entitled Systems and Methods for Passing Network Traffic Data, dated July 6, 2005, and the basic idea behind this patent, in technology -- in the technology, is a gateway between a user and a server, and -- back up, back up.

So as the patent describes it, a gateway between a user and a server.  So you might think of this as -- we talked about having all of these networks interconnected, and usually there's a computer that kind of sits between two networks, and it's called the gateway.  That's how you get in and out from one network into another.  And so, like, a corporation might have a gateway, and then all the people inside working in the office are users inside, and they need to go through the gateway to get out, to access internet websites or services outside of the corporate network.

And the '430 states that one of the functions of a gateway is policy enforcement, which it says it can do based on

a number of characteristics, including even things like anti-virus or user authentication, but the problem with that is when you're doing that kind of policy enforcement to determine whether or not the network access should be allowed, it requires a lot more processing power than simple routing.

When you're just routing, you just check the header fields and say, oh, I know where this is supposed to go, and you send it on its way, but if the gateway has to do policy enforcement and it's scanning for viruses or doing user authentication or any of these more complicated things, that takes more time and more processing power.

So in 2005, the '430 observed that -- what's observed in the background section of the '430 is that gateway products would try to speed up this processing with multiple processors. The idea is, if you have 20 people trying to go through the gateway at the same time, multiple processors should speed up that policy enforcement, and so that there wouldn't be a bottleneck.

The problem that is identified in the background section is that even figuring out how to use your multiple processors efficiently and effectively is, by itself, a difficult problem, because you have to decide which packet flow lines up with which processor, you have to allocate resources to the different processors, and so just by throwing more processors at something, that kind of can create its own set of

problems.

Would you -- I'll just call next slide. I'm having trouble with the clicker. I'll back up one -- no, this is the right one. Thank you.

One of the other problems that they identified is that you had to also share resources between the processors. Memory is necessary for doing this processing, and it's usually shared in a multi-processor system, and if there are inaccuracies in how that is handled, data doesn't -- there's a term called "cleanup," where data that's no longer used gets cleaned up, and if you don't clean up data, it creates -- the term here is, a memory leak. Basically, it looks like your memory is continuing to shrink because data is supposed to get cleaned up and is not, and eventually, the device can even appear to run out of memory and stop working altogether.

Next slide, please.

So the '430 patent proposes an architecture to make this management of the multiple processors more effective.

And the next slide. Great. Will you zoom in on that?

And one of the key ideas behind it is a worker module that is going to handle the processing of packets.

The key again is that we want to have the efficient use of the resources, like the multiple processors, and so one of the elements that's described in the patent is that you can use information from the packet coming in, specifically

addresses, and you can combine that with the knowledge of how many worker modules are available, and you can compute really simply which ones should have it.  And I'll describe the example that's given.

Let's pretend that internet addresses were just numbers like 1, 2, 3, 4, 5.  You can take an internet address and you could say, well, we have three worker modules.  So we'll have the internet address with the address of 1 go to worker module 1, and the address with 2 go to module 2 and 3 go to 3.  And then we're just going to do a wrap-around, so that 4 goes to 1, and this is a process where you basically divide by the number of worker modules you have, and take the remainder, and that remainder tells you which worker module you would use.

So the reason why this ends up being a useful approach is because you've got IP addresses that come in, and they're not perfectly random, but they are -- they're kind of all over the place.  And so as you take these IP addresses and you do the equivalent, where you get a number from them and then you divide by the number of worker modules, it does a fairly good job of evenly distributing which packets go to which worker modules.

The goal is something called load balancing, where you make sure that the packets are kind of evenly distributed amongst all the worker modules, and it's also what we might call a lightweight algorithm, meaning that it doesn't take a

lot of processing power to be able to do it, so you're not wasting resources figuring out which worker module should process the packet with resources that should be used actually processing the packet.

Just by way of a fairly simple animation, the packet 1 will arrive from the sender, and when it reaches the I/O module, then you use a -- the address in it, and it describes that you can use the sender and receiver address, you could add them together to come up with a combined number.

There's a number of variations, but you take this information and you combine it with the known number of worker modules, and in this example, packet 1 is going to go on to worker module 1 for processing. Once it's received at the worker module, then the worker module goes ahead with the packet processing.

Next slide, please.

So the packet processing, as described in the patent, is the things we talked about before, the policy enforcement, making sure that it comes from a valid source, that it's going to an allowed destination. You can check user authentication, anti-virus scanning or these other processing pieces in the individual worker modules.

One of the key points from this slide, again, where it shows the different worker modules, is that while worker module 1 is processing a packet, worker modules 2 and 3 can

also be processing packets, so you gets the parallellization to keep the system moving efficiently.

Once it's done --

**THE COURT:**  And I/O module stands for...?

**DR. NIELSON:**  Input-output.  Once the packet has arrived and been processed, it's sent out on the outgoing I/O module to its destination.

If there are no other questions on that patent, I will --

**THE COURT:**  Okay.  Great, thank you.

**MR. CUNNINGHAM:**  Your Honor, once again, I can move quickly through my slides, because I -- again, I don't necessarily disagree with anything that Dr. Nielson just said about the overarching technology.

I found it useful just to see the same sort of simple -- simplified network that we had before on this slide, with the gateway added to it.

And so the gateway, as the name suggests, you know, literally or figuratively, as the case may be, sits in between the untrusted network, the internet, and in this configuration at least, the switch that we discussed earlier, and the gateway is in charge of a great deal more processing capabilities than the simple network switch is, and I agree that one of the things the gateway does is policy enforcement, which in my -- in an example I'll use later on, can be figuring out what sorts

of websites a user, a particular user, is allowed to see and not see, depending on the circumstance that that user is in.

THE COURT:  Well, you're referring to the gateway or the switch?

MR. CUNNINGHAM:  The gateway.  The gateway -- in what I was just describing, it's the gateway doing that.  And we can see this on the next slide.

So this gateway, which is typically a much larger, more robust hardware device, although you may have heard of virtual gateways, which are implemented in software that can sit inside a different hardware device, in this instance, what we're talking about is a physical gateway that's actually a stand-alone device that does this processing.

In the example I have here on slide 57, what it's doing is taking packets out of the stream that it identifies as malware.  So that's one of the many things that gateway can do, and as Dr. Nielson described, that requires the different processers inside this gateway to be performing different functions in parallel with one another, and the idea is how to distribute the processing power in a more efficient way across the different processors.

So on the next slide, we're now looking inside at these different processors that are performing processing on different packets at the same time, and one of the challenges here is each one of these processors has a protocol that keeps

track of the packets that pass between and among the different processors.

