# EXHIBIT 10
# FILED UNDER SEAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FORTINET, INC., a corporation, | Case No. 13-5831 (EMC) |
|     Plaintiff, | |
| vs. | |
| SOPHOS, INC., a corporation, MICHAEL VALENTINE, an individual, and JASON CLARK, an individual, | |
|     Defendants. | |
| SOPHOS, INC., and SOPHOS LTD., corporations, | |
|     Counterclaim Plaintiffs, | |
| vs. | |
| FORTINET, INC., a corporation, | |
|     Counterclaim Defendants. | |

## EXPERT REPORT OF BRIAN W. NAPPER

## CONTAINS CONFIDENTIAL BUSINESS INFORMATION
## SUBJECT TO PROTECTIVE ORDER

Brian W. Napper
Dated: July 20, 2015

CONFIDENTIAL ATTORNEYS EYES ONLY

was also attributable to the FortiGate product family, due to "increased demand…from our entry-level and mid-range products for smaller enterprises", as well as high-end products for large enterprises.[290] According to Fortinet, many of its FortiGate customers also purchase a FortiGuard security subscription service with a product purchase, [291] making the FortiGate product a primary driver of service revenues.[292] Security subscription revenues from FortiGuard also account for a significant percentage of Fortinet total revenues.[293]

In 2013, Fortinet controlled 24.95% of the market share in UTM products with net sales of $369 million.[294] That same year it held 9.96% of the market share in firewall equipment with net sales of $463.7 million.[295] In 2014, Fortinet increased its market share in UTM to 26.28% with net sales of $431 million.[296] Fortinet also increased its market share in firewall equipment in 2014 to 11.19% with net sales of $588.7 million.[297]

Although Fortinet does not track cost or profit information on a per-product basis, in aggregate it reports an incremental profit margin of about 60% on its products.[298] This includes direct costs, comprising hardware component costs, of 30-32%, and indirect costs, comprising

---

[290] Fortinet Form 10-K for year ended December 31, 2012, p. 49.

[291] Fortinet Form 10-K for year ended December 31, 2014, p. 7.

[292] Fortinet Form 10-K for year ended December 31, 2012, p. 42.

[293] Fortinet Form 10-K for year ended December 31, 2014, p. 13.

[294] Schedule 2.2a.

[295] Schedule 2.3a.

[296] Schedule 2.2a.

[297] Schedule 2.3a.

[298] Fortinet's First Supplemental Responses to Sophos Interrogatories (Nos. 1-4, 6-10, 13 and 15),  p. 12.

CONFIDENTIAL ATTORNEYS EYES ONLY

freight, warranty, warehouse, operation, and personnel costs, of 8-10%.[299] Fortinet's overall gross margin was approximately 70% in both 2013 and 2014.[300]

Sophos's UTM and Firewall products have also been commercially successful. In 2014, Sophos experienced "continued strong double digit growth" in its UTM products, supporting 4% growth in total company billings.[301] Sophos held 7.57% of the UTM market share in 2013, and increased its share to 11.1% the following year in 2014.[302] With respect to firewall equipment, Sophos held 2.4% market share in 2013 with sales of $111.6 million, with an increase to 3.46% in 2014 with sales of $182.1 million.[303] Sophos also enjoyed a high gross margin on its products overall, at approximately 83% in 2013 and 2014.[304]

The overall commercial success of the Fortinet accused products has an upward influence on the royalty rates I have determined for the Sophos patents-in-suit.

> *Georgia-Pacific Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results; and Georgia-Pacific Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned an produced by the licensor; and the benefits to those who have used the invention.*

Below I discuss the nature and benefits of the patents in suit, their advantages over old modes and devices and any alternatives or design arounds that would have been available to Fortinet at the hypothetical negotiation in 2002.

---

[299] Fortinet's First Supplemental Responses to Sophos Interrogatories (Nos. 1-4, 6-10, 13 and 15),  p. 12.

[300] Schedule 6.

[301] Sophos Holding Limited Directors' report and consolidated financial statements for year ended March 31, 2014, p. 7.

