**Pages 1 - 51**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | | |
|---|---|---|
| FORTINET, INC., | ) | |
| Plaintiff, | ) | |
| VS. | ) | **NO. CV 13-5831-EMC** |
| SOPHOS, INC., ET AL., | ) | |
| Defendants. | ) | |

San Francisco, California
Thursday, October 8, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
            QUINN EMANUEL URQUHART & SULLIVAN, LLP
            50 California Street - 22nd Floor
            San Francisco, CA  94111
      BY:  **JOHN NEUKOM, ATTORNEY AT LAW**
            **JORDAN R. JAFFE, ATTORNEY AT LAW**
            **GRANT N. MARGESON, ATTORNEY AT LAW**
            **DANIEL OLMOS, ATTORNEY AT LAW**

For Defendants:
            DLA PIPER, LLP
            401 B Street - Suite 1700
            San Diego, CA  92101
      BY:  **DAVID R. KNUDSON, ATTORNEY AT LAW**
            **SEAN CUNNINGHAM, ATTORNEY AT LAW**

Reported By:       Pamela A. Batalo, CSR No. 3593, RMR FCRR
                   Official Reporter

APPEARANCES CONTINUED:


For Defendants:
                          DLA PIPER, LLP
                          500 8th Street, N.W.
                          Washington, D.C. 20004
                     BY:  **ANDREW N. STEIN, ATTORNEY AT LAW**

**Thursday - October 8, 2015**                                    **1:37 p.m.**

## P R O C E E D I N G S

### ---000---

THE CLERK:  Calling CV 13-5831-EMC, Fortinet, Inc. vs. Sophos, Inc., et al.

Appearances, counsel.

MR. NEUKOM:  Good afternoon, Your Honor.  John Neukom on behalf of Fortinet.  With me today are Jordan Jaffe, Daniel Olmos, and Grant Margeson.  Also with us today is Mr. John Whittle, the general counsel of Fortinet, and Todd Nelson, vice-president of legal.

THE COURT:  All right.  Good afternoon.

MR. CUNNINGHAM:  Good afternoon, Your Honor.  Sean Cunningham with DLA Piper for defendant Sophos.  And with me is Andrew Stein and David Knudson also with DLA Piper.

THE COURT:  Good morning.  Welcome everyone.

All right.  We have a couple motions on this afternoon. Let me first address defendants' motion for summary judgment, and the first issue contains the sufficiency of the identification of the trade secrets allegedly misappropriated here.

And so let me ask first sort of a framework question: That is, Section 2019.210 is designed to promote a number of interests, as we know.  One reason why we try to require that trade secrets be described with reasonable particularity up

front is that it will make sure that there's some merit to the claim, that it's not just a fishing expedition. It will guide discovery and help the Court frame the appropriate scope of discovery. And finally, to enable the defendant to form complete and well-reasoned defenses and not have to wait until the eve of trial to effectively defend.

Now, in this case, there were some stipulations and there were some understandings that allowed this case to proceed, discovery to proceed, to the point of where we are today, which is not far from trial, but also suggests that of all the interests that are meant to be furthered by Section 2019.210, we're at the latter one. It's primarily to ensure that the defendant form complete and well-reasoned defenses and not sort of be subject to surprise on the eve of trial.

That suggests to me, although there are no cases -- we haven't been able to find one on point -- that I have to look at the degree of rigor and specificity with that in mind.

And to the extent that there -- I don't know if you call it a sliding scale, but my main purpose, it seems to me, at this juncture, at summary judgment several months away from trial, a couple months away from trial, is to make sure that there's enough reasonable particularity to fulfill that purpose.

And that does suggest in some ways that the demands are a little bit less than when you're at the outset of the case and

you're trying to ensure against a fishing expedition, reverse-engineering kind of stuff.  We're beyond that.

So does anybody have any disagreement that the degree and the level of particularity, specificity ought to be informed by the stage of the case?

**MR. NEUKOM:**  No disagreement from Fortinet, Your Honor.

**THE COURT:**  I'm not surprised.  But do you have a different -- I know this is not something that was necessarily briefed, but it does seem to me as a practical matter that's what we should be focusing on here.

**MR. CUNNINGHAM:**  Well, I certainly agree, Your Honor, that we are within the -- what I'll call the fourth purpose of 2019.210 at this point, at least as the advanced modular case describes it, which is cited on page 7 of our brief, that we're in a position -- Sophos is in a position where based on what I'll call the sifting sands approach to the identification of trade secrets, we don't know what we're shooting at.  We don't have -- you know, other than these very general categories of information, we don't know what the particular information is that is alleged to be a trade secret.

To answer your question, I've not seen any cases that say that there's a different level of rigor that's applied at the summary judgment stage, and in fact the *Imax* case and a couple of others say that you look to see whether trade secrets have

been identified with reasonable particularity, and if they haven't, you grant summary judgment.

**THE COURT:**  Well, that one was so broad that it didn't -- I mean, it would have flunked the test under either, it seemed to me -- whether you call it the more refined or the unrefined version, so I'm not sure how helpful that it is.

I mean, it comes up to a certain extent to the extent that we look at Judge Grewal's analysis in the *FireEye* case.  It just struck me that one of his concerns was a fishing-expedition concern and that's what animated sort of his analysis, to a certain extent.

Since we're beyond fishing expedition and we're now at the stage of unfair surprise and demanding some particularity for trial prep purposes, frankly, I find that if I were to deviate from what -- or diverge from what Judge Grewal concluded, that wouldn't be necessarily inconsistent because there are different contexts.  You may or may not agree with that.

But let's get to a particular area here.  One question I have is has there been discovery, such as contention interrogatories or other things, that have not cured the question of exactly which document -- I mean, that's the end of the day.  At the end of the day at trial, you're going to have to identify which documents you contend were trade secrets and were found in possession -- allegedly in the possession and used allegedly by defendants.

Have we reached that point?  Was that disclosed through discovery as one might normally think, either through early disclosures or late disclosures, through contention interrogatories, requests for productions of documents, request for admissions, 30(b)(6)?  Where are we in that process?

MR. CUNNINGHAM:  Sure.  Three answers, I think, Your Honor.

We were provided obviously with the 2019.210 statement, several versions of it, leading up to the second supplemental one.  We've contended in our motion, as you can tell, that that's -- there's very broad categories of information listed there that we don't think meets the cut.

There are 136 documents listed by Bates number in that statement.  At least by my count it's 136 documents.

THE COURT:  Okay.  But they are specifically identified.

MR. CUNNINGHAM:  They are specifically identified and there is a footnote in the 2019.210 statement that says we, Fortinet, are relying on these documents in their entirety as trade secrets.