These protocols might have different rules, they might have different characteristics, and so the idea is how, inside these gateways, do you manage the various protocols that each of these processors are operating under.  And the term "load balancing" was used, and I agree with that terminology. I think that's a great way to describe trying to manage the processing requirements of each of these processors as they're running in parallel.

Next slide.

So this is the same figure we just saw from Dr. Nielson, so I won't belabor it, but essentially, I basically agree with his description of how this figure, which is actually adapted from one of the figures in the patent, is described, and it just -- it shows how the various packets are passed among the modules inside the gateway to make the most efficient use of each of the modules as they're coming in from the left to the I/O module and out from the right, on a different I/O module, out to the client device or to the switch, in my configuration.

That is all I have, your Honor.

**THE COURT:**  So your diagram shows a gateway between the switch and the internet, and I thought I understood the presentation of Dr. Nielson to indicate that the switch was

performing this load balancing allocation function.  Is there a difference here in the way the system architecture works?

MR. CUNNINGHAM:  I may call on -- you know, send a lifeline to Dr. Nielson, but my understanding is, the switch is not as an intelligent a device as a gateway.  So that the gateway is performing -- the switch is designed to decrypt a packet, figure out where it's supposed to go, and send it along to the right destination.

The gateway can do that, but it also performs things like anti-virus scanning, malware protection, policy management, that sort of thing.  So its processing power is exponentially greater than a switch.

Now, since we're turning to the Sophos patents, would you like me to go first?

THE COURT:  Yeah.  Sure.

MR. CUNNINGHAM:  Okay.  Why don't we just start with slide 5.

So the slides before this defined client and server devices, but I think we're probably beyond that at this point. I did want to make sure that I'm at least on the same page with your Honor as to the different types of computer threats that are out there, and this is by no means on this slide an exhaustive list, but I think it's interesting to see how the types of computer threats have proliferated since 1971, which is the year when it's generally understood that the first

computer virus was written and released to the world, called Creeper.

Since then, you know, we have obviously viruses, those kinds of programs that self-replicate and try to do damage to your computer and often do a great deal much damage; spam, which we all love; adware, which is similar to spam but it's essentially, you know, trying to insert advertising into things that -- where it shouldn't belong.

Malware at the top is a more -- obviously a more general concept that's designed to encapsulate any kind of malicious software; so software with a malicious intent, thus the name malware.

Phishing is, you know, you get that e-mail looking for to you click on a link to put in your Social Security number, and I know we all fall for that every other day.

And then keystroke logging, which is actually one of the more insidious types of malware, where a piece of software can be embedded in your computer that can actually take down keystrokes, so when you go to your banking website, you put in your password, it logs those keystrokes and delivers those keystrokes to a bad actor.

Next slide.

So "threat management solutions" is a very broad term that's designed to capture the difference types of hardware and software that protect against these various types of malware,

and I think the most -- probably the most recognizable one is the firewall.

I'm sure the court system has a very robust firewall or set of firewalls that protect its internal trusted network from the external untrusted network of the internet. And so the firewall is one of the more common examples of a threat management solution.

So the first concept for the Sophos patents relates to checking data validity. And this actually pertains to the '587 patent that we'll discuss during the claim construction hearing.

This is an earlier patent, dates back to 1993, 1994. So this was sort of as the internet was starting to become a thing, as networks were becoming more robust, and the idea is that you're looking for invalid data, and that doesn't necessarily mean a virus, but it means either data that is not wanted by the computer or data that a user is not authorized to have. That's how I think of it, anyway. And so it could be a computer virus, it could be spam e-mail, it could be a website that a worker in an office setting is not allowed to access during work hours.

So invalid data is simply incoming data into a computer that a user may try to execute on their computer that they're not supposed to, or that may be looking to do damage to the computer system itself.

So the problem, at least at that time, was checking for invalid data with limited computer resources.  As you might recall, computers of that day had very small storage capacities, especially compared to today, when I'm holding in my pocket a memory stick that has 32 gigs of storage space on it.

And so anti-virus vendors began to create these invalid information lists, sometimes called blacklists, that were lists of data that, for a given network administrator, would be invalid if you tried to load it into a user's computer.  And it became increasingly difficult as the number of threats increased over the years to hold all of that invalid information -- the entire list of invalid information, in a client computer, because of the limited storage resources.

Next.

And so what we've created here is just a very, very simple network setup.  So this is a client computer on each side of a server in the middle.  That server is, in this example, serving data to both of the client computers, and information also might come in from the left side of the screen or the right side of the screen.  So you have a network that reaches beyond the four corners of this slide.

And this, as networks were growing over this time, this meant that no longer did you have a network that might be limited to a lab or an office floor or an office building, but

you were having networks that reached out across cities, countries, and eventually around the globe.

And so in this example, an unknown program comes into the client computer on the left side, and in this example, it came in from the left side of the screen.  It's just come in from another part of the network.  That computer, when it sees a program it's never seen before, holds up its invalid data list, it's local list of invalid data, and checks it against that list, and it's asking, is this something I'm authorized to see, is this something I'm not authorized to see, you know, how does it match up with what's on the list?

So the concept of this version of validity checking is to have a much more robust invalid information list on the server, where there's more storage capacity, there's more processing capacity, and therefore, checks can be done on a greater list of data and more quickly.

So in this example, the server would check the validity of the unknown program, and deliver back basically a yes-or-no answer:  Is this valid data?  Is it invalid data?

In the example we have here, it turns out that the unknown program was found to be valid because it didn't -- the data didn't appear on the invalid information list, and so the server gives the metaphysical green light, and the program is allowed to run on the client computer.

Now, this isn't limited to information flowing in from

the network.  This could include, in this next example, the client computer on the right side of the slide receives data on an unknown disk, so files on a disk it's never seen before.

Back then, you know, we still had floppy disks, but as I -- you know, the thing I just pulled out of my pocket, a lot of viruses get distributed today through memory sticks.  It's actually data travels around in ways that employers don't intend and don't want, because it's so easy to pocket a memory stick.  So that's sort of our modern day example of what we're seeing here.

But same thing, the client might check its limited local list, but then the server checks its invalid information list, more robust invalid information list and decides, no, there are files on that disk that match a definition on my invalid list, and so I'm going to send a message to the client to block access to that file.

So the user in this example would receive a warning saying the disk you just inserted contains invalid data, don't run it, et cetera.

So that's validity checking, your Honor.  Thank you.

**THE COURT:**  All right, thank you.

**DR. NIELSON:**  So discussing the '587 patent, I feel that a lot of what we've discussed has already been said, so I'll have a shorter presentation here.

As was discussed, this patent goes back to the 1993

time frame, which does frame some of the discussion.