[302] Schedule 2.2a.

[303] Schedule 2.3a.

[304] 8531SOPHOS_00589357.

CONFIDENTIAL ATTORNEYS EYES ONLY

RPX Corporation, a worldwide provider of patent risk management services, licensed U.S. Patent Nos. 5,311,591 and 5,412,717 to Sophos PLC on January 29, 2010.[336] The patents in the license agreement allowed Sophos to monitor the ability of a program in a computer to utilize certain resources, including program execution.  Sophos licensed the rights to U.S. Patent Nos. 5,311,591 and 5,412,717 for an initial license fee of $73,827, plus a three year annual membership and license fee.[337]

I discussed these patents with Mr. Stillerman, Sophos technical expert on the infringement of the Sophos patents-in-suit, who informed me that these patents are somewhat comparable to the Sophos patents-in-suit.[338]  U.S. Patent Nos. 5,311,591 and 5,412,717 utilize somewhat related technologies to the Sophos Patents-in-suit, although not with respect to network security.[339]  Monitoring occurs over communications channels as opposed to over a hierarchical network as in the Sophos patents-in-suit.[340]

*Juniper Networks Inc.*

Sophos PLC and Juniper Networks Inc. entered a software OEM agreement on October 3rd, 2008.  The agreement grants Juniper Networks the non-exclusive, non-transferable right and license to use the Sophos SXL-enabled Anti-Virus, also known as Sophos Live Anti-Malware or "SLAM", an anti-malware functionality that combats web and email-borne threats through the use of off-box URL reputations filtering and signature matching.[341] The SLAM functionality licensed by Juniper is a host cloud look-up service where the service checks a hash and/or a URL

---

[336] 5831SOPHOS_00593994– 4003.

[337] 5831SOPHOS_00593994– 4003 at 994

[338] Discussions with Robert Stillerman

[339] Discussions with Robert Stillerman

[340] Discussions with Robert Stillerman

[341] 5831SOPHOS_00593420 – 451

against a data library in the cloud to determine if the content is good or bad.[342] I understand that the SLAM functionality was developed by Sophos for Juniper Networks and that it was the foundation of invention patented as the '347 patent and that the named inventors of the '347 patent are the team the developed the SLAM functionality.[343] I also understand that the SLAM technology licensed to Juniper is comprised primarily of technology related to the '347 patent.[344]

Under the agreement, Juniper would pay an upfront pre-paid royalty to Sophos of $2,500,000, divided into annual payments over three years, after which Juniper would pay a running royalty to Sophos.[345] For the first year of the agreement, Juniper would pay Sophos $1,000,000, followed by payments of $750,000 and years two and three.[346]

The software OEM agreement between Sophos and Juniper incorporated royalty rates based on Sophos' share of Juniper's total quarterly AV net sales.[347] The royalty rate pricing specifically applies to net revenue produced from "Juniper's next-generation JUNOS-based enterprise security appliances that support UTM functionality (e.g. SRX platforms)."[348] The percentage of Juniper's net payable to Sophos in 2009 to 2010 is listed as 29%, 30%, and 33% if the percentage of Juniper total AV stand-alone net revenue attributable to sales of Sophos AV products is 85% or more, 65-85%, and 0-65% respectively.[349] For AV Bundle sales, the royalty is calculated by using the "Sophos list price share relative to the combined total list prices of all

---

[342] Discussion with Mark Harris.

[343] Discussion with Mark Harris.

[344] Discussion with Mark Harris.

[345] 5831SOPHOS_00593420 – 451

[346] 5831SOPHOS_00593420 – 451 at 435

[347] Net sales to Juniper after Partner and Distribution portion; I understand that Juniper receives approximately 50% of the end customer revenue with approximately (25% - 40% of revenue going to channel partners and another 10% going to the distributors) (Discussion with Mark Harris).