There's a case out there called *Bunnell vs. Motion Picture Association of America* that says you can't do that.  You have to point out the particular information in each of those documents that you claim constitutes a trade secret.

And we know that there are large portions of some of these

documents that are obviously public information.  Ninety-two of them are not marked confidential at all.  So we know that there's a lot of things in those 136 documents that can't constitute a trade secret.  What we're looking for is a clear statement of what is a trade secret in those documents.

Secondly, we issued an interrogatory that asked that very question.  It's Interrogatory No. 15.  And we got the response that essentially says *see our 2019.210 statement* or it parroted the same categories of information.

We also asked questions of a 30(b)(6) witness who's in the courtroom today and we first asked, "What does Fortinet allege to be its trade secrets."  The answer was, "I can't, off the top of my head, just list them off."  We asked again later in the deposition, "What does Fortinet consider to be its trade secrets," and the answer, after some throat clearing, was, "I don't know why you're asking me."

So that was the 30(b)(6) witness on the identification of the trade secrets.  So we think we've had three, at least, opportunities here to try and find out what the trade secrets are, first through the 2019.210 statement where we've been told all of these 136 documents are trade secrets.  Two, we asked an interrogatory that we don't think was answered correctly or properly; and three, we asked a 30(b)(6) witness who didn't give us any additional information about what the trade secrets might be.

So we're in a place where discovery is done.  We're into expert reports on the trade secrets damages issues, and we still don't know what the trade secrets are.

THE COURT:  Is there any dispute that the 136 documents defines the universe or is this an *included but not a limited to* situation?

MR. CUNNINGHAM:  Well, Your Honor, the way I can answer that, I know the answer must be included but not limited to because when Fortinet opposed the summary judgment motion, it included -- Exhibit 1 to Mr. Jaffe's declaration contained 47 new documents, none of which were on the 2019.210 statement, and claimed that these were ones that correlated to various categories of information in the 2019.210 statement.

So now we have 47 new documents that no one says are trade secrets.  There is no witness that says any of these documents are actually trade secrets.  But they're not ones that were on the 2019.210 statement.  So is it these new 47 documents?  Is it some subset of those?  Is it the original 136 documents?  Or is it something we haven't seen yet?

THE COURT:  All right.  Let me let you answer that question, Mr. Neukom.

MR. NEUKOM:  Thank you, Your Honor.

It is absolutely an including and not limited to, and I know that may not be the answer the Court wanted, but I can explain why.

In the suggestion that Fortinet should have pre-identified the specific documents included in Exhibit A to the Jaffe declaration with its 2019 disclosure makes no sense at all.  In this case, 11 employees moved from Fortinet to Sophos.  Fortinet filed a claim for trade secret misappropriation based on, among other things, aberrational sales force records by those employees on the way out the door.

Fortinet then, in a 2019 disclosure, identified what documents it was identifying as being compilations of trade secret data in this case.  And we did that.  We identified the documents by repository; for example, the sales force data, the MANTIS database, the myfortinet.com.  We identified documents by proper name, such as leaderboards, LeadLanders, special pricing requests.  We identified exemplary documents by Bates number.  We identified some documents by proper name of third party.  And I just want to be mindful of that particular third party's confidentiality in this courtroom, so I will just refer to that third party as the "I" partner.  We even named the "I" partner and it turns out we hit the jackpot, pardon the expression, in subsequent discovery.

So after we served that 2019 disclosure, after Sophos' counsel in writing on May 11, 2015 conceded that we had satisfied 2019 for discovery purposes, I'm tempted to say we then got discovery, but that's not true.  Of course, discovery was withheld.  We filed two motions to compel.

And finally well after the close of fact discovery, we received something over 2 million pages of documents which were computer files and documents taken from the machines of Fortinet's former employees working at Sophos.

There are tens of thousands of documents on the personal laptops and the Sophos-issued laptops of these individuals. We have given Your Honor a sampling of those documents in Exhibit 1 to the Jaffe declaration.

And I -- if the Court has time, I would love to give Your Honor a sampling of what some of those documents look like. They were reminding me of *Byrne vs. Boadle res ipsa loquitur*. You have got individual account names, you have the opportunity pipeline, stuff which -- we're talking about the playbook for a sales team in a very crowded, competitive industry, and those documents have no business being in Sophos' files on Sophos' computers, let alone being on those computers with metadata showing that they've been accessed by Fortinet's former employees now at Sophos competing with Fortinet.

So I'm a little far afield. Let me take it back to the specific issue that Your Honor has put to me.

The 2019 disclosures could not identify which specific documents these employees took and which we would be showing to the jury to show trade secret misappropriation. We couldn't know that until we got discovery.

What we could do is demarcate what we were looking for and

be held accountable to that.  And we're happy to be held accountable to that standard, Your Honor.  If you look at what they've produced in August and September of 2015 as compared to the categories and proper names and descriptions of documents that we identified as candidate trade secret materials in May of 2015 and even before that in September of 2014, it's quite an eerie matchup.

THE COURT:  So how would you demarcate these documents?  How are we actually going to try this case?

MR. NEUKOM:  Well, Your Honor, the final section of my argument outline for today was that I think that this trade secret identification issue is not a dispositive motion issue. I think it's a case management and trial management issue.

I think -- and I had, by my lights, three ways that this Court can manage this case for trial.

The first is to do nothing but to expect the parties to abide by the rules and practices already in place.  And here's how that would play out.

Fortinet will, in due course, serve an exhibit list.  That exhibit list will include numerous documents.  Almost every single one of those documents is going to have a Sophos Bates stamp because it was taken from their computers and yet is going to have a Fortinet confidential stamp on it.  And it will then be up to Sophos to object or move in limine if they believe that those documents weren't properly preserved through

preceding interrogatory answers or the trade secrets disclosure. I submit that process will be just fine.

I will say, Your Honor, although we have found tens of thousands of candidate documents on their machines, we are obviously not planning to show this jury tens of thousands of documents. We are going to have to be judicious about making exemplary showings and picking the right documents, but at the trial exhibit stage would be the time to do that.

My second proposal would be we are fine with an amended -- a tweak to the exhibit list format in this case that we could add a column such that if Fortinet was going to use that document to show a compilation of data for which Fortinet seeks trade secret protection, we could call those documents out.

**THE COURT:** Say it again. I'm not sure how I understand that's a tweak to the exhibit list.

**MR. NEUKOM:** So when I think of the exhibit list, I think of the columns that are normally on it. I'm thinking of simply adding a column to Fortinet's exhibit list.

**THE COURT:** That says what?

**MR. NEUKOM:** Which would be, "Is Fortinet asserting that the compilation of information contained in this document is a trade secret?"