Next slide, please.

So like we said, we're going to have one computer that's having a second computer do its check.

Next slide, please.  Keep going, one more, please. Yes -- yeah, next slide, one more.

Just as the visualization, this idea of these workstations, and we have a picture of something from that time frame, but just a -- you know, to help visualize, stepping back in time just a little bit.  The workstation memory was very, very limited, and so having the virus checking software and virus definitions m memory would use up a lot of resources.

Next slide, please.  Go ahead, one more.

So here we have kind of an illustration of those old workstations hooked up with the bigger servers, mainframes sometimes, or even if it was a computer, a personal computer, was still a more powerful one, that had more capabilities.

Next slide, please.

So here, the virus checking software and the definitions in the server memory are a much smaller proportion of the resources there.  So it doesn't affect its performance as much.

Next slide, please.

And by taking out the virus definitions from the workstation, then the workstation is enabled to work better,

faster and with more of its memory free.

Next one, please.

So like we discussed -- see, I found a copy of the older disk, very exciting -- the data could come in from a floppy disk, and when it got onto the computer, it would need to be checked, and so the computer, the workstation, would copy the data over to the server for a check, and then the server would do its validity check, and if it was safe, then it would send back a report saying that the data is safe.

And alternatively, if the data comes in, gets copied over again to the server, the server checks it and said, oh, this is bad, this has unwanted data, malware, virus, then it sends back a report saying that it should not be accessed, and the workstation would prevent access.

That's all I had to add on that patent.  I'll pass the mike.

THE COURT:  Thank you.

MR. CUNNINGHAM:  Your Honor, this discussion relates primarily to the '344 patent, which is the next of the Sophos patents that we'll address in *Markman* -- in the *Markman* hearing, and this one is in the mid-2000s range, so we're moving forward a bit in time from the previous patent.

So -- and this patent deals with what I called proactive technology, and I do that to kind of stay away from some of the terminology that's going to be at issue in the

*Markman* hearing, but it's the concept of trying to proactively figure out if a piece of data or a file is likely to be malware, and here's the distinction.

So traditionally, the way the first types of anti-virus programs worked is they had a set of definitions called signatures, where you say, okay, this virus has this signature, this set of bits that constitute this particular virus are known, because we've seen the virus before, we've caught it, we've put it in our lab, we've analyzed it, we know what its signature is.

So you would push that signature out to all of your customers, and say, this is a new signature to add to your invalid information list.  We found a new virus, and here's its signature.

Even today, that's still the best way to identify -- at least I think that's the best way to identify malware is by its signature.  But with new viruses, new types of malware being introduced every other second, it seems like there's a different type of threat.

And so in this -- go back one slide.

In this example, you have anti-malware vendors who are pushing these definitions, these signatures, to client computers, and I'm sure you've had the experience of getting, you know, McAfee wants you to update your software and Symantec wants you to update.  That's what they're doing.  They're

pushing new signatures, new definitions, to your computer, so you have all the latest patches.  Microsoft does it quite a bit, too; Apple not so much, for reasons we can get into.

Next slide.

So then the problem became, what about these things called zero-day threats?  And a zero-day threat is just what it sounds like.  It's a threat that nobody's ever seen before, because it just got released, it just hit the market, it's now infecting computer networks, and this happens, you know, more than any of us even know.

And so how do you manage these zero-day threats when they're not in your definition library, you don't have a signature that's associated for them, you have to figure out a different way to decide whether something coming into the computer network is malware?  And one of the ways you do that is you look at the characteristics of software using what I'm going to call proactive technology.

So what do I mean by characteristics?  I mean the way in which, in one example, the way in which the software is behaving, is attempting to behave, that seems suspicious to your threat management facility.

So in this example, you have a piece of software that's coming into a network, coming into a client device, and before the software is fully accessed, the security software on your computer will determine whether that software is safe for

use, even if the software doesn't match one of the signatures in -- that's already in the security software.

Well, obviously, if the software is a large chunk of code, it's a big piece of software, it's a big file, you can't look at the whole piece of software or your computer's going to hang up for a long time, and when that happens, people disable their anti-virus solutions, and that happens quite frequently. Then their computers get infected and then they wonder why, and it's because they disabled their firewall or disabled their own anti-virus software.

So you extract a portion of the software to analyze, and -- next slide -- and you look at its characteristics, and by "characteristics," I mean things like the type of file. So an .exe file is the one thing that I know raises the most alarm bells with security software. An .exe file may be something perfectly innocuous, but many times it is the type of file that contains malware.

And so an .exe file is a characteristic of the file, you don't have to look any farther. You see an .exe extension, the security software seizes upon that and says, this might be a problem. So that's one characteristic.

Another one might be what we call "call to action." The software begins running and it's asking your computer to perform other activities. It's accessing the operating system, it's accessing input-output modules, it's accessing the

keyboard subsystem.  So it's doing things or causing your computer to do things that don't behave like a normal piece of software.

It could be something as simple as the file size.  If you receive a Word document, that's typically several hundred kilobits of a word document.  If you were to receive a Word document that were several megabytes or a gigabyte of data, well, that's an alarm bell, because it might contain -- it might contain something innocuous like image files, but it also might contain a hidden Trojan horse, a hidden .exe file that's going to spring out and try and do damage to your computer.

So it's these type of characteristics that this proactive technology is looking for.

And you have, in this slide, you compare it against a classification library.  So not necessarily signatures, but the type of functionality, the type of characteristics of the software that gives it the hallmark of being either a virus, a worm, a Trojan horse, or in some cases spyware.

That's all I have on that one.

**THE COURT:**  All right.  Thank you.

**DR. NIELSON:**  Our slide deck is in a slightly different order.  Could we skip to slide 112, please?  Oh, I'm sorry, over here.  I apologize to your Honor.  We'll be moving to 112.

So on the '344 patents -- where do I want to start?

I don't want to duplicate -- Mr. Cunningham described it as "proactive."  That's a good way to describe it.

By way of background, there are a couple of terms that are terms that I don't use, or I don't see used in the field, and so these are terms that kind of come from the patent, the gene in the library of gene information, a grouping of genes and classification of genes.  So some of these terms are terms that are in dispute, so what I'm going to do is I'm going to walk through some of the technology in an embodiment described in the patents, and explain how that technology operates.

Next slide, please.  Next slide.

So in the prior art, prior to 2006, there were, as we've discussed already, a number of ways of scanning for viruses.  Mr. Cunningham mentioned signature-based scanning, and that, like we talked about, you're looking for a certain pattern, and again, as Mr. Cunningham explained, it's something that you've already seen before.  If you've seen this before, you can create a signature for it, you can find it again.