[348] 5831SOPHOS_00593420 – 451 at 436

[349] 5831SOPHOS_00593420 – 451 at 436

of the bundle components. For example, if the bundle contains Sophos AV ($100 list price), URL Filtering ($100 list price) and IDS ($125 list price), Sophos would receive its royalty percentage based on 100/325 or .308 x the Net for that bundle."[350] In addition, the agreement specified a royalty floor of 10% based on the Juniper AV list price for the stand-alone product and 5% of the AV list price of the bundled product.[351] Royalty rates were re-established for 2011 to be 29%, 30%, and 33%, and in contract year 2012, new percentages of Juniper's net payable to Sophos increased to 29%, 31%, and 39% for the same percent of sale bands.[352] The Sixth Amendment redefined the Juniper products into two categories: (1) Low End SRX products, defined in the Fourth Amendment as the SRX 100, SRX 210, SRX 220, SRX 240 and SRX 650 series products,[353] and (2) High End SRX product family, including the SRX 1400, 3xxx and 5xxx series.[354] "When Sophos AV products' share of Juniper's total AV net revenue exceeds 85%, the royalty rate for the Low End SRX products for AV shall be reduced to 25%."[355] Effective as of July 1, 2013, the percentages of Juniper's net payable to Sophos as a royalty on Low End SRX products decreased to 25%, 31%, and 39%.[356] The High End SRX products were subject to a flat royalty rate of 25%.[357] The royalty floor for the high-end products was 6% of the stand-alone Juniper AV list price and 3% of the Juniper AV list price for bundled products.[358]

---

[350] 5831SOPHOS_00593420 – 451 at 436

[351] 5831SOPHOS_00593420 – 451 at 437

[352] 5831SOPHOS_00593411

[353] 5831SOPHOS_00593570 – 572

[354] 5831SOPHOS_00593588 – 595 at 589; In 2014, Juniper had a 5% share of the UTM market and 8% share of the Enterprise Firewall market segments according to Gartner. Sophos' and Fortinet's market shares were 11% and 3.5% and 26% and 11% respectively (5831SOPHOS_00593794 and 5831SOPHOS_00593944 – 964 at 947).

[355] 5831SOPHOS_00593588 – 595 at 589

[356] 5831SOPHOS_00593588 – 595 at 589

[357] 5831SOPHOS_00593588 – 595 at 590

[358] 5831SOPHOS_00593588 – 595 at 590

CONFIDENTIAL ATTORNEYS EYES ONLY

From the period from Q1 2011, when the Juniper SRX product with the SLAM AV functionality released through Q1 2015, Juniper has paid Sophos approximately $1.3 million in royalties for the SLAM AV functionality.[359]

In addition to the Sophos SLAM AV product, the Juniper and Sophos OEM agreement includes several other Sophos products with separately tracked royalties. The First Amendment to the Sophos and Juniper software OEM agreement revised the terms to also cover the Sophos anti-spam IP reputation service, "an anti-spam product that blocks spam based on IP reputation and characteristics through the use of off-box IP reputation filtering."[360]   In April 2011, the Fourth Amendment introduced a license to the Sophos Anti-Virus Interface ("SAVI") to the agreement for a fixed royalty rate of $64 USD per CPU per twelve month period.[361]   In total, Juniper has paid Sophos $4.1 million under the OEM agreement, including the $1.3 million related to the SLAM AV functionality.[362]

The royalty rates Sophos charged to Juniper for the SLAM product are a relevant data point for the value of the '347 patent, due to at least the following considerations: 1) I understand that the SLAM functionality implements the '347 patent invention, and that the '347 patented invention contributes the primary value to the SLAM product, even though the SLAM functionality contains some optimizations that are not covered by the '347 patent;[363] 2) The agreement involves Sophos as patent holder/licensor; 3) The licensee involved is a provider of

---

[359] Discussions with Stuart Fillingham; 5831SOPHOS_00596033

[360] 5831SOPHOS_00593412-5831SOPHOS_00593419 at 5831SOPHOS_00593412

[361] 5831SOPHOS_00593570 – 572; I understand that this SAVI functionality is separate from the SLAM product. The Fifth Amendment to the agreement also pertained to the SAVI functionality and extended the fixed pricing at $147.20 per CPU per 36-month period, and $275.20 per CPU per 60-month period (5831SOPHOS_00593542).