The third proposal that I had was Fortinet would be fine accelerating the date for exhibit lists to make sure that Sophos is on notice. I will say, Your Honor, we took -- I

think the deposition ended something like 18 hours before Fortinet's opposition brief was due.  But we took their 30(b)(6) corporate representative, and I have copies of this, if the Court would like to see it.  Alternatively, I can read it into the record.

That deposition included quite a bit of back and forth about whether Sophos understood what Fortinet's trade secrets were.  And if I may, Your Honor, I'm reading from the Clark deposition, page 271, starting at line 14:

"Q.  Are you aware of whether any of the documents that are described in what we've marked as Exhibit 26 are in the possession of the former Fortinet employees?"

I'm going to go outside the transcript for just a moment, Your Honor.  Exhibit 26 was Fortinet's second supplemental trade secret disclosures.

"A.  Based on conversations, there is some that are in possession of them.

"Q.  And some of the former Fortinet employees, they have looked at some of those documents in their work at Sophos; true?

"A.  Yeah.  I can't speak to their work at Sophos, but they have -- in general they have -- they have looked at them.

"Q.  Since they started work at Sophos?

"A.  Since they started working at Sophos."

And the second exchange begins on page 319 of the Clark deposition:

"Q.   Okay.  And that group of documents, your understanding of what those documents are, that's a subset of the documents that are described in -- in Exhibit 26. You agree with that; right?

"A.   I would agree with that."

And finally the last question and answer of the deposition beginning on page 321:

"Q.   So going back to our discussions a little bit earlier, your understanding of Sophos as a 30(b)(6) witness on what documents are found on the former Fortinet employees' devices from Sophos' counsel is that it's a subset of documents of those described in Exhibit 26; is that fair?

"A.   As a subset of -- yeah.  Sounds -- sounds fair."

There is a case management issue here, given the -- and by the way, it's not Fortinet's fault that we've got so many documents that were improperly moved out of Fortinet's servers on these individuals' personal devices and Sophos' laptops. But given that they were, Fortinet --

THE COURT:  Let me ask you something.  In your second disclosure, second amended disclosure, there are places where you say "specifically" and then you identify subcategories.  I assume that "specifically", which is different from

"including", is meant to be exhaustive; correct?

MR. NEUKOM:  Absolutely.

THE COURT:  Okay.  So if you take No. 5, the information and compilation of information about Fortinet's current and former partners, distributors, wholesalers, which itself is a fairly -- if it was that alone, that would be problematic, it seems to me, even at a late stage because that seems pretty broad.  But when you say "specifically" and then you talk specifically about point of sale reports on a per partner basis, specific special price authorization, those are the two subcategories that comprise Category 5; right?

MR. NEUKOM:  Yeah.

THE COURT:  That's why I asked "specifically" means "i.e.", not "e.g."?

MR. NEUKOM:  Yes.

THE COURT:  Well, it seems to me, just to cut to the chase -- we don't have all day here -- is that reasonable particularity is required.  We are well past the discovery stage, managing discovery, the so-called anti-fishing expedition issues, and we are into the fair defense stage.

So viewed, it seems to me, that the second amended disclosure, which although it lists specific documents by Bates numbers and things, I am now told it was not necessarily meant to be exhaustive, but the categories, the subcategories under each category that would appear the broadest does have

delimiting subcategories.

So, for instance, "nonpublic information and compilations of information about Fortinet products," that's pretty broad, but it does go on to say "specifically" and it talks about inventory reports, information in MANTIS, information accessible through myfortinet.com portal, reports tracking and logging details, confidential price lists, competitive intelligence, competitive analysis, product comparisons.

That reaches a level of specificity that delimits an otherwise broad category that, in my view, for purposes of 2019.210 disclosure is satisfied, particularly when coupled with case management tools that are available to ensure a fair opportunity to mount a defense.

And I think that that fair opportunity will be afforded if I accelerate one of these proposals. Actually, I think there needs to be an exhibit list that identifies which one contains trade secrets and I think the trade secrets within those particular exhibits ought to be identified so we're no longer guessing at, if it's a big document, where in that 100-page document is the trade secret. We ought to delimit and clearly identify and we ought to do that sooner. You have the documents. You have discovery now. You know what your case is going to be.

What's our trial date? Is it March? When is our trial?

**MR. CUNNINGHAM:** January, Your Honor.

**THE COURT:** January. Well, then I think that accelerated exhibit list should be provided soon, like in two weeks.

**MR. NEUKOM:** We can certainly do our best to get that done, Your Honor. I would ask, at the pleasure of the Court, if we be given three weeks to do that. I think it's more likely that we can get --

**THE COURT:** Well, you can do it on a rolling basis. You can certainly -- I mean, we don't have much time left, and, you know, to the extent this hasn't already been done, it ought to be done now, and I think you've got a big enough staff here. I think two weeks is a reasonable amount of time, so I'm going to order that be produced in two weeks.

**MR. NEUKOM:** Thank you, Your Honor.

**THE COURT:** Which is the 22nd.

**MR. CUNNINGHAM:** And, Your Honor, if I could ask -- make one observation and ask you a question about what you envision here.

**THE COURT:** Yes.

**MR. CUNNINGHAM:** The observation is that for at least two categories, now that I'm looking at this in the way that you are, Categories 1 and 8 of the 2019.210 statement are e.g.'s, not i.e.'s. They both say "including."

Now, perhaps your case management suggestion that you just made takes care of that, but I do want to point out that these

aren't all self-limiting.  Some of them --

THE COURT:  That's a fair question.  What about that?
You did use the word "include" but not "specifically?"

MR. NEUKOM:  Absolutely.  And I don't want to strain
credibility.  Can I give the Court one example?  Okay.  So I
have a binder here of some materials and I'll just show the
Court one or two tabs.

MR. CUNNINGHAM:  And I still do have a question,
Your Honor, that I would like to get back to.

THE COURT:  Yep.

MR. CUNNINGHAM:  When he's finished.

THE COURT:  Okay.

MR. NEUKOM:  And I have a few extra copies for the
clerks, if the Court would like me to hand those out.

THE COURT:  If you want.  We are only going to go
through a couple of these; right?

MR. NEUKOM:  That's correct.  I will limit myself to
two.

THE COURT:  Okay.

MR. NEUKOM:  So if Your Honor looks at, for example,
Tab 3.

THE COURT:  Yep.

MR. NEUKOM:  And I am -- I will try to describe the
document, Your Honor, without disclosing in this public setting
exactly what -- the specifics of what's in there.

This document was located on Kendra Krause's laptop.  The metadata shows an access date of December 2013, which was six or seven months after she left Fortinet and joined Sophos.

This document lists opportunity owners within the company, specific accounts they were targeting, how much amount of money they expected to close.  It's got -- it's bad formatting here, but if Your Honor looks at the subsequent pages, you've got pipeline information, what the forecast category is.  I'm looking at the Bates number ending 1026.