There were some mechanisms for doing this proactive scanning in the 90s.  One of them was called heuristic-based scanning, and it was to look for things about the file that would be suspicious, and again, you would raise alarm bells if it became too suspicious.

There was another technique called emulation, which is kind of similar to the virtualization that we talked about

before.  You could have your computer simulate a separate processor, and you would take a piece of data that you didn't know anything about and you would start stimulating how it would execute, and then you could see if it was doing unwanted things or suspicious things, and then you could mark it as either bad or at least need to be checked more closely.

So that's kind of what was available prior to 2006. Next slide, please.

There's also a cited published patent application on the '344 patent to Chiriak.

Next slide, please.  One more.

And in this one, the -- Chiriak describes some of these mechanisms that I've just been describing.  He describes emulation and some of the problems with it, and he -- because he says that emulation can be too slow, and so he talks about a way to make emulation more effective.

Next slide, please.

So the bad program comes over the internet to the computer.  Next slide.  Here we go.

And when the bad program arrives at the computer, it's broken down.  And so in the prior art, you could break it down into what was termed a basic block, and it was a series of instructions that were relatively simple, like, it didn't -- when you have a normal computer program, literally it jumps around back and forth inside its code as it receives different

instructions, and a basic block was a sequence without any jumps. So it was kind of like, a sequence of instructions that didn't have any complicated algorithms or jumping or loops, things like that.

So once you had a basic block, then you could break it down into instructions, and you could check and see -- you could emulate individual basic blocks, sometimes in parallel, and that would speed it up, or you could pick ones that needed to be looked at sooner or were more important, to try and speed up emulation.

Next slide, please.

So the idea is, if all the basic blocks that you check are good, then the file's okay, but if you find a bad one, you can stop immediately and say, I think I've found a computer program that's unwanted.

**THE COURT:** What is a basic block? Again, when you say basic block of a bad program, what is that?

**DR. NIELSON:** Right, I failed on my attempt to describe it. I'll try again.

So when you have a computer program, a computer program is a bunch of instructions, but of course, if you run a computer program, it just doesn't start at instruction one and run all the way to the end. It's more like a choose your own adventure book. Did you ever read those? Where, like, you'd get to a page and it would say, if you choose A, jump to page

90, and if you choose B, jump to 23.

Well, a computer program is like that, and it will get to a place where it says, if the data here is greater than zero, jump farther out, and if it's exactly zero, then just keep going where we are.

And so in the Chiriak reference, for example, it described the basic block as being a sequence of instructions with none of those jumps, or in a choose your own adventure book, it would be like a page. You'd have the page and you wouldn't have to make a decision until the bottom of the page. That would be like a basic block.

Next slide.

So the '344 technology moves -- adds something to this. As the bad program comes in, we again break it down -- go ahead and, there we go, next slide.

And then on the next slide, we're going to have a functional block, and a functional block is kind of similar to that basic block idea, except that the '344 specification describes it as being a high-level description that is extracted, so that you can -- it says, for example, when you compile a program, that means -- let's see, I'm...

So when you write a computer program, you don't write it in ones and zeros, because humans don't think very clearly when they just see a bunch of ones and zeroes on the screen. So they have programming languages, and these languages are

designed to be kind of a semi-English, and then -- but they're constrained, and you have to use them in a certain way.  And then you take and you convert them into the ones and zeros that the computer understands, and that process is called compiling.

The '344 explains correctly that different compilers would actually convert that programming language into different but functionally equivalent binary.  In other words, there might be multiple ways of expressing the same thing, and so different compilers might choose to take the instructions from the programming language and convert them in slightly different ways.

And so the '344 talks about taking a functional block and trying to get back from that -- those implementation-specific details into what it's actually doing.  And we have -- I've got a slide here that kind of shows an example.

So this is pulled from the '344 example in the embodiment, where they show a functional block where, instead of ones and zeroes, they have extracted it to these functional steps:  GetSystemDirectoryA would be a step that some of those binary instructions are doing.  GetModuleHandleA, GetModuleFilenameA.

And the next one down there, that fourth one there that is in quotes, that's what in computer science we refer to as a "string," which is just our technical jargon for letters,

words, text.

So in the functional block we get some of these functional pieces, and they're called APIs, which is Application Programmer Interface, and basically, it allows the computer program to ask the computer to do something for it. It would be an example of an API, because the computer program isn't allowed to directly write to a file, and so the computer provides these function calls that the program can do to say, hey, computer, I want to write to a file now, hey, computer, I want to read from a file, and then the computer will -- well, the computer will do that and return the result.

And so there's API calls here, and there are strings, as well as some general programming instructions in this functional block.

So the '344 specification goes on to say that,

"A gene is a piece of functionality or property of a program.  Each piece of functionality is described using sequences of APIs and strings which can be matched against functional blocks.  A matching functional block includes the APIs and strings in the correct order."

And so it goes and shows an example of this, using that functional block that I had on the previous slide.

So here it is again, the same functional block, and the patent talks about, well, we see that these instructions

here, GetSystemDirectoryA, GetModuleHandleA,
GetModuleFilenameA, and we see some executables and a copy, we
recognize that that is doing some higher-level function.  We're
going to call that higher-level function or that higher-level
gene CopySys.

And we see these other things are messing with the
registry.  The registry is a database that your computer holds
internally for knowing where certain programs are.  It's kind
of system-level information.  And so here we see in the green
that what it's doing is some -- it's putting a key into the
registry, and we're going to call that the "Runkey" gene.

And finally, we see at the very bottom there
CreateProcess, which we can recognize as launching another
computer program.  So we're going to call that the "Exec," or
execute gene, for executing another program.

Next slide, please.

So then, to try and categorize whether a program is
behaving inappropriately, we have this library of gene
information to line up with the functional blocks of a
potentially bad program.

And so it says,

"A classification of genes is a combination of
genes used to describe or identify a class of software
program,"
and the example that it gives here -- back up one slide just

for a second -- the example that it gives here, it has another set of examples -- another example set of genes there at the bottom, SockSend, Runkey, Exec, CopySys, and it says, well, if we look at this, we think that that is going to be either like an IRC bot, which is a type of unwanted program.

Next slide.

So it kind of summarizes into these two separate pieces of information.  The gene definitions, like CopySys, Runkey, Exec, that we saw previously, and then some kind of classification, like if we see CopySys, Runkey and Exec, we can categorize that as malicious.

**THE COURT:**  And a classification of genes is sort of derived from earlier malware?  I mean, is that -- how do you get this classification of genes with which to make this definition or comparison?