[362] Discussions with Stuart Fillingham; 5831SOPHOS_00596033

[363] Discussion with Mark Harris

products within the relevant marketplace (i.e., UTM SMB market) and 4) It involves a running royalty rate (after a pre-paid upfront royalty amount) stated as a percentage of the end licensee product into which it is incorporated.

> *Georgia-Pacific Factor 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.*

This factor takes into account the relative contribution of the patented feature(s) to the success of the accused products. In evaluating this factor, I am aware of and have taken into account recent developments in the case law relating to patent litigation as reflected in such decisions as *Uniloc* and *LaserDynamics*. The Federal Circuit stated in *Uniloc*: "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the "basis for customer demand" or "substantially create[s] the value of the component parts."[364] In *Uniloc*, the Federal Circuit emphasized the importance of apportionment, stating that damages should reflect the "invention's footprint in the market place"; that evidence should be "linked to the economic demand for the claimed technology"; and that the patentee must "sufficiently tie the expert testimony on damages to the facts of the case."[365]

I have also considered the Federal Circuit opinion in *LaserDynamics, Inc. v. Quanta Computer*, Inc. stating: "[i]f it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product."[366] A number of other cases address this

---

[364] *Uniloc USA, Inc. v. Microsoft Corp.*, No. 03-CV-0440 (Fed. Cir. Jan. 4, 2011).

[365] *Uniloc USA, Inc. v. Microsoft Corp.*, No. 03-CV-0440 (Fed. Cir. Jan. 4, 2011).

[366] *LaserDynamics, Inc. v. Quanta Computer, Inc.,* (Fed. Cir. Aug. 30, 2012)

CONFIDENTIAL ATTORNEYS EYES ONLY

inform my opinions in this case. In the event only certain of the patents-in-suit are found to be infringed, damages can be adjusted to remove the royalty associated with any particular patent-in-suit.

I have calculated damages under two scenarios: (1) a blended damage scenario where I calculate lost profits damages (including a residual royalty) on the '587 patent and reasonable royalty damages on the '852, '344 and '347 patents and (2) an all-reasonable royalty damages scenario.

- The '587 Patent

I understand the '587 patent generally relates to a system architecture that uses a second data processor to help protect against unwanted software.[367] I understand that one way that this functionality can be implemented is to perform an additional check of whether the data contains viruses or other unwanted data using a second processor in the cloud after the initial content check.[368] I understand that Sophos' Live Protection feature, which is enabled by default in its UTM and endpoint products, is an implementation of this check to a second processer under the '587 patent.[369] I understand that, while the Live Protection feature is enabled by default, some users disable the feature for various reasons.[370] As a result, the percentage of users that retain the shipped-enabled Live Protection feature within its products provides an indication of value in use of a second processor. I have reviewed historical data of Live Protection activity by endpoint and reduced, on a percentage basis, the accused Fortinet product sales subject to royalty to reflect my best estimate of non-usage of the accused functionality, relying upon Sophos use data of Live

---

[367] Expert Report of Robert Stillerman dated July 20, 2015, ¶ 46

[368] Discussions with Robert Stillerman & Aaron Striegel

[369] Discussion with Mark Harris

[370] Discussion with Mark Harris; for example, per Mr. Harris, the customer may be concerned with sending data to Sophos or the Live Protection cause issues within the customer's network.

CONFIDENTIAL ATTORNEYS EYES ONLY

Protection.[371]  The percentage of Sophos devices that have Live Protection enabled and in use has steadily climbed from 65.6% in September 2013 to 78.2% as of December 2014.[372] By applying these percentages, on a quarterly basis,[373] to accused Fortinet sales, I apportion the accused Fortinet royalty base to include, based upon the best available information, only those sales in which the customer has not disabled the '587 functionality.