THE COURT:  All right.  So what's your point about this?

MR. NEUKOM:  Well, my point, Your Honor, is without -- without parsing one particular paragraph of the trade secret disclosure versus another, Fortinet quite clearly and fairly identified actual and potential customer deal flow pipeline information.  In light of that trade secret disclosure, when we then find this document in their files and with an access date, I see no justice in depriving Fortinet from its ability to put this evidence in front of the jury --

THE COURT:  Why isn't this already covered by one of the subcategories of 1?  Isn't this an opportunities tab?  Is this like 1-B?

MR. NEUKOM:  That's my point, Your Honor, is I believe it is, but I'm not sure it is, and if it's not -- if it wasn't taken from that tab within the sales force portal, then I don't

think Fortinet should be precluded from using this kind of evidence.

THE COURT:  Well, here's what we're going to do.

If there's going to be objections for the reasons you stated -- failure to disclose properly, failure to disclose inconsistent with an interrogatory answer -- you yourself said they would have a chance to object.  I'm going to measure it against, among other things, the 2019.210, and if it does not fall -- if I find something does not reasonably fall within some of these categories, I'm going to look at the word "include" with a very close eye because I think that that, you know -- it really should be -- if you're only going to do subcategories like you did in 2, 3, 4, 5, 6 and 7, there is no reason why those subcategories couldn't have been described, you know, with some degree of specificity, even though it's categorical, some degree of specificity, but I'm going to look at in terms of basically fairness, basic fairness.  Let's just cross that bridge when we get there.

I assume that in the end, it's not going to make much difference because you've had so many subcategories under 1 that you are probably going to be able to find something that correlates with that, and so you didn't need to say "include" and therefore it may be moot, but if it's something that is not in there and it seems somewhat surprising, you know, I'll have to look at it at that point.

**MR. NEUKOM:**  If I may, Your Honor, for the accelerated -- well, one point of clarification and then one offering to the Court.

The point of clarification is I take it that Fortinet's exhibit list due in two-weeks' time will not be the entire exhibit list for the case, but rather will be comprised of the specific documents that Fortinet alleges are compilations of trade secret data?

**THE COURT:**  Yes.  The normal exhibit list for whatever foundational things or whatever issues, we'll do that in the normal case management process.  This is an early exhibit list relative to the trade secret disclosure identification.

**MR. NEUKOM:**  Thank you, Your Honor.  And the offering was, because we would do this internally anyway, why don't we, on Fortinet's end in this disclosure that we will prepare -- we will add a column identifying exactly where in our 2019 statement we believe we pre-disclosed this document.

**THE COURT:**  That will be helpful as well.  If there is an objection, I will know exactly where to look.

**MR. CUNNINGHAM:**  Thank you, Your Honor.

And my question is around -- and I think I wrote it down correctly -- that you want Fortinet to delimit the information within each document that it claims is a trade secret.  My question is how do you envision that?  Because what I don't want is -- because these cases say you can't do it.  The entire

document is a trade secret.  Every single word in the document is a trade secret.  That's what I fear I'm going to get.

So can we be more specific about what they need to do to actually put us on notice about what these trade secrets are?

THE COURT:  Well, the simplest thing to do would be to highlight the documents.  There may be some documents that are only a couple pages long.  I don't think -- that's a problem if they say the entire document.  It's got to list -- a customer list that's 20 pages, that's okay.  It's when there is a mix of things that I think then in that case it ought to be highlighted.

MR. CUNNINGHAM:  All right.  And one of the examples that I'm going to refer to is in this -- by the way, we have never seen these documents.  I guess that's no surprise.

MR. NEUKOM:  No.  These are taken from -- pardon me. These are taken from Exhibit 1 to the Jaffe declaration.

THE COURT:  He has never seen it in this format.

MR. CUNNINGHAM:  The second tab is a document that, for instance, talks at great length about Sophos' products. That's not a Fortinet trade secret.  So if they're going to claim that there is trade secret information in this document, they need to separate that which pertains to my company's products from something that they think is a trade secret. That's fundamental fairness.

THE COURT:  Well, I just said they're going to have to

highlight what they think is a trade secret.  You may come back and say, "Well, how can it be," etc., etc.  That's a merits question, but that's not an identification question.

MR. CUNNINGHAM:  All right.  Thank you, Your Honor.

MR. NEUKOM:  Your Honor, if I may, we will certainly do that where we can.  I don't want to invite a fight with Mr. Cunningham on this point right now, but there are some of these documents where we are going to rely on California Trade Secret law which states that compilations of data, even if some of it is publicly available, that compilation in that form is entitled to trade secret protection.

And if I may, I think Exhibit -- pardon me, Tab 2 is a wonderful example.  Tab 2 is an internal Fortinet document marked "confidential" on every single page and it is a roadmap. It's a playbook, if you will, for how Fortinet salespersons are supposed to out compete Sophos in the marketplace.

If --

THE COURT:  I understand that.  And I'm not here to adjudicate who wins and who loses on the substance of that one. I'm here simply to facilitate the identification and for case management how we're going to proceed.  So we don't need to get into that.  But that's the process.  We're going to file an accelerated exhibit list of assorted trade secrets with clear identification of what it is, whether it's the entirety of that document, whether it's a portion of that document, with a

column citing the relevant antecedent disclosure, whether it's through a 2019.210 or interrogatory, and then leave a column blank for objection.

And we'll have to deal with that I guess when we have to deal with that in motions in limine through the normal process since there is really no time for any further motion practice at this point.

There are a number of other issues here. There is this a question about marking for the products under Section 287, and I will say this. There's some dispute in law about who's got the burden of going forward, who's got the burden of production, who has got the burden of persuasion, and I will say that I am persuaded by Judge Grewal's approach that it is, I think, Sophos' burden to at least indicate the products that it feels practice the patent and therefore subject to marking, and in this case, there has been some testimony here with respect to some of the claims but not all the claims. And in particular, Dr. -- is it Striegel? Striegel.

MR. CUNNINGHAM: Striegel.

THE COURT: -- has produced some testimony regarding Claim 26 of the '430, Claims 3 and 5 of the '125, and in this case, it does seem to me that there is a pretty good argument here that there's not really much of a counter to that.

MR. CUNNINGHAM: Your Honor, if I may, in view of at least some other judges' in this district suggestion that we

permit younger attorneys to have opportunities, I would like to have Mr. Stein address this -- address this issue.

THE COURT:  Sure.

MR. NEUKOM:  And likewise, Mr. Jaffe is scheduled to handle this for Fortinet.

THE COURT:  Excellent.  We will hear from the real voices.