**DR. NIELSON:**  That's a very good question.  So for example, companies that do security often try and analyze and categorize instructions.  And so this would take some analysis from a researcher or a security firm where they would need to be able to classify these instructions and say, well, when we're accessing a directory and getting a module handle and then doing some EXEs copying, that looks like CopySys.

So you'd have to define them, you'd have to create -- you'd have to build a library of genes.  So basically, just a summary of what we talked about:  You have to be able to

identify a gene, describing this -- a function or a property of the software, then you match the gene into the gene classification, and from the gene classification, you classify the software.

And so that was the example given in the '344 spec. And that's the end of my presentation for this patent. Thank you.

THE COURT: Comments on that, or...?

MR. CUNNINGHAM: Your Honor, I do. I found this very interesting, because we actually -- one of my colleagues actually did it.

So in my answer to your question on how these gene libraries get built is, these companies do something that is sometimes called sandboxing, where they literally catch a virus, catch a piece of malware, put it in a cage, you know, in a very secure computing environment in a lab, and let it do its thing.

And we actually did this to a couple computers in the last case I had for Sophos, and completely wrecked the computers. I mean, they were junk by the time we were done with them.

And they analyze the characteristics that these pieces of malware -- you know, what does it do? When it starts to run, you know, what modules does it seek to access? What files does it try to copy? Does it try to decrypt itself? Does it

try to decrypt other portions of the computer?

And so in that way, you develop these lists of characteristics of common malware, so that you can use those lists of characteristics to identify the next piece of malware that comes down the road.

THE COURT:  But it's -- but to derive what you call genes or characteristics or whatever into a library, I mean, that's research --

MR. CUNNINGHAM:  It is.

THE COURT:  -- and it's looking at stuff that's captured in one way or another and sort of, I don't know, using characteristics is then generalized from that?

MR. CUNNINGHAM:  Yes, that's exactly right.  You can -- some are easier than others.  Like the .exe file example I gave to you is one that doesn't require a whole lot of research.  You know, we know that a good percentage of malware is delivered through executable files that people still click on and run from e-mails that they get, even in my law firm. I mean, I can't believe it, but they do.

That's one that doesn't require a whole lot of research, but there are very, very sophisticated pieces of malware that need to be run multiple, multiple times in a research lab to figure out what it's trying to do, so that those characteristics can be added to the gene library.

THE COURT:  And I was sort of curious, how accurate --

how is the accuracy of these libraries then measured?  I mean, if it's too broad, if it's under-inclusive --

MR. CUNNINGHAM:  It's measured by something called false positives, your Honor, and it doesn't happen very often to a security company, but when it does, it's a real problem. You set off a false positive, and all of a sudden, you know, 5,000 people at a company can't access, you know, common Word documents because you've got your security software tricked into believing that it's malware and, you know, I'd like to say Sophos has a perfect record on never having a false positive, but I'd not be telling the truth.

So it's a bit of trial-and-error sometimes but, you know, it gets better and better the more time you spend looking at the known malware.

THE COURT:  Of course, there's the greater problem of the false negatives, if you miss --

MR. CUNNINGHAM:  Exactly and, you know, there's certainly more false negatives than there are false positives, in my experience.

THE COURT:  All right.

MR. CUNNINGHAM:  Okay, so the next topic I've titled URLs and Proxy Sites.  It relates to the Sophos '852 patent. We're now into the mid-2008 time frame.  So this is primarily a web-based discussion, a discussion of how we --

THE COURT:  It's slide --

MR. CUNNINGHAM:  Yeah, and I've skipped forward, your Honor.  I'm switching -- we're on slide 37.

THE COURT:  All right.  Okay.

MR. CUNNINGHAM:  So slide 38 is the most basic starting point for what I need to discuss on this particular patent.  It's, What is a URL?  Your Honor may already have a complete understanding of a URL, but I, like most people, take them for granted, primarily because I click links way more often than I type in URLs.

THE COURT:  Right.

MR. CUNNINGHAM:  So I have one that -- where we've broken down the syntax just to get straight what parts of the URL we're looking at in any given URL string.

So the first is obviously http, or https if it's a secure transfer, and that's obviously the protocol, the language in which this URL is going to be delivered and dealt with.  So in this case it's the Hypertext Transfer Protocol, that was developed years ago.

The second piece of it is those two forward slashes.  That's a separator, to separate the protocol from the rest of the URL string.

The third piece, "www.fresh.com/," is the web server domain name.  So it's the destination that you're seeking to go to to get whatever information you want, and the separator between the domain and the subdirectory.

The next, "fruit/" is the subdirectory or folder name inside that domain where the file that you're seeking is actually sitting.

And finally, the document name in this instance is "seed.jpg," which in this instance, if you typed that URL in, I have no idea if it would actually go somewhere, but if it did, it should return to you a lovely picture of a seed from a fruit.

So that's -- the remainder of that URL, the "seed.jpg," is specifying what your client computer is asking for.  So it may be a web page, it may be a file, it may be a Word document, it may be -- could be all kinds of audio file, video file, et cetera.

So a web server is simply a computer system or a device that processes requests via this Hypertext Transfer Protocol language, and it can refer to the entire system or to the software that accepts and supervises these http requests, and its primary function is to store, process and deliver web pages to clients; so hundreds and millions of these web servers sitting all the over the globe hosting various web pages that people visit every day.

Now at the other end, at our end of this network, is a client web browser, and obviously, the most common examples these days are Google Chrome, Internet Explorer, things of those nature, which is a client -- a piece of client software

that sends requests to the web servers to bring back web pages from those web servers.

And in this instance, I've got a firewall that's sitting -- I'm sitting at my desk or she's sitting at her desk in an office, and we've got a firewall between, in this instance, the Facebook web server and the client.  So this is as if, you know, someone was sitting in this courthouse, the courthouse has a firewall, it's sitting between the Facebook web server and the user.

Now, pretty basic here, but in this instance, the client, the user, would send a request for www.facebook.com, either by typing that URL into the browser or by clicking on a link for Facebook, or a previously stored bookmark, and that request goes directly to the firewall.

And eventually, if the firewall allows it, your request goes through to the Facebook web server, the web server processes that request, returns the requested page of data, my profile or my mom's profile, what have you, and the client receives www.facebook.com and whatever web pages were requested there.

And the web browser also renders the content.  So it brings it from a markup language up into the images and words and layout that you see on a particular web page.  And if your connection is slow, you can actually see that rendering happening often.  You know, you have the -- usually the ads

come in first and then some of the text and then the images come in last.  So that's the rendering that this web browser's doing.