The amount claimed by Sophos as a royalty should appropriately reflect the contribution made by the technology under its patent. As discussed with Sophos technical expert Mr. Stillerman, it is my understanding that Sophos Live Protection is an implementation of the '587 patent. When content for the ~74% of Sophos users who have not disabled Live Protection is sent to the cloud for a second check, approximately 10% to 15% of content not identified as problematic in the initial scan is identified as malware and an additional small percentage of content flagged as malware initially is determined to be a "false positive."[374]  This 10% to 15% can be viewed as a measure of the incremental "effectiveness" of the accused '587 functionality. As a result, I have multiplied Fortinet's apportioned (based upon estimated use) revenues by 10% to arrive at an estimate of the specific portion of revenue attributable to the benefits of the '587 patent. This amount does not capture the value associated with the reduction of false positives, nor does it account for any benefit from any additional confidence gained as a result of knowing that a secondary check has been performed on content where the final determination (good or bad) remained unchanged between the initial and secondary checks.

---

[371] Fortinet did not produce information which would allow me to identify the percentage of Fortinet customers who disable the accused functionality that is comparable to the Live Protection functionality within Sophos products. If Fortinet produces such information, I will consider it and re-visit analysis herein.

[372]  Schedule 1.1c

[373] For the periods prior to September 2013, I have applied the September 2013 Live Protection enablement rate.

[374] 5831SOPHOS_00596032.

CONFIDENTIAL ATTORNEYS EYES ONLY

After calculating the portion of the apportioned Fortinet revenue attributable to the '587 patented functionality, I then estimate the operating margin of Fortinet products accused under the '587 patent. I understand Fortinet typically incurs direct costs on its products, in aggregate, of around 30-32%.[375] Indirect costs on Fortinet products amount to about 8-10%, again on an aggregate basis.[376] This operating margin from Fortinet represents the estimated amount of Fortinet profit attributable to assumed use of the accused functionality of Sophos' 587 patent.

Recognizing that the calculations describe above likely understate the Fortinet profits attributable to the '587 patent (e.g., use of 10% rather than 15% and other benefits such as false positives not included), this results in Fortinet retaining 90% of its profits on the accused devices under the '587 patent to account for non-patented elements as well as Fortinet contributions. Further, a review of the Georgia Pacific Factors above suggest an overall upward influence over the '587 royalty rate determination within the hypothetical negotiation between Sophos and Fortinet including but not limited to additional potential Fortinet revenue through sales of security subscriptions, possibility of other convoyed sales and the incremental competitive relationship between the parties. Further, the Trend Micro patent license agreement with Fortinet serves as an additional datapoint for a patent that is comparable to the '587 patent.

### *Lost Profits*

Under a lost profits damages scenario, Fortinet would pay Sophos a reasonable royalty on the '587 patent from January 24, 2008 through January 23, 2014. From the date of the filing of

---

[375] Fortinet's First Supplemental Responses to Sophos Interrogatories (Nos. 1-4, 6-10, 13 and 15), p. 12.

[376] Fortinet's First Supplemental Responses to Sophos Interrogatories (Nos. 1-4, 6-10, 13 and 15), p. 12.

CONFIDENTIAL ATTORNEYS EYES ONLY

the suit, January 24, 2014, through present,[377] Sophos would receive lost profits damages as well as a residual royalty on the portion of Fortinet sales not subject to lost profits.

1) Reasonable Royalty Period:

    a.  From the first quarter of 2008 through January 23, 2014 (the reasonable royalty period), Fortinet sales of products accused of infringing the '587 patent totaled approximately $222.0 million.[378] This includes revenues of all FortiGate series products (20-5000), including FortiWifi, FortiGuard subscription revenues, FortiMail, and FortiClient.[379] FortiCarrier, a type of FortiGate product,[380] is also accused under the '587 patent, however, to date I have received no sales data on this product.[381]

    b.  Applying the percent of Sophos devices that have Live Protection enabled and in use to the Fortinet accused product revenues results in apportioned revenues of $145.8 million over the period from Q1 2008 to (partial) Q1 2014.[382]

2) Lost Profits Period:

---

[377] I have currently calculated damages through March 31, 2015. I anticipate updating my damages calculations prior to trial in this matter.

[378] Schedule 3.1a.