MR. CUNNINGHAM:  Exactly.  Somebody who knows what they're talking about.

THE COURT:  So you've heard my initial take and that is Sophos has at least the initial burden of identification and I think they arguably have done so and that there's -- frankly, I didn't hear much of a response with respect to those three claims.

MR. JAFFE:  So I'm happy to address that.

THE COURT:  I guess the burden of proof is on you.

MR. JAFFE:  So for Fortinet's part, I think we agree with Your Honor that the burden is on the accused infringer to identify the products that they contend that practice that are not marked.

What has happened here, though, is markedly different from what has happened in those other cases that Sophos relies on in that the Striegel report was a rebuttal report submitted by Sophos.

As Your Honor just explained, the initial burden in *Oracle*

*vs. Google* and the two Judge Grewal decisions, it's the party who's accusing one, the accused infringer, that is, to identify the products, and then the burden shifts to the patentee to be able to rebut that.

What we have here is something different, where the time for expert reports, opening expert reports on the issue on which the party bears the burden passed. Sophos did not say anything and they laid silent. And the only contention in the record at that point was Fortinet's contention that it does not contend it practices these patents.

It was only in a rebuttal report from Dr. Striegel that we first learned about these products and the identity of these products. We went through the entirety of fact discovery and we went through all of expert discovery, until Dr. Striegel's rebuttal report, without having these identified.

So if a rebuttal report is sufficient to put Fortinet on notice, it has no opportunity to rebut any of these assertions. And it would make the shifting burden framework that Judge Grewal identified almost dead letter in that there would be no opportunity for the patentee to rebut these arguments.

**THE COURT:** Well, I hear your point. On the other hand, you had the rebuttal Striegel report before summary judgment papers were filed. So you opted just to rest on that and sort of put your eggs in that basket that it doesn't count because it's rebuttal, it's too late in the day, rather than

trying to seek some, either by stipulation or dispensation by the Court -- to say, "Hey, wait a minute, we want a chance to file a surrebuttal or We want to strike or We want to do something."

MR. JAFFE:  So as an initial matter, this gets at the substantive response that we have to the motion, which is that Dr. Striegel's report only talks about products that are released after the suit.  So as -- when it comes to the inquiry that we're having from marking, which is did Fortinet sell a product that practiced before suit, Dr. Striegel's report doesn't actually speak to that.

So having us rebut something that is irrelevant to the question of marketing, for Fortinet's part, did not make sense in that he only analyzed current products and those questions do not get at the heart of the issue.

The *Oracle vs. Google* decision by Judge Alsup has facts very similar to the ones here in that the defendant said well, they -- they practice, but there was no evidence that they practiced before the date of suit; that is, for the purposes of marking, they have to show before they received actual notice that Fortinet sold the patented article and failed to market. And Dr. Striegel's report doesn't actually speak to that.

If you look at their motion itself for the '125 patent example, their motion says Version 5.2 practices certain claims of the '125 patent.  But there's no dispute on the record that

Version 5.2 wasn't released until 2014, which is six months after this case was filed, and Sophos was unquestionably on actual notice.

THE COURT:  All right.  What's your response to that?

MR. STEIN:  My response to that is twofold, Your Honor.

In the *Oracle vs. Google* case, the issue is a little bit reversed, but the temporal aspect of this that Mr. Jaffe is referring to was brought to the attention of the accused infringer on the summary judgment record.  And in response, the accused infringer decided not to address the temporal issue at all, and it's very similar that -- what Fortinet's raised here and what happened in the *Oracle vs. Google* case.

And the second responsive to that --

THE COURT:  Well, I thought the -- the problem is Sophos' assertion was in its reply brief here, wasn't it?

MR. STEIN:  Which assertion?

THE COURT:  Reliance on the Striegel report.

MR. STEIN:  We offered that report affirmatively and we relied on that in our motion, our opening motion.  But as far as the -- as far as what the Striegel report actually contains, I direct Your Honor to our reply brief where we do address the temporal element, and Dr. Striegel in his report, talks about products dating back at least to 40 OS 2.8 and including currently-marketed FortiGate products running 40 OS

5.2, and he says those products practice Claim 3 and 5 of the '125 patent.

And Dr. Striegel continues to talk about 40 OS 2.8, or later, practices all the limitations of Claim 26 of the '430 patent.

And there is no dispute in the record that I'm aware of that 2.8 was released December 9th, 2003, which preceded the suit by --

THE COURT: So there was reason to seek surrebuttal or to somehow respond?  Fortinet had a reason to respond and not just sit on it?

MR. STEIN: Yes.

MR. JAFFE: As you might imagine, I disagree with that statement in that --

THE COURT: Well, he does say, right -- he references 40 OS 2.8.

MR. JAFFE: And I think "references" is the exact right term here.  What we don't have is any mapping by Dr. Striegel of Version 2.8 to any claim language.

What we have is a bare reference and these kind of bare references by Dr. Striegel where he doesn't cite one line of source code, one piece of documentation, do any analysis for any limitation for Version 2.8 --

THE COURT: Well, the burden is identification, not necessarily proof.  Burden of proof, depending on which way you

take it, at least I agree with Judge Grewal, ultimate burden of proof lies with the patent holder.

So to say that he's got to map it now and show -- that goes a little beyond what I think the burden is.

**MR. JAFFE:** So if Your Honor is saying that they have identified in their reply brief for the first time this Version 2.8 and the issue is identification only and not whether that is sufficient to carry their burden, then I think the response would be that the only admissible evidence in the record is Fortinet's contention that it doesn't practice, and that stands unrebutted because if you're relying on Dr. Striegel report's reference 2.8, only for purposes of identification.

**THE COURT:** What's the evidence from Fortinet that it doesn't -- that, let's say, 2.8 does not practice Claim 26 or Claims 3 and 5 of the '125?

**MR. JAFFE:** Well, as Judge Grewal noted, it's proving a negative here. Our evidence is the absence of evidence that this -- of any contention or evidence in the record.

So for our part, there is no evidence in the record. We don't contend that we practice so there is --

**THE COURT:** That's where burden of proof comes in.

**MR. JAFFE:** That's right.

**THE COURT:** If you've got the burden of proof, it's your problem; if they've got the burden of proof, it's their problem.

**MR. JAFFE:** So in addition to the lack of any contention at all that we practice, there's also deposition testimony that we have from Dr. Striegel where we take issue with some of his analysis and we believe point out some errors in his analysis, which even though he's analyzing the wrong products, we believe is at least sufficient to raise an issue of fact here.

**THE COURT:** All right. I'll consider that.

Let me go on to Fortinet's motion for summary judgment and let me raise a couple of issues here.