So a concept that I hadn't been familiar with before this case started is what's called an http query stream, and it's, in the simplest terms, a portion of an URL containing data that doesn't fit into that hierarchical path structure neatly that I described earlier, the one with the dividers, the sub-folders, et cetera.

And so here we have a base URL, www.hiddenproxysite.com, and below that we have an http query stream appended to the base URL, and typically a query stream is separated by a character, and in this example, and I think pretty typically, it's a question mark.  So if you see a question mark and then a variable and an equals sign, you're typically looking at what's called an http query stream.

So that gets us into what is a proxy server, and a proxy server -- so in this instance, we've deleted our firewall.  We've got no firewall, the user has just direct access to the internet, and this person has asked for information from a proxy server.  And so the user has said, I want to see a web page from the target website, but I'm going to go through a proxy server, and these are actually fairly easy things to do.

You can -- I sat down today, I Googled "proxy server

website," popped one up.  It looks a little like Google.  It's got a little box where you type in the URL that you want to go to, you hit "go," it goes out and talks to, in that instance, Facebook.com, returns the web pages that you requested from Facebook.com and the web server serves the data back to the user's computer.

You can enter basically any URL that you want to into a proxy server, and it will return some or all of the data that you requested from the target website, from Facebook or what have you, and these proxy servers, these proxy websites sort of come and go.  They'll pop up on the internet here, they'll get shut down, they'll pop up on the internet over here and get shut down.

So a lot of them are -- I asked for -- I asked my team for examples of whether you might use a proxy website for a legitimate purpose rather than an illegitimate one, and I didn't get a whole lot of great examples.  So I'll be interested to hear if somebody comes up with one, but oftentimes you're doing -- you're using a proxy site because you don't want your network administrator to know something that you're doing, whether it be at a university or at a workplace or whatever, and we'll get to that in just a second.

So this proxy server works by handling these query strings that are appended to a proxy site URL request, by separately processing that query string, figuring out what it

is the user is actually asking for and obtaining that data.

The original client will think that the data is being provided by hiddenproxysite.com when, in fact, the underlying data is coming from, in this example, Facebook.

And so in this string, the proxy server interprets that "U=" -- the U is a variable -- it could be S, it could be T, but in this example, it's U -- as just a variable that it knows now, okay, after that U=, I need to separately parse the www.facebook.com out of the string and deal with it.  So that's how a proxy server figures out what you're really asking for.

And so this comes into play when your network administrator has blocked access to certain websites, be they inappropriate content for minors, social media sites that take up productivity time, et cetera, et cetera.

So you may encounter a situation where you sit down at your computer at work, you type in "Facebook.com," you get a response that says, "Access to this website blocked."  Well, I really need to get on Facebook.com for whatever reason, so I use my proxy server.

I go to hiddenproxysite.com, I append my query string to the end to request Facebook.com, and the firewall may not know what hiddenproxysite is.  It's certainly not on its -- in this example, it's not on its list of blocked websites, and so it allows the string to go through.  And eventually, the user ends up getting back the web page Facebook.com.

I was able, when I tried it on my proxy site today, I was able to get back about half of the content that Facebook would otherwise render to me.  Some of it was broken links, but in essence, it's a way to get around firewall restrictions on websites.

And so the point of this is --

THE COURT:  The web server, also, then would not be able to determine the true source of the request, it only knows it's coming from a proxy server?

MR. CUNNINGHAM:  That's correct, it delivers it back to the proxy server.  The proxy server then figures out where the request came from and sends it along to the user.

So threat management solutions needed to be developed that would parse all the information in a web -- in a URL stream to detect whether there was an attempt being made to use a proxy site to get around what would otherwise be a restricted web page.

And so that's essentially the underpinnings of the '852 patent.

THE COURT:  Okay.  Thank you.

MR. CUNNINGHAM:  Thank you.

DR. NIELSON:  Your Honor, we'll be jumping to slide 72.

THE COURT:  Okay.

DR. NIELSON:  As I said before, Mr. Cunningham did a

very good job describing a lot of this, so we'll run through it pretty quickly.  I have very little to add.

Just a quick addition about the state of the prior art.  At the time the patent lists '618 to Shannon as a known prior art, and the Shannon reference actually was a patent related to doing some of the first blocking at the firewall of these outgoing requests, from 1998.

So blocking of URLs was something that had been done for some time, and it's kind of the arms race that happens in computer security, right?  Somebody came up with this mechanism for blocking employees at work from visiting Facebook, you know, they need to get back to work, so we're going block Facebook but, you know, then other people come along and say, I think I know how to get around that kind of an obstruction. So that's kind of the -- just some extra backdrop, here.

I do want to say, just maybe as another bit of flavor about this, it is true that a good amount of proxy site use is for less than admirable purposes, but I do want to point out that even though it's a relatively small part, it is also used -- people in countries that are less open than ours will try to use them to get around state-sponsored firewalls or other blocking for their country.  Sometimes people use it for whistle blowing, some other things like that.

So it may be true that there is a large amount of use of that that's not super-positive, but it is occasionally used

for good purposes, too.

Next slide, please.  I think we can skip through this one, jump through this.

So just right here, what I was showing is that, you know, we have this list of blocked websites.  I'm now on slide 84.  So as we've already discussed, Mr. Cunningham laid it out, you might go to some proxy website which is not on the blocked list.

Next slide.

So first of all, you go there, and it says, hey, Facebook is blocked, my proxy to Facebook is not.  So it allows the user to access the Facebook website.

Next slide, please.

Also, just a note about flavor here, but it's going to show up in the other patent we talk about.  One of the reasons why a proxy website won't always get you everything -- like Mr. Cunningham pointed out, it gave about 50 percent for him when he looked at it -- is when you go request a web page, it doesn't send you all the data.  It sends you some portion of the data, with instructions for how to get the rest of the data.

So even though you yourself could plug into your browser, well, I want to go to my proxy facebook.com, Facebook didn't know that it needs to change all of the other pieces that it's going to tell you to get.  And so when those

instructions come back, and your browser -- I should explain.

Your browser, when it's browsing the internet, the first thing it gets back is usually an HTML file, which is just some instructions for how to lay out the page. It will include the text and it will include a lot of information, but it will often say, and then you need to go to this other address to get an image, or you go to this other address to get this video, or you go to this other address for ads, unfortunately.

And so those instructions in the HTML didn't change just because you went to the proxy site, and so when you get the HTML from Facebook, all of its instructions are still to the original addresses, and accordingly, when your browser tries to go get those, those may end up being blocked. So just a little bit of added flavor, there.

Next slide, please. Okay, back up one.