[379] Expert Report of Robert Stillerman dated July 20, 2015, ¶ 97, 103-105, 109, 110

[380] Expert Report of Robert Stillerman dated July 20, 2015, ¶ 80

[381] If such data is made available to me, I reserve the right to supplement my analysis.

[382] Schedule 3.1a.

CONFIDENTIAL ATTORNEYS EYES ONLY

a.  From the first quarter of 2014 through the first quarter of 2015 (the lost profits period), Fortinet sales of products accused of infringing the '587 patent totaled approximately $76.6 million.[383]

    i.  With respect to Firewall Enterprise accused products, Fortinet sales amounted to $38 million over the relevant damages period, less Federal Government sales.[384] With approximately $426,000 of these sales relating to competing Firewall products that are claimed by Sophos as lost sales, this results in $36 million in sales available to Sophos for residual royalties.[385]

    ii.  UTM related sales over the relevant damages period, less Federal Government sales, totaled $47.4 million, and with $7.1 million claimed by Sophos as lost sales, this leaves $40.3 million available to Sophos for royalty damages.[386]

b.  In total, the amount of Fortinet revenues available to Sophos for residual royalty damages is $76.6 million during the lost profits period.[387]

c.  Applying the percent of Sophos devices that have Live Protection enabled and in use to the Fortinet accused product revenues results in apportioned

---

[383] Schedule 3.1b

[384] Schedule 3.1b

[385] Schedule 3.1b

[386] Schedule 3.1b

[387] Schedule 3.1b

CONFIDENTIAL ATTORNEYS EYES ONLY

revenues of $56.9 million over the lost profits damages period from Q1 2014 to Q1 2015.[388]

    d. As discussed at Section VII above, lost profits damages under this scenario are as follows:[389]

        i. UTM market Segment: $4.6 million

        ii. Enterprise Firewall market segment: $275,000

        iii. Total lost profits damages: $4.9 million

3) Total Damages Period

    a. In total, Fortinet's apportioned accused product revenues subject to a royalty totaled $202.6 million from January 24, 2008 through Q1 2015.[390]

    b. Applying the 10% effectiveness of the accused functionality to Fortinet's apportioned revenues results in $20.3 million revenue attributable to the benefits of the '587 patent over the relevant damages period.[391]

    c. Deducting Fortinet's high end direct and indirect costs (32% and 10%, respectively) from the apportioned Fortinet sales results in royalties of $11.7 million over the period from January 24, 2008 through March 31, 2015.[392]

---

[388] Schedule 3.1b

[389] Schedule 2.1

[390] Schedule 3.1

[391] Schedule 3.1

[392] Schedule 3.1

CONFIDENTIAL ATTORNEYS EYES ONLY

    d.   Combined damages (lost profits and royalty damages) under this scenario total $19.2 million over the period from January 24, 2008 through March 31, 2015. Refer to Schedule 2 for detail.

*Reasonable Royalty*

Under a reasonable royalty scenario, Fortinet would pay Sophos a reasonable royalty on the '587 patent from January 24, 2008 through present.[393]

From the first quarter of 2008 through the first quarter of 2015, Fortinet sales of products accused of infringing the '587 patent, less federal government sales, totaled approximately $306.2 million.[394] This includes revenues of all FortiGate series products (20-5000), including FortiWifi, FortiGuard subscription revenues, FortiMail, and FortiClient.[395] FortiCarrier, a type of FortiGate product,[396] is also accused under the '587 patent, however, to date I have received no sales data on this product.[397] Applying the percent of Sophos devices that have Live Protection enabled and in use to the Fortinet accused product revenues results in apportioned revenues of $210 million over the period from Q1 2008 to Q1 2015.[398]

Applying the 10% effectiveness of the accused functionality to Fortinet's apportioned revenues results in $21 million revenue specifically attributable to the benefits of the '587 patent over the relevant damages period.[399]

---

[393] I have currently calculated damages through March 31, 2015. I anticipate updating my damages calculations prior to trial.