One is the covenant not to sue question on -- that affects the validity with respect to the validity of Sophos '002, '050 and the '687 patents and the so-called midnight covenant not to sue which was offered does not state it's irrevocable, from what I could determine; does not expressly cover prior products; and does not expressly address indirect infringement and possible suit against customers, vendors, etc.

It seems to me that's problematic if what you want to do is obviate the whole question and prevent -- and remove jurisdiction from this Court to adjudicate the invalidity question, that covenant. Putting aside the timeliness of that covenant doesn't seem to go far enough.

**MR. STEIN:** Your Honor, I guess I'll address the couple points that -- the questions that you had in kind of one-by-one fashion.

Revocable -- I mean, the covenant that we gave them does not explicitly say "revocable" or "irrevocable." It says "unconditional." And I would submit I'm not aware of a condition where we would be able to revoke that if we say "unconditional." It's an unconditional covenant not to sue.

If you would prefer that the covenant says "irrevocable," I don't see an issue with adding the word "irrevocable" to it, but I submit to you that "unconditional" would encompass "irrevocable."

THE COURT: So the intent was irrevocable and you'd have no problem confirming that it is irrevocable.

MR. STEIN: Yes, Your Honor.

I believe Your Honor's second point related to was it past products versus current products?

THE COURT: Past products.

MR. STEIN: Sure. And the covenant says "currently existing products." And I think that if we look at the *Revolution Eyewear* case, the Court said there in all these cases, the covenants covered current products, whether they were produced and sold before or after the covenant. And that's -- again, that was our intent, was to cover products that Fortinet had sold in the past and that product Fortinet was currently making or selling.

THE COURT: What if they're not currently selling. They just discontinued it. I don't know if there is such a

thing that exists and it may not be a huge universe, but there is still initial liability sitting out there if it's within the limitations period.

MR. STEIN:  I would submit to you that's covered within currently-existing products.  If it was a product that they were selling during the context of this suit and they just stopped selling it, I would submit to you that that is within our intent and within the letter of the covenant.

THE COURT:  So any prior products, even if it's not currently offered for sale, was meant to be covered?

MR. STEIN:  Yes, Your Honor.

THE COURT:  And what about the direct versus indirect?

MR. STEIN:  And there, Your Honor, the covenant says we will not sue Fortinet for infringement of those patents, and I don't know how I'm supposed to sue Fortinet for indirect infringement if I've said I'm not going to sue them for infringement.  So --

THE COURT:  Well, the risk arises in some of these cases where there is a suit against a customer who then turns around and seeks indemnification back from, let's say, Fortinet so therefore if there is a potential legal obligation out there -- and I don't know if there is or not at this point -- but that -- that is a -- it could create a problem in terms of, again, removing this Court's jurisdiction.

MR. STEIN:  I think what the cases say is that such a

covenant like this would exhaust any ability of Sophos to assert these patents against Fortinet's customers for the subject matter that's covered.  And so if Fortinet sold a product to a customer and we're not going to ask Fortinet to answer for infringement and we give them the covenant, I'm not sure how I'm going to be able to ask one of Fortinet's customers by virtue of the fact that this covenant exists and that sale has been an allowed sale under this covenant.

THE COURT:  Well, so is there a reason not to make clear that the covenant extends to direct and indirect infringement and covers customers of Fortinet?

MR. STEIN:  As far as saying direct versus indirect infringement, I don't see an issue with saying we will not sue Fortinet for infringement, including direct and indirect infringement.

THE COURT:  And what about customers?

MR. STEIN:  I think the cases -- I'm not sure that the cases require specifically mentioning customers and I think that we could probably say customers.

THE COURT:  Okay.  I don't want to get you in too much trouble, but I'm trying to --

MR. STEIN:  I'm just trying to make Mr. Neukom's life a little easier.

THE COURT:  He's smiling.  If -- and I know this is now a past midnight covenant.  This is now a two o'clock in the

morning covenant.

If these clarifications were made and the covenant were offered, why wouldn't that obviate this issue?

**MR. NEUKOM:** A couple of reasons, Your Honor. Although -- I mean, look, as an initial matter, Fortinet appreciates what has just become the most generous, most gracious granting of rights by a lawyer on his feet for a patent holder in impromptu fashion. But unconditional is not the same as irrevocable. That is a matter of dictionary definition and what Professor Webster would teach us.

**THE COURT:** Let's say now they're going to --

**MR. NEUKOM:** He's going to say that now.

What I would like is, thinking in terms of case or controversy, Your Honor may have gleaned from this case that these two companies are pretty competitive with each other. And Fortinet has spent a quite massive amount of resources and attorney time and third-party experts showing that these three patents are not valid.

I think at best what we heard from counsel was direct and indirect will be included, customers will be included, current and past products will be included.

We want this -- look, I don't want to get too greedy here, but we want this patent, these three patents, invalidated. They were taken to us. We have fought over them for a year and a half. We have put together what we respectfully submit is

one heck of an invalidity argument on each of these patents for the asserted claims.  And Fortinet believes we're entitled to judgment on that basis.

I mean, all of the gracious offers that have been made here today, in a way I actually thought, Your Honor, from their brief, the most telling part of this covenant issue was not that the offered covenant failed to satisfy the *Super Sack* and its progeny standard numerous ways.  I thought the most telling aspect was that they asked Your Honor to dismiss without prejudice.

I mean, if this covenant, which was offered, is to have the scope that is being represented to this Court to have today, what's the harm in dismissal with prejudice so that Fortinet will never have to see these patents again in litigation?

But they didn't.  They went out of their way to make sure that it was an unconditional or non-irrevocable, whatever the case may be, covenant which preserved their ability on the face of the document to get a dismissal without prejudice on Monday and to file a new suit on Tuesday.

At least on the issue of future products, from Fortinet's perspective, there remains today a lot of case or controversy on the validity of these patents.

THE COURT:  Well, when you say "future" -- is there a concrete product that is at issue that is not a product now but

will be -- is there something specific?

MR. NEUKOM:  Not that I have in mind, Your Honor, although Fortinet rolls out new versions of its proprietary operating system on a quite regular basis.  That operating system is married to proprietary chips.  They are entering new markets all the time.  I think they just signed, a week or two ago, an agreement with Capgemini to undertake cyber breach forensic analysis for products.

Fortinet is releasing new hardware, new software, new service combinations on -- I don't want to overrepresent this to the Court, but I want to say on an almost monthly basis, if not a quarterly basis.

And if this covenant, even as it's been broadened today -- if Fortinet comes out with the next 40 OS version three months from now or they come out with a new design on an ASIC chip that's married to a new set of software, I don't think Mr. Whittle and Mr. Nelson want to see me in court again defending this patent a second time.

THE COURT:  All right.  What's your response to the dismissal without prejudice question and the future products?