Mr. Cunningham talked about it, but it's an important point, so I just wanted to emphasize it again. You could, of course, just add the proxy website to the banned list, right? As soon as you know the address of the proxy site, you could ban that, but the problem is, like Mr. Cunningham pointed out, they pop up, and then they -- as soon as people know they're blocked, they'll change their name or they'll shut down that one and open a new one, and the reason they can do this is their names don't matter, right?

Facebook invests a lot of energy in the Facebook name,

they want everybody to know Facebook.com.  If you dreamed the website Facebook.com, they couldn't be happier.  But a proxy, of course, they know you're not coming to the proxy for the proxy, right?

And so it's no big deal for a proxy service to change their name, or if one proxy service goes down, somebody else will pop one up.  And so that's why it's very difficult, if not impossible, to keep up with the number of proxies that can emerge, and it's not reasonable to try and keep track of them all.

And the '852 really points that out as part of the background, you know.  The way they say it is, the new proxy sites appear online faster than the administrator can add them to the banned list.

So that's kind of the reason why checking for this secondary URL is helpful.

**THE COURT:**  I know that's one of the terms.  When you say checking this secondary URL, you're referring to the ultimate web server or is that the proxy...?

**DR. NIELSON:**  Right.  So Mr. Cunningham showed something very similar, and could we go one more slide?

Okay, back up one.

**THE COURT:**  Ninety-five?

**DR. NIELSON:**  Yeah, I am sorry, 95, yes, thank you.  So when you type this website in, or sometimes you can go to

the website, and there will be an entry space where you can type in the website you really want to get to, and then it creates this URL itself, but like Mr. Cunningham pointed out, only the first part of that is an address, right?  The last half of that is instructions.

Backup, slide, a couple here -- let's go back to this one.

So I wanted to show it, because we use it outside of proxy websites, as well, and so on slide 92, I show an example where you do this with a more legitimate website.

When you go to Google.com, there's often a query string appended to the end of it that represents a search.  And so the first half of this URL here is the address you actually want to go to, it's the person you want to talk to, and the information at the end is information you're sending to Google.

Next slide, please.

So in computer science we sometimes call information you pass an "argument."  I don't know why, but it's really just data that gets passed on to the server.  So these -- this -- when you put in that website, or that URL I just showed you, this is what comes up, and you'll notice in "search target," which was in the query string, right there at the end, is what shows up in Google.com's website under their search bar when you bring that up.  It's data they received, they processed it, right?  It was instructions to them.

Well, similarly, when you go to the proxy website, the first half of that is the address you're going to, hiddenproxysite.com.  That's the actual computer server out on the internet, and the other piece here, the HTTP Facebook.com, is data being sent to it.

Mr. Cunningham is correct, usually the question mark is an indicator of data that's being sent.  And so that's data that arrives at hiddenproxysite.com and that's how they know, oh, I need to actually go to Facebook.com to fulfill, you know, to do what I said I'd do.

And so the key point here is that the firewall that needs to keep the corporate workers from wasting their time on Facebook can scan and say, well, even though the server hiddenproxysite.com is not in my banned list of URLs, I do see that URL, HTTP Facebook.com in the query string, and that's banned, so I can still go ahead and block this request.

**THE COURT:**  And it's designated the second URL. That's what you're instructing the proxy to go to --

**DR. NIELSON:**  Right.

**THE COURT:**  -- and you're saying, since it appears as part of the instructions or the argument, they can be picked up.

**DR. NIELSON:**  Right.  Next slide.  Oh, and blocked. Thumbs down.  Next slide.

Okay, thank you.

**MR. CUNNINGHAM:**  First of all, your Honor, I appreciate Dr. Nielson providing two examples of legitimate uses of proxy sites that my team couldn't come up with, so....

So the last -- I'm going to move to slide 28, your Honor.  The last technology portion here that I'll discuss relates to the '050 patent, which again is in the mid-2008 time frame, so just about the same time as the previous technology set we were discussing.  And this relates to what I'll call, for purposes of this tutorial, contextual information.

You remember we discussed file characteristics two patents ago, in terms of looking beyond these signatures to figure out, is this file, is this data doing something -- is it exhibiting a characteristic that we don't like, and therefore, we're going to either take a closer look or block it entirely.

Now we're talking about contextual information, which is information about the analyzed code, but beyond the data itself, such as, in these examples, the source or origin of the data.  Where did it come from?  You know, where can we -- can we figure out where it came from, and if so, where did it come from?

And to use kind of a hackneyed analogy, certainly in the earlier days of the internet, an .ru or Russian origin for data was often scrutinized more carefully than data that might have come from a .com or a .biz website.  So that's one example of an origin that might get more scrutiny and is a type of

contextual information that this kind of technology looks for.

The second example, a pattern of resource locator requests.  Well, what does that mean?  That means if I go request ESPN.com, and what comes back is data that's pulled from 25 or 30 different websites, that what's coming back is pulled from 25 or 30 different websites, including badads.com and spyware.net, that's another type of contextual information.  I've received a whole bunch of information from sources that shouldn't have come back, based on the request I made to ESPN.com.

And then, you know, the third example, background information about the data, that's a fairly broad concept, but an example is the amount of data I received back.  Like the example I gave before, the Word file that's 6 megabytes instead of 500 kilobytes, is the amount of data that's being served back to me so much out of proportion to what I expected to receive that -- what I expected to receive, that it's something that should cause alarm bells to ring?

Next slide.

So in this example, we have the same woman wearing the same shirt she's been wearing at day, sitting at her client computer, and she makes a request for, in this case, in the case I'm going to give you, a website, a web page, to come back, and it goes into this thing that we've described before called a policy management facility, which is, in simplistic

terms, a software module inside a hardware device.

In this instance, I'm saying that the policy management facility is inside that gateway computer that we talked about back a few patents ago, and the policies can be things like blocked websites, blocked types of files.

We had to institute a policy finally that only administrators could -- for a while, could review and run EXE files, which made getting those type of files from clients very challenging, but for a while, that was a DLA Piper policy, because so many people were clicking on unwanted EXE files and causing mass hysteria.  So those kinds of things go into your policy management facility.

And so what you do to look for this contextual information is first you analyze the request that's being made. So my request to ESPN.com is analyzed.  We've seen this type of request before, we know what Sean typically gets back when he requests ESPN.com, and so we look at the type of data that's been previously returned in response to that request.  We look at the type -- the sources that that data comes from when Sean requests ESPN.com 42 times a day, and we store that, the contextual information about the request, to identify later, on try to identify malware that might be being returned in response to that request.

Next slide.  Next slide.

So eventually, the request gets passed through your

policy management facility, it's not a blocked website, ESPN.com is not on the list, and it goes to your web server.

Next slide.

The data gets returned.  Next slide.