[394] Schedule 1.1a

[395] Expert Report of Robert Stillerman dated July 20, 2015, ¶ 97, 103-105, 109, 110

[396] Expert Report of Robert Stillerman dated July 20, 2015, ¶ 80

[397] If such data is made available to me, I reserve the right to supplement my analysis.

[398] Schedule 1.1a

[399] Schedule 1.1

CONFIDENTIAL ATTORNEYS EYES ONLY

Deducting Fortinet's high end direct and indirect costs (32% and 10%, respectively) from the apportioned Fortinet sales results in royalties of $12.19 million over the period from January 24, 2008 through March 31, 2015.[400]

As a reasonableness check to the calculation above, I have reviewed the patent license and settlement agreement between Trend Micro and Fortinet discussed above. Under this agreement, Fortinet was willing to pay 19% of its prior year *total revenue* of $79.8 million for a license to the Trend Micro patent '600 patent, or 10% of its estimated *total cumulative revenue*. In addition to the $15 million up-front payment under the agreement, Fortinet also agreed to pay an on-going royalty of 4% of revenue (decreasing to 2.5% over the term of the license). I understand from my discussions with Mr. Stillerman that the '587 patent, like the Trend Micro '600 patent, is related to the architecture of a network security system/application.

- The '852 Patent

I understand that the '852 patent provides a specific method of implementing a feature within UTM products.  To calculate reasonable royalty damages related to this patent, I have first apportioned the accused product revenue to the portion of revenue that can be attributed to the patented functionality.  I then determined an appropriate royalty rate and applied that rate to my apportioned base to calculate damages due to Sophos as a result of Fortinet's infringement of the '852 patent.

It is my understanding that the '852 patent generally relates to a method of operating a threat management facility to prevent access to prohibited content.[401]  It can be used as a

---

[400] Schedule 1.1

[401] Expert Report of Robert Stillerman, dated July 20, 2015, ¶ 56 & 57

CONFIDENTIAL ATTORNEYS EYES ONLY

time it would take to develop the emulator engine, particularly if these activities could not happen concurrently.

The various approaches discussed above for valuing the '344 patent result in a range of values from approximately $70,000 to $375,000.

I understand that the emulator code that Dr. Striegel reviewed had a file date of October 2010. I note that Fortinet's RAP Average score, as tested by Virus Bulletin, a security information portal, testing and certification body,[431] increased from around 50% in 2010 to approximately 90% in 2011.[432] According to Virus Bulletin, the RAP test "measures products' detection rates over the freshest samples available at the time the products are submitted to the test, as well as samples not seen until after product databases are frozen, thus reflecting both the vendors' ability to handle the huge quantity of newly emerging malware and their accuracy in detecting previously unknown malware."[433]  This increase in performance, as well as my review and summary of the Georgia Pacific factors above, may suggest that the value of the '344 patent would be at the higher end of the range of value data points.

- The '347 Patent

I understand that the '347 patent provides a specific method of implementing a feature within UTM products. To calculate reasonable royalty damages related to this patent, I have first apportioned the accused product revenue to the portion of revenue that can be attributed to the patented functionality.  I then determined an appropriate royalty rate and applied that rate to my

---

[431] https://www.virusbtn.com/about/index

[432] https://www.virusbtn.com/vb100/archive/compare?id=17&id2=0&id3=0&id4=0&id5=0&id6=0&tab=onDemand&showOlder=24

[433] https://www.virusbtn.com/vb100/rap-index.xml

CONFIDENTIAL ATTORNEYS EYES ONLY

apportioned base to calculate damages due to Sophos as a result of Fortinet's infringement of the '347 patent.