MR. STEIN:  I think as far as if it -- if the Court would prefer it to be a dismissal with prejudice as to the currently existing and prior products, I think Sophos would be agreeable to that.

I didn't intend to lard up with or without prejudice, you

know, with all this necessarily.  What my intent there in writing "without prejudice" was that if there are future products that are not in existence today, that we would retain the ability to consider those products.

And to Mr. Neukom's point about future products, the declaration that Fortinet filed in this case was the same type of conclusory declaration that was at issue in the already Supreme Court case.

And the Federal Circuit has said that future theoretical possibilities of infringement are insufficient grounds for jurisdiction.  And in view of Mr. Crawford's declaration, sure, Fortinet might release things every two months, three months, but he doesn't say anything about what those future products may hold.  And that's why future -- this kind of theoretical future product is not enough to maintain it.

**THE COURT:**  All right.  Well, if this Court has not issued a substantive ruling on invalidity, it is still a live issue whether or not this is a live issue.

And although the Court should not be in a position to encourage midnight covenants not to sue for many of the reasons why you indicated in terms of people wasting resources, hedging their bets and this sort of thing, I think this Court retains discretion -- or I'm not even sure it's discretion.

If there is an adequate covenant not to sue done timely enough before any ruling, it seems to me that that is something

that is cognizable.

And with respect to future products, unless there is something concrete that can be pointed to, something specific for which there is a reasonable fear of litigation arising out of these same claims herein and the same patents that are at issue, it seems to me there's -- its problematic to argue that there is a case or controversy and I don't think that's been shown here.

So I'm going to do this.  I'm going to give you until tomorrow to make another proffer of your covenant not to sue, and I will evaluate it at that point, but you've heard what the Court's concern is and presumably you can make that and I want to see that covenant -- file it with the Court so we can see it, too, and then I'll make my determination on that.

MR. STEIN:  Thank you, Your Honor.

THE COURT:  All right.

And the last thing I just want to briefly touch on is the merits of the '587 and particularly whether or not there has been sufficient specificity here.  Assuming this is -- I treat this is as a means plus function claim and therefore there has to be something in the specification that describes the structure -- and I guess the question for you, Mr. Neukom, is they point to the descriptions that are contained -- the specifications, the Exhibits 2-A and B and C, I believe it is, and there's also various columns that sort of describe the

process of, for instance, copying data and sending it to the second processor, etc., etc.

So why isn't that adequate?  Why isn't that specific enough?

**MR. NEUKOM:**  Your Honor, I'm going to turn the podium over to Mr. Jaffe, but before I do, if I may, I have one very short comment or request of the Court on the covenant not to sue issue.

**THE COURT:**  Yes.

**MR. NEUKOM:**  I am assuming that after today's hearing, counsel is going to cooperate and we are going to come up with some sort of covenant not to sue which is broad enough that I don't feel comfortable arguing to this Court that it doesn't deprive you of jurisdiction.

Even in that case, once that covenant is offered up to this Court, I would ask Your Honor to look at the *Highway Equipment* case in which the Federal Circuit in 2006 held that even if there was a covenant which was sufficient to deprive the Court of jurisdiction, number one, the dismissal that would follow was a dismissal with prejudice, and, number two, that the Court still retains jurisdiction on the limited issue about whether the putative infringer effectively exonerated through the covenant is entitled to attorneys' fees under the relevant standard.

So we would -- I expect that counsel will be able to put

that covenant together and we won't have an objection to it. We will still be asking Your Honor for dismissal with prejudice and for jurisdiction over attorneys' fees.

THE COURT:  Well, and I've already said that -- if I didn't indicate that clearly, it seems to me that it's got to be dismissal with prejudice because if it's really irrevocable, the proof is in the pudding.  How that has any implication in terms of prevailing party status, that is something you can either work out or I will have to deal with at some point.  But I don't -- that could well be part of your discussion process but not necessary at this time; in other words, that could be resolved later if you all don't resolve that.  Okay.

MR. NEUKOM:  Thank you.

MR. STEIN:  Thank you, Your Honor.

THE COURT:  So just briefly on the '587, just --

MR. STEIN:  Your Honor, are you referring to the indefiniteness issue?

THE COURT:  Yes.  Right.

MR. JAFFE:  So I think Your Honor's question was on the indefiniteness issue.  So I think Fortinet's initial position is that the Court doesn't need to actually reach the indefiniteness issue because there has been a failure of proof on non-infringement.

So we think the best course and the easiest course and most efficient course here is a finding of non-infringement and

then the Court doesn't need to reach the indefiniteness issue.

With that said, I'm happy to answer the Court's questions on the indefiniteness issue specifically.

**THE COURT:**  All right.  So what about that?  Why is it not indefinite or why do you think it is indefinite in light of the various descriptions contained in the detailed description of the preferred embodiment, as well as Figures 2-A, 2-B, 2-C?

**MR. JAFFE:**  So I think -- backing up.  What we have here is means plus function, and there are particular requirements for means plus function in the software context.

And what *Aristocrat* and the cases that follow on that show is you need to have an algorithm described in the specification which performs the cited function.  So that's the context that we're living in here.

And there is no dispute, I think, from Sophos' counsel that that is the world we're living in.  So for there to be sufficient definiteness here under Section 112, what they have to show is an algorithm.

**THE COURT:**  Let me stop you there.  Do you disagree with that, that in the software context, there has to be some articulation of the actual algorithm?

**MR. STEIN:**  I do disagree with that, Your Honor.  And I think the world in which we're living is a world in which the parties did not put these terms on their top 10 list for the Court to consider and to adjudge the appropriate claim

construction, and so we're living in a world where we have plain and ordinary meaning of a means-plus-function claim which has been interpreted by the experts to have various definitions.

And so while the *Aristocrat* case and the others may talk about when you have a general purpose computer performing the function that's claimed, then an algorithm is required. And I think what the evidence shows is at least from Mr. Stillerman's perspective, there's structure disclosed in the specification that corresponds to this particular limitation.

And I think that the evidence also shows that Fortinet's expert agrees that there is structure in the specification corresponding to the claim function for this limitation that they're now saying is indefinite.

**MR. JAFFE:** I would just take issue with one part of that. Mr. Stillerman has -- did not identify -- and this gets to the non-infringement motion, but Mr. Stillerman did not identify corresponding structure.

And then to counsel's first point where he said that there -- he doesn't admit that there is an algorithm, Sophos proposed these terms in Claim 9 for construction. They admit that they are subject to 112(6) and they proposed constructions that include both a physical thing, which is required under the statute, but also an algorithm, a piece of software that went with it.

So while counsel may disagree as a general matter whether an algorithm is required, I don't think there is a real dispute here as to what world we're living in in the context of these claims.