And you look again at the contextual information: Where did it come from?  Did it actually come from ESPN.com or did it come from ESPN.ru?  Are we getting it from a source that we didn't anticipate?  Is it more -- much more data than we anticipated?  Is it from more sources than are typically returned when we get a request of the type that Sean just made?

And so we're looking at not the data itself in this instance, but the contextual information surrounding the data that came back.  And eventually, the data, if declared to be valued, is returned to the user.

That's what I have, your Honor.

**THE COURT:**  Great, thank you.

**MR. CUNNINGHAM:**  Thanks.

**DR. NIELSON:**  And it looks like we're on slide number 99, your Honor.

There's a couple of things that I'd like to add in terms of technology background here on the '050.

Next slide, please.  Next slide.

This is a -- on slide number 102, this is an illustration of what's in an IP packet header.  So like we talked about, when you send your data out on the network, you

get all these different headers attached to it, so that there's sufficient information for it to reach its destination and for the person who receives the information to send a response back.

And so when you have an IP packet header, it includes a source address, which is the IP address of the computer it came from, and the destination address, which is the computer that it's intended to go to.

And there are certain circumstances where along the way you might have a change.  For example, when you send an IP packet from, say, a computer inside the courthouse, when it reaches the gateway or firewall at the border, right, it will often change the source address to be the source address of the gateway, so that the response will come back to the gateway first and then the gateway sends it to the person inside that sends it.

But the thing is, along any particular segment of that route, all the different pieces of a single packet flow are going to keep the same source and destination address along the way.

So it's not like if you have your document broken up into a hundred pieces, so you're sending out a hundred pieces of your document, you wouldn't have a situation where the first 10 pieces appear to come from one source address, and the next 90 pieces appear to come from a different source address or

site.

On the other hand, when you're getting, say, a web page -- and Mr. Cunningham talked about this -- when you're getting a web page, a web page actually does include a lot of different pieces, and where those pieces come from can be different from each other.

So what I've done here to kind of illustrate this is, I've got a picture on the right, which is a very simple web page. It has just a single "Hi," exclamation point, and underneath it, an image. And on the left, I have the HTML that creates this web page.

So HTML, like I said, it's called a description language, and it basically allows you to lay out what a web page should look like, and so when your browser goes to a web page, what comes back is usually some text like this, that tells the browser how it should display this information on the screen.

But included in that is also a -- so in this example, if you look inside the section, you see there's a body section there in the HTML, and inside that section it has the "hi," exclamation point, "BR" stands for break, meaning move down to the next line, and then you have this "IMG SRC." An "IMG" stands for image, "SRC" stands for source. And so what it says here is, put in an image right here, and this is the source that you can get that image.

And so your browser would actually make two separate requests.  The first time it would go out and ask for the web page, and the web page would come back with this HTML, and as soon as the browser was reading this, it would say, ah, I need to go do another request, and it would go to this address and request an image, and it would use both the text that it received and the image to create the final web page.

Next slide.

So -- and just as a note, the term "sub-deliverable" is one that's disputed.  This is how I understood it from the example in the patent specification, and so kind of a -- back up one more, back to here.

So this is kind of like, if you have a web page, then your web page might have these separate pieces that come, and they might come from different addresses.

When you go to Google.com, for example, there's an ad server, and so your web page is coming from both the Google.com address and this ad server address, and so when you have a bad website, a lot of times a bad website will also have data coming from a bunch of sources.

And an example of where something like this might happen, why would somebody go to a bad website in the first place?  Well, you've seen maybe those e-mails that come that are like, I'm your friend, and click on this link right here, and you don't know where that link will take you.

And so sometimes your gateway may try to block a bad website, but just like we talked about with the proxies, the bad guys will change their name.  Nobody's going out and looking for them by name.  They're getting sent there by clicking on a link or getting redirected there, in one way or another.

So one of the things that can happen is that if you're going to a bad website and you have these different pieces, even though they're coming from different addresses, there are sometimes patterns that can be detected in the different addresses that make up the full web page.

Next slide, please.

So if you're fortunate enough to be sent to a bad website that's been blocked -- go ahead and -- that it will get caught at your gateway or your router, and it will say, hey, this is bad, don't allow it, and even though you clicked on the e-mail you shouldn't have, you're safe because your gateway or firewall protected you.

Next slide.

But if the bad guys quickly change the names of their site and then send out a new batch of e-mails, maybe there wasn't time to get this blocked, then it gets past the scanning and it arrives at the computer and causes damage, in one form or another.

Next slide.  Next slide, please.

So one of the things that you can do with the pattern of changing addresses is you can try -- you can detect how addresses are changing as the bad guys are changing their addresses.

A lot of times they're not trying to pick unique names, and so if you have a bad guy who just cycles through and adds in a prefix -- like, they might take the exact same address they've been using and add on two letters at the beginning or something like that, that makes it so it bypasses the blocking that was used before.

But if you take those addresses, especially maybe in an example like when you've got a web page where you're going to have multiple addresses, you may be able to see patterns you've seen before.  I've seen aaa.com before and bbb.com before and ccc.com before, and I see that all we've added is a new prefix.  Well, there's a pattern of changing addresses, and that's too suspicious.

Or you might have a situation where, because they're all sharing a similar prefix, maybe the bad prefix triggers an alarm bell, something like that, then that's another example of pattern of changing addresses that may be sufficient to raise an alarm bell and block access at the scanning facility.

Next slide.

And so those would be blocked, and again, the user is protected.

**THE COURT:** So you look for patterns.

**DR. NIELSON:** Right. So there's patterns of changing addresses is one of the things that is looked for to try and determine what the bad guys are doing.

Thank you.

**MR. JAFFE:** Your Honor, we've run out of patents.

**THE COURT:** Excellent. I was hoping you'd say that.

Well, this has been helpful. I mean, you've made it about as clear as one could make it in terms of the general technology. How much that helps us in this actual process of claim construction we'll soon find out, and we'll find out on the 15th, and thank you. Very good presentations.

**UNIDENTIFIED SPEAKER:** All right, thank you, your Honor.

**THE COURT:** I appreciate it. We had a CMC scheduled, but it seems to me we just need to plow through, unless there's something else that I should know about.

**MR. JAFFE:** That sums it up from Fortinet's perspective.

**THE COURT:** All right. So you're not going into a settlement conference or something in the meanwhile that I should know about?

**UNIDENTIFIED SPEAKER:** Not that we know about.

**THE COURT:** Okay, all right. Thank you.

4:42 p.m.

**CERTIFICATE OF TRANSCRIBER**


I, Leo Mankiewicz, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____ 07/12/2015

Signature of Transcriber          Date