As discussed under *Georgia-Pacific* Factor 12, Sophos and Juniper entered into an OEM agreement which includes the '347 patented technology.  This agreement provides for a running royalty on the net AV engine revenue attributable to the SLAM AV functionality. The agreement also includes a floor royalty percentage from the list price of the stand-alone and bundled SLAM AV product. Initially, the stand-alone AV product had a royalty floor of 10% of the Juniper AV list price for the stand-alone product and the bundled product had a royalty floor of 5% of list price.[434] In 2013, when the agreement was revised to include High End SRX products, the royalty floors for the Low End SRX products remained the same (5% of the list price of the AV functionality if bundled), but the royalty floor for the high-end products was set at 6% of the stand-alone Juniper AV list price and 3% of the Juniper AV list price for bundled products.[435] I have used these royalty rates per the Sophos/Juniper agreement for Sophos '347 patent functionality (5% of list price if bundled and 3% of list price if bundled for high end products) in consideration of the reasonable royalty rates that would be negotiated between Sophos and Fortinet, as discussed and applied below.

I apportioned the Fortinet accused revenue to reflect my best estimate as to the portion of the Accused Fortinet revenue that could be attributable to Sophos '347 patented functionality. Similar to Juniper, a licensee of the Sophos '347 functionality, Fortinet identifies stand alone list prices for its AV functionality as it relates to its many different FortiGate configurations.[436] Since I do not have access to Fortinet's specific discounts taken from its list prices for AV, and

---

[434] 5831SOPHOS_00593420 – 451 at 437

[435] 5831SOPHOS_00593588 – 595 at 590

[436] FORTI-NDC00049278

CONFIDENTIAL ATTORNEYS EYES ONLY

to be consistent with the structure of the Sophos/Juniper's "floor" royalty structure, I have summarized the list prices of each AV product as it relates to each accused FortiGate model and multiplied these prices by the number of units accused. This summary, included and shown on Schedule 1.4a, represents the apportioned Fortinet revenue base, resulting in a significant reduction to the accused FortiGate revenue.

After apportioning the Fortinet royalty base, I then applied the "floor" royalty rates from the Sophos/Juniper agreement to the apportioned Fortinet royalty base, consistent with the structure of the Sophos/Juniper agreement.  It should be noted that based upon consideration of the Georgia Pacific factors as well as the presumption of validity and infringement of the '347 patent, it could be suggested that Sophos would negotiate a higher royalty rate than the "floor" royalty rate included in its agreement with Juniper for the SLAM AV product whose primary value is attributable to the '347 patent. However, for a variety of reasons, I have maintained the same "floor" royalty rates from the Sophos/Juniper agreement in my determination of a reasonable royalty for the '347 patent between Sophos and Fortinet.

I have calculated damages on the '347 patent from its issue date of December 10, 2013. This includes revenues of all FortiGate series products (20-5000), including FortiWifi, FortiMail, FortiGuard subscription revenues, and FortiClient.[437]

**SUMMARY OF DAMAGES[438]**

Based on my analysis of documents and information produced in this case, as well as my experience in assessing the value of patents and analyzing patent infringement damages, it is my opinion that Sophos has suffered damages in the form of lost profits as a result of Fortinet's

---

[437] Expert Report of Robert Stillerman, dated July 20, 2015, ¶ 100 & 280

[438] I note damages are on-going and will update damages when I receive updated information.

CONFIDENTIAL ATTORNEYS EYES ONLY

infringement of the '587 patent and damages in the form of a reasonable royalty for the '852, '344' and '347 patents.

Under this approach, damages due Sophos are as follows:[439]

- Damages for the '587 patent are approximately $16.6 million over the damages period;

- Damages for the '852 patent are approximately $2.2 million over the damages period;

- Damages for the '344 patent range from approximately $70,000 to $375,000[440] over the damages period;

- Damages for the '347 patent are approximately $1.3 million over the damages period;

- Total damages for all of the patents-in-suit are approximately $20.2 million over the damages period.

In the event the trier of fact believes Sophos is not entitled to lost profits on its portion of the accused sales made by Fortinet over the damages period for the '587 patent, reasonable royalties for the '587 patent on all accused sales made by Fortinet total $12.2 million over the damages period.[441] Total damages for all of the patents-in-suit in this only royalty scenario are $15.7 million.[442]

## IX.    PREJUDGMENT INTEREST

---

[439] See Schedule 2. Each patent has a separate damages period – see Sections VII and VIII.

[440] See Section VIII

[441] Schedule 1.

[442] Schedule 1.