THE COURT:  The fact that the language -- this is Claim 9 that we are dealing with -- says "comprising means in a first data processor of the network for providing a second data processor of network with a copy of an item of data," etc., etc.

Is there significance to the word "in" at all, "means in" as opposed to "means by" or "of"?

MR. JAFFE:  Well, I think the presumption because the word "means" is in there, we start from the presumption that it's subject to 112(6).

THE COURT:  I understand that.

MR. JAFFE:  And there hasn't been any rebuttal on that point.  So from starting from there, to answer Your Honor's question directly, is there an effect that it says means -- not "means for," it says "means for something else," the answer is no.  "Means" is still a word which has no structural connotation which puts us in the land of Section 112 now F.  It used to be 6.

THE COURT:  But the term "in" is not -- there is nothing special about that when it says --

MR. JAFFE:  No, Your Honor.

**THE COURT:** It's the "means" that triggers 106?

**MR. JAFFE:** Well, "means" and a recited function thereafter.

**THE COURT:** Recited function.

You're saying if you look at 2-A, 2-B, which at least describes in a schematic way what is being done, you calculate a cryptographic checksum for the item with the checksum of that on the previously-checked item, copy item to a central server, etc., etc. It's almost like a schematic of function. That is not enough. That's not enough structure. You've got to have an algorithm?

**MR. JAFFE:** I think there is two issues there. One is that Figure 2-A -- and the Patent Office looked at this exact issue.

Figure 2-A merely recites the function again. And there has been a number of cases which have held that merely parroting the function in the specification is not sufficient to show an algorithm.

The second part is Figure 2-A does not sufficiently actually disclose performing the recited function here. It's talking about checksums. It's not talking about providing a copy, which is something different.

**THE COURT:** Well, it goes on to say, "If the answer is no, third step, copy the item to a central server where it will be scanned for data or characteristic forms. Wait for a

reply."

Your take is that is simply a description of the function.

MR. JAFFE: That's right, Your Honor. In fact, if you look at the -- if you compare the claim language and what Sophos in its joint claim construction statement agrees is the recited function here and you compare that to the box that you're talking about in Figure 2-A, substantively they are basically parallel. There is no further information in Figure 2-A than what is already cited in the claim language itself.

THE COURT: What's your response to that?

MR. STEIN: My response to that would be twofold, I think.

First, there is no -- Fortinet hasn't put forth any evidence that one of ordinary skill in the art would read this patent and not be able to understand what it covers. There is no evidence in the record of that.

And actually the only evidence in the record is that one of ordinary skill in the art, according to Fortinet's expert, does think there's sufficient structure in the specifications. So on that basis alone, the issue of indefiniteness should be done with.

And, two, if Fortinet wanted to, you know, play gotcha with a claim construction argument, which is what they're doing at this stage, they should have asked for this term to be construed in their top 10 list, and this is kind of what

happened in the Apple/Samsung case.

In the Apple/Samsung case, Samsung wanted to claim priority to a prior Korean patent application, and in order to do that, they had to construe a term in their U.S. patent as broad enough to encompass a disclosure in the Korean patent application.

Without that subject matter being disclosed in the Korean patent application, Samsung could not retain the earlier filing date of that application, and Judge Koh said, "If you want to make it a claim construction issue now, you should have put it on your list and I would have considered it at the appropriate time."

And so if Fortinet wanted to argue that as a matter of claim construction there's no infringement or as a matter of claim construction, the claim is indefinite, then the time for that has passed.

**THE COURT:**  Is that the only way you can win an indefinite argument, is through the lens of a claim construction process?

**MR. STEIN:**  I don't think it's the only way, Your Honor, but I think that in terms of what the evidentiary record shows and what Fortinet would be able to put on at trial, is at this point closed.

They have no expert testimony that says how someone of ordinary skill in the art would read this, other than what

their expert has already admitted, which is this function and this claim limitation has adequate structure disclosed in the specification.

THE COURT:  What about that admission?

MR. JAFFE:  Dr. Crivello was analyzing from a prior art perspective whether the claims were invalid.  Sophos' position is essentially that Fortinet had to waive asserting a prior art defense to this claim instead of if it wanted to pursue indefiniteness.  And I don't think that is right.

I think we can both contend it is invalid under Section 102 and 103 and have our expert opine on that as best as he can, and I think if you look at the deposition testimony that they cite from Dr. Crivello, what he says is, "I did the best that I can."  And that is not an admission that there is sufficient corresponding structure for indefiniteness, which is a question of law.

The one point I want to make on the top 10 issue, the irony here as I'm looking at our top 10 is included in Fortinet's terms is one of the patents that they just tried to covenant not to sue us.  So if we're talking about gotcha moments, the idea that we should have put it on our top 10 when they were forcing us to litigate that they were going to throw a midnight covenant not to sue at us I think readily demonstrates the prejudice of this issue.

THE COURT:  I'm not going to put a lot of weight on

whether it made the top 10 or not.  I don't think that is dispositive.  I'm more interested in the merits of this.

MR. JAFFE:  The other issue I would note is as a practical matter, in that -- the same Apple/Samsung case, the most recent one, there was some means plus function claims which were not construed in the top 10 terms.  And it turned out those claims were going to trial, and what Judge Koh actually did is she construed them immediately before trial to allow the patentee to go onboard.  So the idea that we're foreclosed from construing --

THE COURT:  No.  I understand that.  Just because you pick 10 doesn't mean that there's not more work to be done in that regard.

All right.  I will take the matter under submission. Thank you.

Let me ask, before you leave, I know we don't have a case management conference scheduled, but as trial approaches, do you have any more ADR plans or sessions?

MR. NEUKOM:  Judge Infante, Your Honor, who I think was the magistrate judge in the *Imax* case so he has been on my mind this morning -- but Judge Infante is the court-appointed mediator in this dispute.  The parties have had a number of meetings with His Honor.

I don't believe that Judge Infante has filed any paperwork indicating that the mediation is concluded, meaning that he

believes he's unable to get a deal done.  But as to the specific status of the settlement talks, Judge Infante threw Mr. Cunningham and I out of that process a month or two ago, so I believe it's ongoing, but I couldn't give Your Honor many more details than that.

MR. CUNNINGHAM:  Just so the record is clear, counsel said court-appointed.  I believe Judge Infante was someone that we agreed to privately.

MR. NEUKOM:  Yes.  The parties stipulated that Judge Infante should be the proper choice for a court-ordered mediation session.

THE COURT:  Good.  All right.  Well, you know my feelings on these things.

MR. CUNNINGHAM:  Thank you, Your Honor.

THE COURT:  Thank you.  Good luck.

(Proceedings adjourned at 2:50 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, October 12, 2015

*Pamela A. Batalo*

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
U.S. Court Reporter